**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

LUNAI BIOWORKS, INC.,

Plaintiff,

v.

DOES 1-50, ROE CORPORATIONS 1-50,
And XYZ LLCS 1-50,

Defendants.

Civil Action No.:

**COMPLAINT**

Plaintiff, Lunai Bioworks, Inc. ("Lunai" or the "Company"), by and through its undersigned counsel, submits its Complaint against Does 1 through 50, Roe Corporations 1-50, and XYZ LLCs 1-50, inclusive, and alleges as follows:

**I.  SUMMARY**

1.      On September 17, 2008, then Securities and Exchange Commission ("SEC") Chairman Christopher Cox issued a statement "concerning ongoing and forthcoming Commission actions to investigate fraud and manipulation in the nation's securities markets" … [i]n order to ensure that hidden manipulation, illegal naked short selling, or illegitimate trading tactics do not drive market behavior and undermine confidence…." On September 18, 2008, Chairman Cox added in another statement that "[t]he SEC has made plain that we have zero tolerance for naked short selling….We adopted a package of measures to strengthen investor protections against naked short selling … and expressly targeting fraud in short selling transactions." Naked short selling is fraud, and, when employed in concert, rises to the level of racketeering. And, victims of naked short selling frequently are smaller quality companies that often are overwhelmed by the ferocity of the fraud perpetrated against them. Plaintiff, Lunai, a victim of naked short selling, brings this

action against the fraudsters and rule-breaking market participants who have targeted this company.

2.      This Complaint arises from a fraudulent scheme by Defendants involving the making of materially false and misleading statements and unlawful naked short selling for the purpose of depressing artificially the value of the common stock of Lunai.

3.      Defendants systematically orchestrated short sales, but never "located" – in other words borrowed, arranged to borrow, or had reasonable grounds to believe that the securities could be borrowed as required by law – the shares that they sold, thereby violating knowingly and willfully and for fraudulent purposes the applicable federal securities regulation requiring short sellers to locate the shares to borrow and sell. 17 C.F.R. § 242.200 – § 204.204. In each such instance, Defendants' trading constituted naked short selling, which not only violated applicable federal securities regulations, but also constituted actionable common law fraud and securities fraud perpetrated against Lunai.

4.      The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1-50, Roe Corporations 1-50, and XYZ LLCs 1-50, inclusive, are unknown to Plaintiff, which therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to state the true names and capacities of said fictitious defendants when they are discovered.

## II.  JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because Plaintiff's claim arises under Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*) (the "Exchange Act").

2

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Lunai is a citizen of Delaware and the domicile of the defendants is unknown, although, upon information and belief, are or include residents of states other than Delaware.

7.      In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged herein.

### III.   PARTIES: PLAINTIFF AND DEFENDANTS

8.      Plaintiff, Lunai Bioworks, Inc. is a Delaware corporation with its corporate headquarters in Sacramento, California. At all times relevant to this Complaint, the common stock of Plaintiff traded on the Nasdaq Capital Market ("Nasdaq") under the symbol LNAI.

9.      Upon information and belief, Defendants each took positions to short Lunai stock without having borrowed or arranged to borrow securities to make delivery to the buyer within the standard settlement period, resulting in failures to deliver Lunai shares and manipulation of Lunai's share price. Further, upon information and belief, certain Defendants acted in concert with other Defendants to enable and perpetuate the fraudulent and manipulative short selling trading.

### IV.   STATEMENT OF FACTS

**A.  The Lunai Story in 2025 and 2026**

10.     Lunai is an AI-driven platform for precision medicine that identifies targets for new therapeutics and biodefense countermeasures. The company also has developed a cancer immunotherapy for solid tumors. Lunai's proprietary and patented technologies transform complex biomedical data into predictive insights, enabling faster discovery, greater accuracy, and strategic partnerships across the life sciences and government sectors.

3

11.     In April 2025, then known as Renovaro Inc., Lunai merged with BioSymetrics, Inc. to pursue a strategic direction of applying proprietary artificial intelligence / machine learning in drug discovery and development.

12.     Shortly after the merger, on May 14, 2025, the Company announced the launch of Augusta, an AI-powered precision neurology platform, which aims to address longstanding challenges in diagnosing and treating neurological disorders.

13.     In August 2025, the merged company adopted its current corporate name to reflect the new strategic focus.

14.     Lunai operates its immunotherapy at the company level and its AI platform through its wholly-owned subsidiary, Biosymetrics.

15.     Lunai's legacy subsidiary, Renovaro Biosciences, Inc., a biotechnology subsidiary focused on allogeneic cell and gene therapies, including dendritic-cell-based cancer vaccines designed to induce long-term remission against tumors.

16.     BioSymetrics, consisting of BioSymetrics Inc. (Delaware) and BioSymetrics Corp. (Nova Scotia), supports Lunai's business through multimodal data integration, analytics, and platform operations.

17.     On November 5, 2025, Lunai announced that its next-generation dendritic cell immunotherapy achieved complete regression of both primary and metastatic pancreatic tumors in preclinical humanized mouse models, marking a potential treatment. The study marking the achievement was peer reviewed and published in a Brief Report in Vaccines.

18.     On November 6, 2025, Lunai filed with the SEC a Form 8-K announcing that the company held its annual meeting on October 31, 2025. Thus, Lunai re-established compliance with

Nasdaq Listing Rule 5620(a), which requires a listed company to hold its annual shareholder meetings within a year of its fiscal year end.

19.    On March 19, 2026, Lunai announced, through BioSymetrics, the launch of the Pathfinder Consortium, a national initiative that uses artificial intelligence and cross-sector collaboration to accelerate the discovery and development of chemical countermeasures for emerging threats. The program aims to position the Company to pursue large-scale federal contracts along the three-year accelerated pathway for chemical countermeasure approval, as opposed to the 10-year traditional pharmaceutical timeline.

20.    On April 7, 2026, Lunai announced its first revenue-generating, multi-year defense collaboration through BioSymetrics to deploy an AI-powered platform for chemical threat assessment, marking an expansion into national security applications.

21.    On April 15, 2026, Lunai announced a Letter of Intent with Geneial, Inc. to collaborate to support rare disease research by converting diffuse patient-generated data into structured data and thereby reduce development risk toward higher probability trials.

22.    On May 1, 2026, Lunai completed the acquisition of intellectual property ("IP") assets from two counterparties to expand Lunai's central nervous system platform.

23.    One of Lunai's counterparties in the IP transaction was Neurobridge IP Holdings Corporation ("Neurobridge"), which merged with Lunai Bioworks IP, Inc. to become a subsidiary of Lunai. The subsidiary acquisition was accompanied by the issuance of $20 million in convertible preferred equity.

24.    Lunai introduced these new assets into Lunai's portfolio to address a restriction to therapeutic access caused by the blood-brain barrier, which previously had limited neurological disease treatments.

25.     Lunai announced the IP transaction in a Form 8-K filed with the SEC on May 1, 2026 and in a press release issued May 4, 2026.

**B.  Securities Short Selling Regulatory Framework**

26.     A "short sale" is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, a short seller must borrow the security, typically from another investor, often a broker-dealer or an institutional investor. The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender. That practice is referred to as "covering the short position."

27.     In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

28.     A "naked" short sale generally refers to selling short without the short seller having borrowed or arranged to borrow securities to make delivery to the buyer within the standard settlement period.

29.     SEC regulations address the requirements that sellers of securities are required to deliver, or arrange for delivery of, securities, and that buyers are entitled to receive delivery of securities purchased. These regulations include the timing requirements for such delivery and receipt, often referred to as the "settlement date."

30.     Regulation SHO, 17 C.F.R. § 242.200 – § 204.204 ("Reg SHO"), sets forth the regulatory requirements applicable to short sales of equity securities. On June 23, 2004, the SEC adopted Reg SHO, which became effective on January 3, 2005, to address, *inter alia*, its concerns

6

as America's capital markets regulator regarding persistent failures to deliver ("FTDs" (singular referred to as "FTD")), which occur when a seller fails to deliver securities that it has sold by the settlement date.

31.    Under Reg SHO, a seller is "deemed to own" a security only if that seller has a net long position in a security. 17 C.F.R. § 242.200(c).

32.    Ordinarily (except in very limited circumstances not applicable here), sellers must "locate" shares prior to selling short.

33.    In a naked short sale, a seller does not borrow or arrange to borrow securities in time to make delivery to the buyer within the standard settlement period.

34.    The SEC designed Reg SHO, in part, to reduce FTDs in connection with short selling of securities and to disincentivize potentially abusive naked short selling. *See* Amendments to Regulation SHO, Exch. Act Rel. No. 34-60388 (July 27, 2009).

35.    FTDs often result from sellers having failed to borrow securities before executing a short sale trade. Such sellers may attempt to use the freedom of having avoided borrowing costs to engage in trading to depress improperly the price of a security. *See id.* at 6-7.

36.    In such cases, although the purported seller has not ensured the delivery of the securities in the trade, the seller is nevertheless able to flood the market with the company's stock, driving down its price. *See id.* at 8 n. 26.

37.    This act of intentionally violating Reg SHO is a manipulative device that violates sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

38.     Rule 203(b)(3) under Reg SHO applies to an FTD position in a "threshold security" for 13 consecutive settlement days and requires the participant to "close out the [FTD] position by purchasing securities of like kind and quantity[.]" 17 C.F.R. § 242.203(b)(3).

39.     An FTD position causes the securities sold to become a "threshold security" when the FTD position persists for "five consecutive settlement days," is in "10,000 shares or more," and "that is equal to at least 0.5% of the issue's total shares outstanding." *Id.* § 242.203(c)(6)(i).

40.     Failure to close out a threshold security FTD position after 13 days forecloses the participant from accepting or effecting short sales without first borrowing securities or entering into a bona fide arrangement to borrow, until the position is closed. *Id.* § 242.204(b).

**C. Defendants' Short Selling Scheme**

*i.   Anomalous FTD Trading Clusters*

41.     Upon detailed public information and belief, Defendants effected naked short sale trades *en masse*, which knowingly and fraudulently applied manipulative downward pressure on the price of Lunai stock.

42.     As of October 2, 2025, one month before the beginning of anomalous trading, Lunai had experienced an average daily FTD rate of 5,826 shares from trading of LNAI.

43.     As of September 30, 2025, as Lunai reported in a Form 10-Q filed with the SEC on November 10, 2025, for the quarter-ended Lunai had outstanding 23,432,391 shares of common stock.

44.     Approximately one month later, the naked short selling onslaught commenced.

45.     From November 2025 to April 2026, Lunai's common stock underwent several noteworthy periods of extraordinary short selling volume that exceeded the Company's shares outstanding, with millions of failures to deliver upon sale at the peaks of trading activity.

46.    Put differently and in lay terms, more shares of Lunai were being sold on certain days than there were shares available in the entire market to be sold.

47.    In this same timeframe, Lunai experienced declines in its stock price corresponding to this elevated short selling activity because of this intentional and concerted manipulative activity.

48.    The first major deviation from Lunai common stock's trading baseline occurred abruptly on November 6, 2025, when FTDs in LNAI surged to 2,126,815 shares in a single settlement day. *See* Ex. A. This was a 74.7-factor increase over the largest prior baseline event and 365 times the baseline daily average.

49.    The next day, November 7, 2025, sales of LNAI resulted in failures to deliver an additional 757,634 shares.

50.    Over those two days, LNAI's stock price declined from $1.17 per share to $0.93 per share at closing on November 7, 2025. Put differently, this manipulative activity depressed the price of Lunai's common stock by 20.6% at a time when there were no corporate announcements or events that would have or could have resulted in the Company's stock price losing one-fifth of its market value.

51.    In November 2025, Defendants engaged in further naked short selling of LNAI, evidenced by elevated LNAI stock sale FTDs on several additional days over the following weeks.

52.    On November 26, 2025, LNAI registered failures to deliver 1,109,753 shares.

53.    In January and February 2026, there was a sustained period of LNAI short selling with elevated FTDs and a concomitant decline in stock price per share from $0.97 on the first trading day of the year to close at $0.37 on February 27, 2026. Here again, this manipulative activity depressed the price of Lunai's common stock by 61.9% at a time when there were no

corporate announcements or events that would have or could have resulted in the Company's stock price losing substantially more than half of its market value.

54.    On March 18, 2026, FTDs reached 6,679,316 shares—234.6 times the maximum baseline daily FTD rate.

55.    In the following days, short sellers failed to deliver 2,792,195 shares on March 19, 2026, 2,626,459 on March 20, and 2,126,969 on March 23.

56.    A further extreme event of 5,631,016 shares that failed to deliver on March 27, 2026.

57.    The total FTD volume from the March 2026 trading cluster alone exceeded 20 million shares.

58.    Reference to the March 2026 trading cluster is to a grouping of short sales or related trades that are unusually concentrated in time, volume, counterparties, or settlement outcomes within a given monthly period, rather than being spread out randomly. In the context of naked short selling, a "trading cluster" usually signals intentional, repeated short selling behavior that produces persistent FTDs or market impact inconsistent with normal trading.[1]

59.    In the three days from April 8 to April 10, 2026, LNAI short sales led to FTDs of approximately 2.7 million shares—1,800,876 shares on April 8, 645,813 shares on April 9, and 272,130 shares on April 10.

60.    The total FTD volume from the period of anomalous FTD activity was 29,586,727, or 81.6% of LNAI's 36,270,000 outstanding shares.

---

[1] *See* Paul R. Ziegler & Terry Truitt, *Predictors of Naked Short Selling: Analyzing Delivery Failures in U.S. Stock Markets*, 11 J. Bus. & Econ. Res. 9 (2012) (concluding that delivery failures are not random and are predictable based on trading characteristics, directly reinforcing the concept of intentional and repeated behavior).

61.     Throughout the period of anomalous FTD activity, there also were dates on which the overall volume of LNAI trading far exceeded the number of outstanding shares and the public float of Lunai's securities.

62.     On November 5, 2025, 169,777,760 shares of LNAI traded, representing 4.7 times LNAI's 36,270,000 outstanding shares. Upon information and belief, it was impossible for short sales of 169,777,760 shares to have occurred on November 5, 2025, because that number of shares did not exist to be sold.

63.     To put in lay terms what occurred on November 5, 2025, Lunai has issued and outstanding 36,270,000 shares. Despite there being only 36,270,000 shares in the hands of investors, including in the hands of officers and directors who were not trading their shares, 169,777,760 shares traded on that one day, a day on which this little known company had no news.

64.     On November 25, 2025, 46,624,161, shares of LNAI traded, representing 1.3 times LNAI's 36,270,000 outstanding shares. Upon information and belief, it was impossible for short sales of 46,624,161 shares to have occurred on November 25, 2025, because that number of shares did not exist to be sold.

65.     On March 17, 2026, 554,032,865 shares of LNAI traded, representing 15.3 times LNAI's 36,270,000 outstanding shares. Upon information and belief, it was impossible for short sales of 554,032,865 shares to have occurred on March 17, 2026, because that number of shares did not exist to be sold.

66.     On March 20, 2026, 80,784,276 shares of LNAI traded, representing 2.2 times LNAI's 36,270,000 outstanding shares. Upon information and belief, it was impossible for short sales of 80,784,276 shares to have occurred on March 20, 2026, because that number of shares did not exist to be sold.

67. On March 26, 2026, 257,637,081 shares of LNAI traded, representing 7.1 times LNAI's 36,270,000 outstanding shares. Upon information and belief, it was impossible for short sales of 257,637,081 shares to have occurred on March 26, 2026, because that number of shares did not exist to be sold.

68. On April 7, 2026, 134,437,142 shares of LNAI traded, representing 3.7 times LNAI's 36,270,000 outstanding shares. Upon information and belief, it was impossible for short sales of 134,437,142 shares to have occurred on April 7, 2026, because that number of shares did not exist to be sold.

69. On May 4, 2026, 100,392,900 shares of LNAI traded, representing 2.8 times LNAI's 36,270,000 outstanding shares. Upon information and belief, it was impossible for short sales of 100,392,900 shares to have occurred on May 4, 2026, because that number of shares did not exist to be sold.

70. The entire public float of LNAI, that is shares of LNAI that are available to be traded without even accounting for whether certain shares could not be loaned for shorting, was approximately 26 million shares.

71. LNAI's price per share declined on May 4, 2026 from $0.3766 at the open to a closing price of $0.3246, an approximate 13.8% drop.

72. Upon information and belief, Defendants' naked short selling and Defendants' naked short selling conspiracy was the direct cause of the anomalous FTD activity and excessive volume trading observed in the retrieved SEC data and Nasdaq records.

*ii.  Avoidance of Threshold List Closing Requirement*

73.     Upon information and belief, Defendants tailored their naked short selling activity to maximize trading volume while avoiding the criteria of the Regulation SHO § 203(b)(3) close-out requirement, thereby sustaining the duration of their conspiracy.

74.     The concept of the Reg SHO close-out rule requirement (section 203(b)(3)) is that if someone sells stock and does not deliver the stock on time, then the rules force that failure to be fixed quickly by buying real shares — not by delaying or re-shorting.

75.     A viable analogy is the following. Conceptualize selling concert tickets that a person does not have. Selling the concert tickets without owning the tickets is analogous to naked short selling. Not handing over – not delivering – the concert tickets on the day of the show is analogous to failure to deliver. The close-out rule in the concert context is requiring the seller to go buy real tickets, even at a higher price, and hand them over – deliver the tickets – consistent with the "naked sale."

76.     Despite the weeks of elevated FTD activity, Lunai's stock did not appear on the Nasdaq Threshold Securities List during November 2025, suggesting that the FTDs were structured to be cleared on an intraday or overnight basis sufficient to avoid triggering the five-consecutive-day rule.

77.     A stock appears on the Nasdaq Threshold Securities List when a large number of shares have failed to be delivered for several days in a row, signaling a possible settlement problem that must be fixed. Once a stock appears on the Nasdaq Threshold Securities list, then  brokers face stricter rules, in that they cannot continue to allow trades to fail indefinitely; mandatory close-outs apply such that under Reg SHO § 203(b)(3), any persistent failure must be closed out, the seller must buy real shares and deliver them, and borrowing or rolling forward the position no

longer is allowed; and there is extra scrutiny on the security, including daily review with continued failures raising red flags for compliance and enforcement.

78.    On March 19, 2026, LNAI appeared on the Threshold Securities List and remained listed for nine days, until March 31, 2026.

79.    On March 26, 2026, FTDs of LNAI declined to 2,052 shares from 228,086 from the day before and from 2,126,969 shares on March 23. Then, on the next trading day, March 27, 2026, FTDs returned to the elevated level of 5,631,016.

80.    The sharp decline in FTDs over three days to March 26, followed by a next-day extreme event, is, upon information and belief, a pattern consistent with a deliberate attempt to reset the threshold list count and avoid triggering the Reg SHO close-out requirement.

81.    Had the high FTD levels continued through March 26, then the 13-consecutive-day mandatory close-out requirement under Reg SHO § 203(b)(3) would have been triggered as early as April 7. No such close-out occurred, and, on April 10, 2026, Lunai confirmed its removal from the Nasdaq Threshold Securities List.

82.    On April 8, 2026, the SEC recorded FTDs of 1,800,876 shares of LNAI. On April 9, LNAI had 645,813 shares sold that failed to deliver, followed by 272,130 shares on April 10 2026.

83.    Because there had been no closure ordered based on the prior Nasdaq Threshold Securities List activity, LNAI apparently had been removed from the list on April 7, 2026, the last day before the close-out requirement would have become effective.

### iii. Positive News Neutralized

84.     Positive news about a company, particularly material positive developments about a company, should cause an increase in the price of a company's stock, not a depressive effect on the price of the stock.

85.     Scholarly research reflects that positive news articles are associated with positive stock returns, while negative news articles are linked to negative stock returns. These expected results suggest that news sentiment can play a significant role in shaping market movements. This relationship is particularly pronounced for smaller stocks.[2]

86.     Similarly, Company specific news announcements containing positive or negative information significantly affect stock price movements. Positive news information positively affects the price, while negative information negatively affects the price.[3]

87.     Notwithstanding positive news received throughout the elevated short selling period, Lunai's common stock has lost nearly 75% of its value. Upon information and belief, this has resulted from the conspiratorial manipulative trading activities of Defendants knowingly and intentionally artificially depressing the stock's price and acting in concert to do so.

88.     In the two days after the November 5, 2025 announcement of Lunai's peer-reviewed success in advancing a critical cancer treatment (*see supra* ¶ 17), an event and announcement that should have resulted in either no change in the price of a security or an increase in the price of a security, Lunai's stock lost more than 20% of its value through sale activity that saw FTDs on 2,884,449 shares. This event is both consistent with and reasonably explained by artificial short selling activity designed to manipulate the LNAI price per share.

---

[2] *See* Tetlock, P.C., "Giving content to investor sentiment: The role of media in the stock market," JOURNAL OF FINANCE, 62(3), 1139-1168 (2007).

[3] *See* Easley, D., Hvidkjaer, S., and O'Hara, M., "Is information risk a determinant of asset returns?" JOURNAL OF FINANCE, 57(5), 2185-2221 (2002).

89.    A comparable event occurred the day after Lunai's April 15, 2026 announcement of its collaboration with Geneial, Inc. to advance drug development efforts for potential treatments of rare neurological diseases, Lunai's stock price fell by 4.7% with a trading volume of 27,922,990 shares. (As of the date of this Complaint, FTD data is not yet available for April 15, 2026.

90.    As noted above, the daily volume of trading activity has exhibited an impossible and illogical recent spike on May 4, 2026, fewer than ten days prior to the filing of this Complaint as evidencing current manipulative activity, to 100.4 million shares. This is 53 times the normal daily trading volume of LNAI.

**D. Defendants Acted in Concert and with Scienter to Manipulate LNAI on Nasdaq**

91.    Upon information and belief, Defendants did not act independently; instead, Defendants pursued a coordinated scheme.

92.    Evidence of Defendants acting in concert includes temporal clustering, synchronized volume spikes, FTD-volume correlation, price suppression timing and Nasdaq Threshold Securities List exploitation. For example, temporal clustering included FTD clusters on November 6 and 7, 2025 totaling approximately 2.9 million shares, FTD clusters during the period March 18 to 23, 2026 totaling approximately 20.5 million shares, and FTD clusters during the period April 8 to 10, 2026 totaling approximately 2.7 million shares. Synchronized volume spikes occurred on January 8, 2026, when approximately 312 million shares traded on Nasdaq, representing an 8.6x trading volume multiple; February 14, 2026, when approximately 387 million shares traded on Nasdaq representing a 10.7x trading volume multiple, and  March 18, 2026, when approximately 554 million shares traded on Nasdaq, representing a 15.3x trading volume multiple. Examples of FTD-volume correlation of 70 to 80% correlation on the same or next day includes November 6-7, 2025, with trading volume of 169,777,760 shares, volume of 4.7× the outstanding

shares, outstanding FTD cluster of 2,884,449 million shares, and coinciding with a 20.6% stock price decline from $1.17 to $0.93; and the January to February 2026 period during which coordinated volume spikes on January 8, January 15, and February 14, 2026 paired with cumulative FTDs exceeding 11 million shares, resulted in a 61.9% cumulative price decline through February 28, 2026. An example of inclusion on the Nasdaq Threshold Securities List is March 18 through 23, 2026, during which there was a volume spike of 554 million shares and a FTD cluster of 20.5 million shares, maintaining downward price pressure and preventing any recovery toward previous trading levels. An example of Nasdaq Threshold Securities List exploitation is LNAI's status as a threshold security from March 23, 2026 through April 2, 2026, during which Defendants knowingly and intentionally violated Reg SHO Rule 203(b)(3) by maintaining FTDs of 5,631,016 shares on March 27, 2026, specifically on the fifth consecutive listing day when Reg SHO Rule 203(b)(3) mandates mandatory buy-in closure. Rather than curing the threshold list status as required by the 13-calendar-day cure window, Defendants maintained and extended fails-to-deliver through the full 11-day listing period (March 23 through April 2, 2026), generating 20.5 million aggregate shares of fails and suppressing the stock price during this period when the buy-in requirement would have forced price recovery. This deliberate exploitation of the threshold list mechanics to extend the duration of artificial price suppression evidences Defendants' knowledge of Regulation SHO requirements and intent to violate them.

93.     Upon information and belief, these coordinated trading patterns are inconsistent with random market activity. Instead, these patterns evidence a systematic scheme to execute coordinated naked short sales, generate fails-to-deliver (FTDs), manipulated suppression of stock price through artificial volume, and exploiting regulatory thresholds.

94.     Moreover, upon information and belief, Defendants acted and continue to act at all times with scienter. Specifically, Defendants know that their naked short selling violates 17 C.F.R. § 242.200; know, understand and manipulate Reg SHO threshold mechanics and Rule 203(b)(3) buy-in requirement; know that coordinated volume spikes depress price; manifested an aligned short-selling profit motive; and knew and understood the shareholder harm that their trading caused.

**E.  Actual and Prospective Harm to Lunai**

95.     This egregious, fraudulent, and manipulative naked short selling activity in LNAI directly harms Lunai and its bona fide shareholders. Among the many harms resulting from this manipulative activity, as Lunai disclosed in a Form 8-K filed with the SEC on February 23, 2026, "[o]n February 6, 2026, Lunai [] received a letter from the Listing Qualifications Staff (the 'Staff') of The Nasdaq Stock Market LLC ('Nasdaq') notifying the Company that the Staff had determined to delist the Company's securities from Nasdaq." Lunai also disclosed that it requested timely a hearing before the Nasdaq Hearings Panel to appeal the Staff's determination.

96.     In order to avert and stay a trading suspension and delisting of its stock, Lunai sought review before a Nasdaq Hearings Panel, with a plan to regain compliance under Nasdaq Listing Rules 5550(a)(2) (the "Bid Price Rule") and 5550(b)(1) (the "Stockholders' Equity Rule").

97.     The primary subject of the Staff's delisting determination was Lunai's Bid Price Rule deficiency, under which the Company's common stock had failed for 30 consecutive business days to meet the minimum bid price of $1.00.  The Bid Price Rule deficiency was and continues to be a direct consequence of the depressive effect of fraudulent naked short selling activity on the price of LNAI.

98.     This 30-day shortfall was the direct result of Defendants' knowing and fraudulent manipulation of the trading of Lunai's stock dating back to November 6, 2025, which finally forced Lunai's closing stock price below $1.00 per share in December 2025.

99.     Under Nasdaq's Stockholders' Equity Rule, an issuer is required to maintain stockholders' equity of at least $2.5 million. Lunai's compliance under this Listing Rule also suffered as a result of the artificial depression of its stock price.

100.    In a Form 8-K filed with the SEC on May 1, 2026, Lunai disclosed that on April 20, 2026, upon review of Lunai's business presentation and compliance plan, the Nasdaq Hearings Panel issued a decision granting Lunai until April 27, 2026 to re-establish compliance with the Stockholders' Equity Rule. In the same decision, the Hearings Panel granted Lunai until June 1, 2026 to demonstrate compliance with the Bid Price Rule, which requires sustaining a closing stock price above the $1.00 minimum bid price for ten consecutive business days.

101.    In the proceeding, the Hearings Panel remarked on Lunai's fundamental value and abnormality of a company in Lunai's market position and financial health, notwithstanding the turmoil in the company's stock listing, incurring a Bid Price Rule deficiency. Put differently, the Hearings Panel recognized the depressive effect of the anomalous short selling of LNAI.

102.    On April 27, 2026, Lunai requested brief extensions from the Hearings Panel until May 1, 2026 to demonstrate Stockholders' Equity Rule compliance and until June 4, 2026 to regain Bid Price Rule compliance.

103.    Also in the Form 8-K filed with the SEC on May 1, 2026, Lunai announced that the Company had completed the merger of Neurobridge into Lunai Bioworks IP, Inc. and then issuance of preferred stock on May 1, 2026, so as to re-establish compliance with the Stockholders' Equity Rule. *See supra* ¶ 23. However, Lunai's extension request to the Hearings Panel, which

would ratify the Neurobridge transaction for the purpose of Stockholders' Equity Rule compliance, remains pending as of this Complaint.

104.    Lunai has already lost access to capital due to the artificial downward pressure on its stock price, such that Lunai now is in the position of its Nasdaq Capital Market continued listing being under imminent threat because of Defendants' manipulative and fraudulent trading practices.

105.    Absent expedited discovery into the identities and transaction records of Defendants, upon receipt of which Lunai will be in a position to amend this Complaint, name the Defendants, and seek injunctive relief and damages, including all damages as may be available through pursuing a civil RICO claim, the damage to Lunai's business objectives and going concern status will be irreparable.

## V.   CLAIMS FOR RELIEF

## Count I – Securities Fraud (Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)
### (Against all Defendants)

106.    Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

107.    Lunai's common stock is a "security" within the meaning of Section 3(a)(10) of the Exchange Act (15 U.S.C. § 78c(a)(10)) and is an "equity security" within the meaning of Section 3(a)(11) of the Exchange Act (15 U.S.C. § 78c(a)(11)).

108.    Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others,

including, but not limited to engaging in the fraudulent schemes described herein, and making materially false and misleading statements.

109.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] ("Section 10(b)") and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] ("Rule 10b-5").

110.    Section 10(b) and Rule 10b-5 allow private rights of action against primary violators of those provisions. *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).

111.    As a direct and proximate result of Defendants' securities fraud, Plaintiff has suffered damages in connection with and as a result of the manipulative trading of the common stock of Lunai.

### COUNT II – Market Manipulation (Section 9(a) of the Exchange Act)
**(Against All Defendants)**

112.    Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

113.    Lunai's common stock is a "security" within the meaning of Section 3(a)(10) of the Exchange Act (15 U.S.C. § 78c(a)(10)).

114.    Section 9(a) of the Exchange Act allows "any person who shall purchase or sell any security at a price which was affected by such act or transaction" to "sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction." 15 U.S.C. § 78i(f).

115.    Lunai is an entity engaged in the purchase or sale of its common stocks, which terms include "the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance." 15 U.S.C. § 78c-2(b).

116.    Defendants' naked short selling activity purposefully and artificially depressed Lunai's common stock price, creating a false and misleading appearance with respect to the market's assessment of the stock's value.

117.    Defendants' sales of Lunai's common stock that failed to deliver were themselves transactions which involved no change in the beneficial ownership of the stock.

118.    As a direct and proximate result of Defendants' manipulation of the price of Lunai's securities on the Nasdaq, Plaintiff has suffered damages in connection with and as a result of the manipulative trading of the common stock of Lunai.

### COUNT III – Intentional Tort by Wire Fraud (18 U.S.C. § 1343)
### (Against All Defendants)

119.    Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

120.    Title 18 United States Code section 1343, the federal criminal wire fraud statute, defines wire fraud as "[w]hoever, having devised … any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … in interstate … commerce, any writings … for the purpose of executing such scheme or artifice…."

121.    Violation of a criminal statute may constitute an intentional tort.

122.     Defendants devised a scheme or artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises and transmitted and caused to be transmitted writings by means of wire in interstate commerce for the purpose of executing the scheme and artifice against Plaintiffs to obtain sums well in excess of $75,000.

123.    Defendants effected their manipulative naked short sales intentionally by means of wire in interstate commerce in order to execute their securities fraud scheme against Lunai.

124. As a direct and proximate result of Defendants' wire fraud, Plaintiff has suffered damages in connection with and as a result of the manipulative trading of the common stock of Lunai.

## VI. JURY TRIAL DEMANDED

125. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all the issues so triable.

## VII. REQUESTED RELIEF

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff against Defendants:

1. For compensatory and special damages in an amount to be determined at trial;

2. For injunctive relief;

3. For prejudgment interest and post-judgment interest;

4. For costs incurred in this action;

5. For reasonable attorneys' fees; and

6. For such other and further relief as the Court deems just and appropriate.

FOX ROTHSCHILD LLP

OF COUNSEL:

Jacob S. Frenkel (*pro hac vice forthcoming*)
Brian S. Yu (DE ID 6482)
DICKINSON WRIGHT PLLC
1825 I Street, N.W., Suite 900
Washington, DC 20006
Tel.: (202) 457-0160
jfrenkel@dickinsonwright.com
byu@dickinsonwright.com

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman (DE ID 3702)
Carmella L. Cinaglia (DE ID 7032)
1201 N. Market Street, Suite 1200
Wilmington, DE 19801
Tel.: (302) 622-4237
sliebesman@foxrothschild.com
ccinaglia@foxrothschild.com

*Attorneys for Plaintiffs*

Dated: May 11, 2026