## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LUNAI BIOWORKS, INC.,

    Plaintiff,

v.

SEVEN POINTS CAPITAL, LLC, EDWARD T. GRIESEDIECK, MARLENA KRASKA, WOJCIECH MALECKI, QUANT LAB SFO FZCO, TYLER H. KLING, BISOKE LLC, ETERNALENVY LLC FZ, HOLD BROTHERS CAPITAL, LLC, SAGETRADER LLC, DOES 5-50, ROE CORPORATIONS 2-50, and XYZ LLCS 6-50,

    Defendants.

Civil Action No. 26-549-CFC

## FIRST AMENDED COMPLAINT

Plaintiff, Lunai Bioworks, Inc. ("Lunai" or the "Company"), by and through undersigned counsel, submits its First Amended Complaint against ten parties identified to date as part of Lunai's on-going investigation, as well as against Does 5 through 50, Roe Corporations 2-50, and XYZ LLCs 6-50, inclusive. The averments in this First Amended Complaint are upon information and belief unless stated otherwise. For its First Amended Complaint, Lunai asserts as follows:

### I. SUMMARY

1.      On September 17, 2008, then Securities and Exchange Commission ("SEC") Chairman Christopher Cox issued a statement "concerning ongoing and forthcoming Commission actions to investigate fraud and manipulation in the nation's securities markets" … [i]n order to ensure that hidden manipulation, illegal naked short selling, or illegitimate trading tactics do not drive market behavior and undermine confidence…." On September 18, 2008, Chairman Cox

added in another statement that "[t]he SEC has made plain that we have zero tolerance for naked short selling….We adopted a package of measures to strengthen investor protections against naked short selling … and expressly targeting fraud in short selling transactions." Naked short selling is fraud, and, when employed in concert, rises to the level of racketeering. And, victims of naked short selling frequently are smaller quality companies that often are overwhelmed by the ferocity of the fraud perpetrated against them. Plaintiff, Lunai, a victim of naked short selling, brings this action against the fraudsters and rule-breaking market participants who have targeted this company.

2.      The naked short selling industry is a multi-billion dollar industry that profits entirely from driving down the price of securities, driving the companies out of compliance with stock exchange listing regulations, and driving out of business quality smaller companies. Between January 1, 2024 and the present, stock exchanges delisted more than 350 companies, the effect of which was to drive companies that chose to remain publicly-traded to the less-regulated, more volatile and more manipulation-risky over-the-counter markets.

3.      This Complaint arises from a fraudulent scheme by Defendants, individually and acting in concert and as an enterprise, to engage in unlawful naked short selling, stock manipulation, making materially false and misleading statements, racketeering, tortiously interfering with Plaintiff Lunai's contracts, and fraud for the purpose of depressing artificially the value of the common stock of Lunai for Defendants' economic gain to the detriment of and harm to Lunai. The magnitude of the naked short selling fraud is staggering — in the seven months from November 5, 2025 through May 4, 2026, well in excess of one billion shares of LNAI settled in trades, notwithstanding that, as set forth below, LNAI's public float during that period grew from only approximately 14.0 million shares in early October 2025 to 24,916,700 shares by April 10,

2026, the two nearest SEC-disclosed beneficial ownership dates bracketing this period.

4.     Defendants systematically orchestrated short sales, but never "located" — in other words borrowed, arranged to borrow, or had reasonable grounds to believe that the securities could be borrowed as required by law — the shares that they sold, thereby violating knowingly and willfully and for fraudulent purposes the applicable federal securities regulation requiring short sellers to locate the shares to borrow and sell. 17 C.F.R. § 242.200 – § 242.204. In each such instance, Defendants' trading constituted naked short selling, which not only violated applicable federal securities regulations, but also constituted actionable common law fraud and securities fraud perpetrated against Lunai.

5.     This First Amended Complaint names 10 parties — Seven Points Capital, LLC; Edward T. Griesedieck; Marlena Kraska; Wojciech Malecki; Quant Lab SFO FZCO; Tyler H. Kling; Bisoke LLC; ETERNALENVY LLC FZ; Hold Brothers Capital, LLC; and Sagetrader LLC — individuals who and corporations that engaged in naked short selling of Plaintiff Lunai's securities and, in some instances, employed other manipulative techniques to further advance their fraudulent naked short selling activities and scheme.

6.     The true names and capacities, whether individual, corporate, associate or otherwise, of additional Defendants Does 5-50, Roe Corporations 2-50, and XYZ LLCs 6-50, inclusive, are unknown or are still becoming known to Plaintiff Lunai, which therefore sues said known Defendants in their true proper names and capacities and the unknown or becoming known Defendants by such fictitious names. Plaintiff will further amend this Complaint to state the true names and capacities of said unidentified defendants when the analysis of the naked short selling activity from detailed trading records is more complete, when their identities are more readily ascertainable, and when others are discovered.

## II.  JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because Plaintiff's claim arises under Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*) (the "Exchange Act").

8.      This Court has federal question jurisdiction, 28 U.S.C. § 1331, over the civil RICO count,18 U.S.C. § 1964(c).

9.      Additionally, this Court has supplemental jurisdiction, 28 U.S.C. § 1367(a), over the Delaware common law fraud claim, the tortious interference with contract claim, and the civil conspiracy to defraud claim predicated on wire-fraud conduct, because the fraudulent transactions, contract interference, and wire-transmitted conduct arise out of the same case or controversy as the securities fraud and civil RICO claims.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3), 15 U.S.C. § 78aa, and 18 U.S.C. § 1965(a). Venue lies under Section 1391(b)(3) because no single judicial district exists in which all Defendants reside, given that named Defendants reside or are organized in Delaware, New Jersey, New York, Puerto Rico, the U.S. Virgin Islands, and the United Arab Emirates and other judicial districts, and because no single district contains a substantial part of the events giving rise to Plaintiff's claims, given that the alleged manipulative trading occurred through a decentralized, national electronic securities market rather than through conduct localized to any one district. Venue is independently proper under 15 U.S.C. § 78aa because one or more Defendants including among Defendants Does, Roes and XYZ LLCs, and specifically including registered broker-dealer Defendant SageTrader, are Delaware limited liability companies that transact business in this District, and because Lunai, the securities of which were the subject of the alleged violations, is a citizen of Delaware. Venue is independently proper under 18 U.S.C. §

4

1965(a) because SageTrader, among the named Defendants, resides as a matter of law, is found, and transacts affairs in this District.

11.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged herein.

12.     Personal jurisdiction over each Defendant is proper in this District. Sections 10(b), 9(a), and 27 of the Exchange Act, 15 U.S.C. § 78aa, and the civil RICO statute, 18 U.S.C. § 1965(b) and (d), authorize nationwide service of process, such that personal jurisdiction over each Defendant is assessed based on each Defendant's aggregate contacts with the United States as a whole rather than with this District specifically. Each Defendant maintained one or more registered trading accounts with United States broker-dealers, executed securities transactions through registered United States execution venues and clearing firms, and used the means and instrumentalities of interstate commerce and interstate wires to effect the naked short sales described herein, and each Defendant therefore has sufficient minimum contacts with the United States to satisfy the requirements of due process.

13.     In addition, and independent of the nationwide-contacts analysis, personal jurisdiction is proper over each Defendant under Delaware's long-arm statute, 10 Del. C. § 3104, and consistent with due process, because each Defendant knew that Lunai is a Delaware corporation, intentionally directed manipulative trading activity at the market for Lunai's securities with the knowledge that the brunt of the resulting harm would be felt by Lunai as a Delaware corporate entity, and thereby expressly aimed tortious conduct at a resident of this forum.

14.     Personal jurisdiction over each Defendant with respect to the Delaware common law fraud, tortious interference with contract, and wire-fraud-predicated intentional tort claims is

additionally proper under the doctrine of pendent personal jurisdiction, because those claims arise from the same nucleus of operative fact as the federal securities and civil RICO claims over which this Court has personal jurisdiction as set forth above.

### III.   PARTIES: PLAINTIFF AND DEFENDANTS

15.   Plaintiff, Lunai Bioworks, Inc. is a Delaware corporation with its corporate headquarters in Sacramento, California. At all times relevant to this Complaint, the common stock of Plaintiff traded on the Nasdaq Capital Market ("Nasdaq") under the symbol LNAI.

16.   Named Defendant Seven Points Capital, LLC ("Seven Points Capital") is a New York limited liability company formed on February 23, 2007 and registered broker-dealer (CRD# 144211)[1] engaged in investment management and trading of U.S. equity securities. Records obtained in discovery identify Seven Points Capital as holding a single registered trading account through which Seven Points Capital executed all of its LNAI short sales described herein. During the relevant period, Seven Points Capital executed approximately 3,262,190 short sale pre-split shares of LNAI while requesting locate authorizations for approximately 40,837,929 shares, receiving zero approved locates on many trading dates from November 5, 2025 through May 4, 2026.

17.   Named Defendant Edward T. Griesedieck is a securities trader (CRD# 7282029), previously employed by co-Defendant Seven Points Capital,[2] is currently associated with a broker-dealer located in New York, of unknown residence. Records obtained in discovery identify Griesedieck as holding two registered trading accounts through which Griesedieck executed all of

---

[1] This information is confirmed in the FINRA BrokerCheck Report for Defendant Seven Points Capital at https://files.brokercheck.finra.org/firm/firm_144211.pdf.

[2] This information is set forth in the FINRA BrokerCheck Report for Defendant Griesedieck at https://files.brokercheck.finra.org/individual/individual_7282029.pdf.

his LNAI short sales described herein. During the relevant period, Griesedieck executed approximately 961,804 short sale pre-split shares of LNAI, receiving zero approved locates on every trading date from November 5, 2025 through April 7, 2026.

18. Named Defendant ETERNALENVY LLC FZ ("ETERNALENVY") is a limited liability company organized under the laws of a free zone in the United Arab Emirates. Records obtained in discovery identify ETERNALENVY as holding a single trading account at a registered U.S. broker-dealer through which ETERNALENVY executed all of its LNAI short sales described herein. During the relevant period, ETERNALENVY executed approximately 11,807,165 short sale shares of LNAI across trading dates from March 12, 2026 through April 24, 2026, including approximately 6,444,475 short sale shares on March 17, 2026, a date on which independent market data confirms there were zero LNAI shares available to borrow in the institutional lending market.

19. Named Defendant Bisoke, LLC ("Bisoke") is a U.S. Virgin Islands limited liability company engaged in investment management and development of trading systems. Records obtained in discovery identify Bisoke as holding four registered trading accounts through which Bisoke executed all of its LNAI short sales described herein. During the relevant period, Bisoke executed approximately 1,299,354 short sale pre-split shares of LNAI, receiving zero approved locates on every trading date from November 5, 2025 through May 4, 2026.

20. Named Defendant Hold Brothers Capital, LLC ("Hold Brothers") is a New Jersey limited liability company and registered broker-dealer (CRD# 151864), engaged in online trading services. Records obtained in discovery identify Hold Brothers as executing pre-split short sales of LNAI through a registered U.S. clearing firm, with approximately 461,977 shares executed on November 5, 2025, the onset date of the manipulative trading campaign described herein. During the relevant period, Hold Brothers executed approximately 775,063 short sale pre-split shares of

LNAI. Hold Brothers' current CEO and Managing Member, Gregory Hold, was the co-founder and principal of Hold Brothers Online Investment Services, LLC, which the Financial Industry Regulatory Authority ("FINRA") expelled from the securities industry after the firm failed to satisfy a disciplinary sanction that included a $2,535,237 fine arising from violations involving layering and spoofing conducted by offshore traders who accessed the U.S. securities markets through the firm's systems. These violations, by their nature, implicated substantial supervisory, compliance, and risk-management failures and involved allegations of failing to maintain and enforce systems reasonably designed to detect, prevent, investigate, and respond to indicia of market manipulation and other regulatory violations. These violations reasonably impute notice to Hold Brothers of its obligations under Regulation SHO, 17 C.F.R. § 242.200 – § 242.204 ("Reg SHO").

21.    Named Defendant SageTrader, LLC ("SageTrader") is a Delaware limited liability company formed on September 29, 2003 and registered broker-dealer (CRD# 137862),[3] engaged in algorithmic and electronic trading. Records obtained in discovery identify SageTrader as executing LNAI short sales through a registered U.S. execution venue, including on all 15 primary coordination dates identified in this Complaint. During the relevant period, SageTrader executed approximately 5,014,261 short sale pre-split shares of LNAI. In July 2022, FINRA imposed on SageTrader a $775,000 fine after finding that SageTrader failed to supervise reasonably potentially manipulative trading activity on its platforms from 2013 through 2019, including trading activity indicative of practices such as layering, spoofing, wash trades, and marking the open or close. Subsequently, in February 2023, FINRA imposed a $100,000 fine for SageTrader's failure to establish and implement anti-money laundering policies and procedures reasonably designed to

---

[3]   This information is set forth in the FINRA BrokerCheck Report for SageTrader at https://files.brokercheck.finra.org/firm/firm_137862.pdf.

detect and report suspicious activity, which occurred between April 2016 and December 2019. Moreover, in March 2023, FINRA imposed a $175,000 fine for SageTrader's mismarking of approximately 9.7 million order events as long, short, or short-exempt, resulting in inaccurate order-marking records and reporting.[4] The March 2023 order-marking violation in particular placed SageTrader on explicit notice of its obligations under Reg SHO's order-marking requirements. The July 2022 and February 2023 dispositions, while not themselves Reg SHO violations, separately established a broader pattern of supervisory and compliance failures at SageTrader during the years preceding the conduct alleged herein.

22.    Named Defendant Tyler H. Kling is the Principal and Founder of House Kling Family Office, a privately held investment management company operating in New York and Puerto Rico. Records obtained in discovery identify Kling as holding two registered trading accounts through which Kling executed all of his LNAI short sales described herein. During the relevant period, Kling executed approximately 1,080,873 short sale pre-split shares of LNAI, receiving zero approved locates on every trading date from November 5, 2025 through March 26, 2026.

23.    Named Defendant Marlena Malecka Kraska (referred to below as Marlena Kraska) is the Founder and Chief Executive Officer of Quant Lab SFO FZCO ("Quant Lab"), a single-family office incorporated under the laws of a free zone in the United Arab Emirates. Records obtained in discovery identify Kraska as executing LNAI short sales through a registered U.S. execution venue between November 5, 2025 and May 4, 2026. During the relevant period, Kraska executed approximately 17,091 short sale pre-split shares of LNAI, receiving zero approved locates on each trading date.

---

[4] Order-marking is specifically relevant to Reg SHO violations.

24.    Named Defendant Wojciech Malecki, who resides in the United Arab Emirates, is or appears to be the Managing Director of Quant Lab. Malecki describes himself on LinkedIn as an "ex-Principal" at one of the world's most prestigious "global management consulting firm and the world's leading advisor on business strategy" from which he took two-years' leave during the period March 2022 through February 2024 to "set[] up a family office focused on utilizing quantitive (sic) methods to generate above the (sic) market returns."[5]   Records obtained in discovery identify Malecki as executing LNAI short sales through a registered U.S. execution venue between November 5, 2025 and May 4, 2026, the final primary coordination date identified in this Complaint. During the relevant period, Malecki executed approximately 164,711 short sale pre-split shares of LNAI, receiving zero approved locates on each trading date.

25.    Named Defendant Quant Lab is a single-family office incorporated under the laws of a free zone in the United Arab Emirates. Records obtained in discovery identify Quant Lab as executing LNAI short sales through a registered U.S. execution venue between November 5, 2025 and April 15, 2026. During the relevant period, Quant Lab executed approximately 5,326 short sale pre-split shares of LNAI, receiving zero approved locates on each trading date.

26.    Defendants each took positions to short Lunai stock without having borrowed or arranged to borrow securities within the standard settlement period, resulting in failures to obtain Lunai shares to sell them short and engaging in active manipulation of Lunai's share price. Further, certain Defendants acted in concert with other Defendants to enable and perpetuate the fraudulent and manipulative naked short selling trading scheme.

27.    Named Defendants are jointly and severally liable, as direct participants in and/or co-conspirators within the fraudulent scheme described herein, including with each other and

---

[5] https://www.linkedin.com/in/maleckiw/.

together with the Doe, Roe, and XYZ LLC Defendants. Complete relief can be accorded among the parties presently before the Court without the joinder of any additional person, and no person absent from this action claims an interest relating to the subject matter of this action such that disposing of the action in that person's absence would impair or impede that person's ability to protect that interest or leave any existing Defendant subject to a substantial risk of incurring multiple or inconsistent obligations.

## IV.  STATEMENT OF FACTS

### A.  The Lunai Story in 2025 and 2026

28.    Lunai is an AI-driven precision medicine company focused on identifying and developing novel therapeutics and biodefense solutions. Its proprietary, patented platforms transform complex biomedical data into predictive insights that enhance target discovery, improve development efficiency, and enable strategic collaborations across the pharmaceutical, biotechnology, and government sectors. The company is also advancing innovative immunotherapy programs designed to address solid tumor cancers.

29.    In April 2025, Lunai, formerly known as Renovaro Inc., merged with BioSymetrics, Inc. in a transformative transaction that repositioned the company at the intersection of artificial intelligence and biotechnology. By integrating BioSymetrics' patented AI and machine learning technologies, Lunai shifted its strategic focus toward leveraging advanced computational biology and predictive analytics to enhance drug discovery, optimize development pathways, and identify high-value therapeutic targets. The merger established the foundation for Lunai's AI-powered precision medicine platform and strengthened its ability to pursue opportunities across life sciences, oncology, neuroscience, and government-sponsored biodefense initiatives.

30.    Building on the momentum of and shortly after its merger with BioSymetrics, Lunai

announced the launch of Augusta on May 14, 2025, an advanced AI-powered precision neurology platform developed to transform the way neurological diseases are understood and treated. By integrating proprietary machine learning models with large-scale biomedical datasets, Augusta seeks to overcome persistent challenges in neurological drug development, including disease heterogeneity, patient identification, and target discovery. The platform reflects Lunai's strategic commitment to applying artificial intelligence to some of medicine's most complex and underserved therapeutic areas, with the goal of accelerating the development of precision therapies for neurological disorders.

31.    In August 2025, the merged company adopted its current corporate name to reflect the new strategic focus.

32.    Lunai operates its immunotherapy at the company level and its AI platform through its wholly-owned subsidiary, Biosymetrics.

33.    While Lunai has expanded its strategic focus through the integration of artificial intelligence and precision medicine capabilities, its legacy biotechnology operations continue through its wholly-owned subsidiary, Renovaro Biosciences, Inc. ("Renovaro"). Renovaro remains focused on the development of innovative cell and gene therapies, with a particular emphasis on allogeneic immunotherapy platforms and dendritic cell-based cancer vaccines. These therapeutic approaches are designed to harness and enhance the patient's immune response to recognize and eliminate cancer cells, with the objective of achieving durable anti-tumor activity and long-term remission. Through Renovaro, Lunai maintains an active presence in translational oncology, complementing its AI-driven drug discovery initiatives with a pipeline of proprietary immuno-oncology programs.

34.    Following the merger, BioSymetrics, through BioSymetrics Inc. (Delaware) and

12

BioSymetrics Corp. (Nova Scotia) operations, became a key driver of Lunai's evolution into an AI-powered precision medicine company. The organization supports the company's business through the integration and analysis of diverse biomedical datasets, leveraging proprietary machine learning and advanced analytics to identify meaningful biological patterns and therapeutic opportunities. These platform operations provide critical support for Lunai's drug discovery, biomarker development, precision neurology, oncology, and biodefense initiatives, helping bridge the gap between complex data and actionable scientific insight.

35.     On November 5, 2025, Lunai announced that its next-generation dendritic cell immunotherapy achieved complete regression of both primary and metastatic pancreatic tumors in preclinical humanized mouse models, marking a potential treatment. The study marking the achievement was peer reviewed and published in a Brief Report in Vaccines.

36.     On November 6, 2025, Lunai filed with the SEC a Form 8-K announcing that the company held its annual meeting on October 31, 2025. Thus, Lunai re-established compliance with Nasdaq Listing Rule 5620(a), which requires a listed company to hold its annual shareholder meetings within a year of its fiscal year end.

37.     On March 19, 2026, Lunai announced, through BioSymetrics, the launch of the Pathfinder Consortium, a national initiative that uses artificial intelligence and cross-sector collaboration to accelerate the discovery and development of chemical countermeasures for emerging threats. The program aims to position the Company to pursue large-scale federal contracts along the three-year accelerated pathway for chemical countermeasure approval, as opposed to the 10-year traditional pharmaceutical timeline.

38.     On April 7, 2026, Lunai announced its first revenue-generating, multi-year defense collaboration through BioSymetrics to deploy an AI-powered platform for chemical threat

13

assessment, marking an expansion into national security applications.

39.    On April 15, 2026, Lunai announced a Letter of Intent with Geneial, Inc. to collaborate to support rare disease research by converting diffuse patient-generated data into structured data and thereby reduce development risk toward higher probability trials.

40.    On May 1, 2026, Lunai completed the acquisition of intellectual property ("IP") assets from two counterparties to expand Lunai's central nervous system platform.

41.    One of Lunai's counterparties in the IP transaction was Neurobridge IP Holdings Corporation ("Neurobridge"), which merged with Lunai Bioworks IP, Inc. to become a subsidiary of Lunai. The subsidiary acquisition was accompanied by the issuance of $20 million in convertible preferred equity. Specifically, as consideration for the acquisition of Neurobridge's intellectual property assets and patent portfolio, Lunai issued eight shares of newly created Series B Convertible Preferred Stock to two different parties having an aggregate stated value of $20 million. The Neurobridge transaction was an all-stock transaction; Lunai paid no cash consideration in connection with the transaction.

42.    Lunai introduced these new Neurobridge assets into Lunai's portfolio to address a restriction to therapeutic access caused by the blood-brain barrier, which previously had limited neurological disease treatments.

43.    Lunai announced the Neurobridge IP transaction in a Form 8-K filed with the SEC on May 1, 2026 and in a press release issued May 4, 2026.

44.    The timing, structure, and stated purpose of the Neurobridge transaction underscores the extent to which Defendants' naked short-selling scheme distorted the market for Lunai securities. Under ordinary market conditions, the addition of $20 million in stated-value preferred equity and the acquisition of strategic CNS-related intellectual property would have been

14

reflected positively in the market price of Lunai's securities. Instead, Defendants' persistent naked short selling, failures to deliver, and creation of synthetic or counterfeit shares overwhelmed legitimate market demand and continued to suppress artificially the price of Lunai common stock. Moreover, Defendants' manipulative injection of a fictitious supply of shares into the marketplace through sales of stock that were neither borrowed nor delivered, impaired price discovery, diluted existing shareholders, and prevented the market from accurately recognizing the value of Lunai's assets, transactions, and capital structure. Thus, Defendants' manipulative naked short sales scheme had the actual effect of muting or eliminating the market benefit to Lunai of the Neurobridge transaction that otherwise, under normal market conditions, would have resulted from the Company's addition of $20 million in preferred equity and related intellectual property assets.

45.     Because the Neurobridge transaction occurred during a period in which Lunai was experiencing extraordinary naked short selling and manipulative activity, significant settlement failures, and Nasdaq compliance challenges, Defendants knowingly and intentionally exploited those circumstances by continuing to flood the market with phantom shares, despite a materially limited number of legally issued and outstanding shares. As set forth more fully below, FTDs and trading volumes reached levels that were inconsistent with the Company's available share supply and even exceeded multiples of the Company's outstanding shares. These circumstances constitute additional evidence of a coordinated market-manipulation scheme, during the relevant period, designed to depress Lunai's stock price, impair its access to capital markets, undermine shareholder value, and generate unlawful profits for participants in the naked short-selling enterprise.

46.     On May 22, 2026, Lunai effected a 1-for-8 reverse stock split (the "Split") pursuant to authorization at a special meeting of Lunai's stockholders and approval by the Board of

Directors. Following the effectiveness of the Split, the company disclosed that its issued and outstanding common shares would be reduced from approximately 36,271,119 shares to approximately 4,533,890 shares, subject to minor adjustments resulting from the rounding up of fractional shares.

### B. Securities Short Selling Regulatory Framework

47.     A "short sale" is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, a short seller must borrow the security, typically from another investor, often a broker-dealer or an institutional investor. The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender. That practice is referred to as "covering the short position."

48.     In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

49.     A "naked" short sale generally refers to selling short without the short seller having borrowed or arranged to borrow securities to make delivery to the buyer within the standard settlement period.

50.     SEC regulations address the requirements that sellers of securities are required to deliver, or arrange for delivery of, securities, and that buyers are entitled to receive delivery of securities purchased. These regulations include the timing requirements for such delivery and receipt, often referred to as the "settlement date."

16

51.     Reg SHO,[6] sets forth the regulatory requirements applicable to short sales of equity securities. On June 23, 2004, the SEC adopted Reg SHO, which became effective on January 3, 2005, to address, *inter alia*, its concerns as America's capital markets regulator regarding persistent failures to deliver ("FTDs" (singular referred to as "FTD")), which occur when a seller fails to deliver securities that it has sold by the settlement date.

52.     Under Reg SHO, a seller is "deemed to own" a security only if that seller has a net long position in a security. 17 C.F.R. § 242.200(c).

53.     Ordinarily (except in very limited circumstances not applicable here), sellers must "locate" shares prior to selling short.

54.     In a naked short sale, a seller does not borrow or arrange to borrow securities in time to make delivery to the buyer within the standard settlement period.

55.     The SEC designed Reg SHO, in part, to reduce FTDs in connection with short selling of securities and to disincentivize potentially abusive naked short selling. *See* Amendments to Regulation SHO, Exch. Act Rel. No. 34-60388 (July 27, 2009).

56.     FTDs often result from sellers having failed to borrow securities before executing a short sale trade. Such sellers may attempt to use the freedom of having avoided borrowing costs to engage in trading to depress improperly the price of a security. *See id.* at 6-7.

57.     In such cases, although the purported seller has not ensured the delivery of the securities in the trade, the seller is nevertheless able to flood the market with the company's stock, driving down its price. *See id.* at 8 n. 26.

58.     This act of intentionally violating Reg SHO is a manipulative device that violates sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-

---

[6] Regulation SHO, 17 C.F.R. § 242.200 – § 242.204, as identified above.

5 promulgated thereunder.

59.     Rule 203(b)(3) under Reg SHO applies to an FTD position in a "threshold security" for 13 consecutive settlement days and requires the participant to "close out the [FTD] position by purchasing securities of like kind and quantity[.]" 17 C.F.R. § 242.203(b)(3).

60.     An FTD position causes the securities sold to become a "threshold security" when the FTD position persists for "five consecutive settlement days," is in "10,000 shares or more," and "that is equal to at least 0.5% of the issue's total shares outstanding." *Id.* § 242.203(c)(6)(i).

61.     Failure to close out a threshold security FTD position after 13 days forecloses the participant from accepting or effecting short sales without first borrowing securities or entering into a bona fide arrangement to borrow, until the position is closed. *Id.* § 242.204(b).

## C.  Defendants' Short Selling Scheme

### i.  *Anomalous FTD Trading Clusters*

62.     Upon detailed public information and belief, Defendants effected naked short sale trades *en masse*, which knowingly and fraudulently applied manipulative downward pressure on the price of Lunai stock.

63.     As of October 2, 2025, one month before the beginning of anomalous trading, Lunai had experienced an average daily FTD rate of 5,826 shares from trading of LNAI.

64.     As of September 30, 2025, as Lunai reported in a Form 10-Q filed with the SEC on November 10, 2025, for the quarter-ended Lunai had outstanding 23,432,391 shares of common stock.

65.     Approximately one month later, the naked short selling onslaught commenced.

66.     From November 2025 to April 2026, Lunai's common stock underwent several noteworthy periods of extraordinary short selling volume that exceeded the Company's shares

outstanding, with millions of failures to deliver (FTDs) upon sale at the peaks of trading activity.

67.    Put differently and in lay terms, more shares of Lunai were being sold on certain days than there were shares available in the entire market to be sold.

68.    Based on Lunai's periodic filings with the SEC and disclosures, Lunai's outstanding shares total increased from 23,432,391 outstanding shares, as reported in the Company's November 2025 Form 10-Q, to approximately 36,271,119 outstanding shares immediately before the May 22, 2026 reverse split, primarily as a result of equity issuances during late 2025 and early 2026, including conversions and financings, rather than any stock split.

69.    On at least one day, November 5, 2025, and as discussed more fully below, 169,777,760 shares of LNAI traded, representing approximately 7.5 times LNAI's 23,432,391 outstanding shares.

70.    In this same timeframe, Lunai experienced declines in its stock price corresponding to this elevated short selling activity because of this intentional and concerted manipulative activity.

71.    The first major deviation from Lunai common stock's trading baseline occurred abruptly on November 6, 2025, when FTDs in LNAI surged to 2,126,815 shares in a single settlement day. This was a 74.7-factor increase over the largest prior baseline event and 365 times the baseline daily average.

72.    The next day, November 7, 2025, sales of LNAI resulted in failures to deliver an additional 757,634 shares.

73.    Over those two days, LNAI's stock price declined from $1.17 per share to $0.93 per share at closing on November 7, 2025. Put differently, this manipulative activity depressed the price of Lunai's common stock by 20.6% at a time when there were no corporate announcements

19

or events that would have or could have resulted in the Company's stock price losing one-fifth of its market value.

74.    In November 2025, Defendants engaged in further naked short selling of LNAI, evidenced by elevated LNAI stock sale FTDs on several additional days over the following weeks.

75.    On November 26, 2025, LNAI registered failures to deliver 1,109,753 shares.

76.    In January and February 2026, there was a sustained period of LNAI short selling with elevated FTDs and a concomitant decline in stock price per share from $0.97 on the first trading day of the year to close at $0.37 on February 27, 2026. Here again, this manipulative activity depressed the price of Lunai's common stock by 61.9% at a time when there were no corporate announcements or events that would have or could have resulted in the Company's stock price losing substantially more than half of its market value.

77.    On March 18, 2026, FTDs reached 6,679,316 shares—234.6 times the maximum baseline daily FTD rate.

78.    In the following days, short sellers failed to deliver 2,792,195 shares on March 19, 2026, 2,626,459 on March 20, and 2,126,969 on March 23.

79.    A further extreme event of 5,631,016 shares that failed to deliver on March 27, 2026.

80.    The total FTD volume from the March 2026 trading cluster alone exceeded 20 million shares.

81.    Reference to the March 2026 trading cluster is to a grouping of short sales or related trades that are unusually concentrated in time, volume, counterparties, or settlement outcomes within a given monthly period, rather than being spread out randomly. In the context of naked short selling, a "trading cluster" usually signals intentional, repeated short selling behavior that

20

produces persistent FTDs or market impact inconsistent with normal trading.[7]

82.    In the three days from April 8 to April 10, 2026, LNAI short sales led to FTDs of approximately 2.7 million shares—1,800,876 shares on April 8, 645,813 shares on April 9, and 272,130 shares on April 10.

83.    The total FTD volume from the period of anomalous FTD activity was 29,586,727, or 81.6% of LNAI's 36,270,000 outstanding shares.

84.    Throughout the period of anomalous FTD activity, there also were dates on which the overall volume of LNAI trading far exceeded the number of outstanding shares and the public float of Lunai's securities.

85.    On November 5, 2025, 169,777,760 shares of LNAI traded, representing approximately 7.25 times LNAI's then-outstanding 23,432,391 shares, the outstanding share count reported in Lunai's November 2025 Form 10-Q referenced above. It was impossible for short sales of 169,777,760 shares to have occurred on November 5, 2025, because that number of shares did not exist to be sold. By contrast, the trading volumes on the later dates below are compared against Lunai's outstanding share count of approximately 36,270,000 shares, reflecting the increase in outstanding shares during late 2025 and early 2026 described above.

86.    To put in lay terms what occurred on November 5, 2025, Lunai had issued and outstanding 23,432,391 shares as of that date. Despite there being only 23,432,391 shares in the hands of investors, including in the hands of officers and directors who were not trading their shares, 169,777,760 shares traded on that one day, a day on which this little-known company had no news.

---

[7] *See* Paul R. Ziegler & Terry Truitt, *Predictors of Naked Short Selling: Analyzing Delivery Failures in U.S. Stock Markets,* Research in Bus. & Econ. J. (2011) (finding that trading volume, market capitalization, institutional ownership, insider ownership, listed options, and short interest significantly predict delivery failures).

87. On November 25, 2025, 46,624,161 shares of LNAI traded, representing 1.3 times LNAI's 36,270,000 outstanding shares. It was impossible for short sales of 46,624,161 shares to have occurred on November 25, 2025, because that number of shares did not exist to be sold.

88. On March 17, 2026, 554,032,865 shares of LNAI traded, representing 15.3 times LNAI's 36,270,000 outstanding shares. It was impossible for short sales of 554,032,865 shares to have occurred on March 17, 2026, because that number of shares did not exist to be sold.

89. On March 20, 2026, 80,784,276 shares of LNAI traded, representing 2.2 times LNAI's 36,270,000 outstanding shares. It was impossible for short sales of 80,784,276 shares to have occurred on March 20, 2026, because that number of shares did not exist to be sold.

90. On March 26, 2026, 257,637,081 shares of LNAI traded, representing 7.1 times LNAI's 36,270,000 outstanding shares. It was impossible for short sales of 257,637,081 shares to have occurred on March 26, 2026, because that number of shares did not exist to be sold.

91. On April 7, 2026, 134,437,142 shares of LNAI traded, representing 3.7 times LNAI's 36,270,000 outstanding shares. It was impossible for short sales of 134,437,142 shares to have occurred on April 7, 2026, because that number of shares did not exist to be sold.

92. On May 4, 2026, 100,392,900 shares of LNAI traded, representing 2.8 times LNAI's 36,270,000 outstanding shares. It was impossible for short sales of 100,392,900 shares to have occurred on May 4, 2026, because that number of shares did not exist to be sold.

93. The entire public float of LNAI, that is shares of LNAI that are available to be traded without even accounting for whether certain shares could not be loaned for shorting, was 24,916,700 shares as of April 10, 2026, based on the Company's then SEC-disclosed beneficial ownership data.

94. LNAI's price per share declined on May 4, 2026 from $0.3766 at the open to a

closing price of $0.3246, an approximate 13.8% drop.

95.     Upon information and belief, Defendants' naked short selling and Defendants' naked short selling conspiracy was the direct cause of the anomalous FTD activity and excessive volume trading observed in the retrieved SEC data and Nasdaq records.

*ii.   Avoidance of Threshold List Closing Requirement*

96.     Defendants tailored their naked short selling activity to maximize trading volume while avoiding, evading and circumventing the criteria of the Reg SHO § 203(b)(3) close-out requirement, thereby sustaining the duration of their conspiracy.

97.     The concept of the Reg SHO close-out rule requirement (section 203(b)(3)) is that if someone sells stock and does not deliver the stock on time, then the rules force that failure to be fixed quickly by buying real shares — not by delaying or re-shorting.

98.     A viable analogy is the following. Conceptualize selling concert tickets that a person does not have. Selling the concert tickets without owning the tickets is analogous to naked short selling. Not handing over – not delivering – the concert tickets on the day of the show is analogous to failure to deliver. The close-out rule in the concert context is requiring the seller to go buy real tickets, even at a higher price, and hand them over – deliver the tickets – consistent with the "naked sale."

99.     Despite the weeks of elevated FTD activity, Lunai's stock did not appear on the Nasdaq Threshold Securities List during November 2025, suggesting that the FTDs were structured to be cleared on an intraday or overnight basis sufficient to avoid triggering the five-consecutive-day rule.

100.    A stock appears on the Nasdaq Threshold Securities List when a large number of shares have failed to be delivered for several days in a row, signaling a possible settlement problem

23

that must be fixed. Once a stock appears on the Nasdaq Threshold Securities list, then brokers face stricter rules, in that they cannot continue to allow trades to fail indefinitely; mandatory close-outs apply such that under Reg SHO § 203(b)(3), any persistent failure must be closed out, the seller must buy real shares and deliver them, and borrowing or rolling forward the position no longer is allowed; and there is extra scrutiny on the security, including daily review with continued failures raising red flags for compliance and enforcement.

101.    On March 19, 2026, LNAI appeared on the Threshold Securities List and remained listed for 11 consecutive days, through April 2, 2026.[8]

102.    On March 26, 2026, FTDs of LNAI declined to 2,052 shares from 228,086 from the day before and from 2,126,969 shares on March 23. Then, on the next trading day, March 27, 2026, FTDs returned to the elevated level of 5,631,016.

103.    The sharp decline in FTDs over three days to March 26, followed by a next-day extreme event, is, , a pattern consistent with a deliberate attempt to reset the threshold list count and avoid triggering the Reg SHO close-out requirement.

104.    Had the high FTD levels continued through March 26, then the 13-consecutive-day

---

[8] https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260317.txt (March 17, 2026 LNAI not listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260318.txt (March 18, 2026 LNAI not listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260319.txt (March 19, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260320.txt (March 20, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260323.txt (March 23, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260324.txt (March 24, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260325.txt (March 25, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260326.txt (March 26, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260327.txt (March 27, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260330.txt (March 30, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260331.txt (March 31, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260401.txt (April 1, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260402.txt (April 2, 2026 LNAI listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260403.txt (April 3, 2026 Good Friday market holiday); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260406.txt (April 6, 2026 LNAI not listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260407.txt April 7, 2026 LNAI not listed); https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260408.txt (April 8, 2026 LNAI not listed); and https://www.nasdaqtrader.com/dynamic/SymDir/regsho/nasdaqth20260409.txt (April 9, 2026 LNAI not listed).

mandatory close-out requirement under Reg SHO § 203(b)(3) would have been triggered as early as April 7. No such close-out occurred, and, on April 10, 2026, Lunai confirmed its removal from the Nasdaq Threshold Securities List.

105. On April 8, 2026, the SEC recorded FTDs of 1,800,876 shares of LNAI. On April 9, LNAI had 645,813 shares sold that failed to deliver, followed by 272,130 shares on April 10, 2026.

106. Because there had been no closure ordered based on the prior Nasdaq Threshold Securities List activity, LNAI apparently had been removed from the list on April 7, 2026, the last day before the close-out requirement would have become effective.

### iii.  Positive News Neutralized

107. Positive news about a company, particularly material positive developments about a company, should cause an increase in the price of a company's stock, not a depressive effect on the price of the stock.

108. Scholarly research reflects that positive news articles are associated with positive stock returns, while negative news articles are linked to negative stock returns. These expected results suggest that news sentiment can play a significant role in shaping market movements. This relationship is particularly pronounced for smaller stocks.[9]

109. Similarly, Company specific news announcements containing positive or negative information significantly affect stock price movements. Positive news information positively affects the price, while negative information negatively affects the price.[10]

---

[9] *See* Tetlock, P.C., "Giving content to investor sentiment: The role of media in the stock market," JOURNAL OF FINANCE, 62(3), 1139-1168 (2007).

[10] Financial economists widely recognize that securities prices generally reflect publicly available information, causing favorable information to be incorporated into higher stock prices and unfavorable information to be incorporated into lower stock prices. *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383, 383-417 (1970). Academic research further finds that short sellers contribute to the price-discovery process by accelerating the incorporation of adverse information into market prices. *See* Ekkehart Boehmer & Juan (Julie)

110. Notwithstanding positive news received throughout the elevated short selling period, Lunai's common stock has lost nearly 75% of its value. This has resulted from the conspiratorial manipulative trading activities of Defendants knowingly and intentionally artificially depressing the stock's price and acting in concert to do so.

111. In the two days after the November 5, 2025 announcement of Lunai's peer-reviewed success in advancing a critical cancer treatment (*see supra* ¶ 32), an event and announcement that should have resulted in either no change in the price of a security or an increase in the price of a security, Lunai's stock lost more than 20% of its value through sale activity that saw FTDs on 2,884,449 shares. This event is both consistent with and reasonably explained by artificial short selling activity designed to manipulate the LNAI price per share.

112. A comparable event occurred the day after Lunai's April 15, 2026 announcement of its collaboration with Geneial, Inc. to advance drug development efforts for potential treatments of rare neurological diseases, Lunai's stock price fell by 4.7% with a trading volume of 27,922,990 shares. (As of the date of this Complaint, FTD data is not yet available for April 15, 2026.

113. As noted above, the daily volume of trading activity has exhibited an impossible and illogical recent spike on May 4, 2026, fewer than ten days prior to the filing of this Complaint as evidencing current manipulative activity, to 100.4 million shares. This is 53 times the normal daily trading volume of LNAI.

**D. Defendants Acted in Concert and with Scienter to Manipulate LNAI on Nasdaq**

114. Derived and extracted in large part from actual trading records reviewed and still

---

Wu, *Short Selling and the Price Discovery Process*, 25 REV. FIN. STUD. 287, 287 (2013) (finding that short selling accelerates the incorporation of public information into stock prices and reduces post-earnings-announcement drift following negative earnings surprises); Robert M. Bushman & Jedson Pinto, *The Influence of Short Sellers on Negative Press Coverage and Price Discovery* (Apr. 2019) (unpublished manuscript) (finding that negative information is incorporated into stock prices more rapidly when short-selling constraints are relaxed).

under continuing comprehensive analysis and review, Defendants did not act independently. Instead, Defendants pursued a coordinated scheme to engage knowingly in a pattern of trading and practices, with intent to defraud and conceal, to manipulate the price of LNAI shares on Nasdaq.

115. Evidence of Defendants acting in concert includes temporal clustering, synchronized volume spikes, FTD-volume correlation, price suppression timing and Nasdaq Threshold Securities List exploitation. For example, temporal clustering included FTD clusters on November 6 and 7, 2025 totaling approximately 2.9 million shares, FTD clusters during the period March 18 to 23, 2026 totaling approximately 20.5 million shares, and FTD clusters during the period April 8 to 10, 2026 totaling approximately 2.7 million shares. Synchronized volume spikes occurred on January 8, 2026, when approximately 312 million shares traded on Nasdaq, representing an 8.6x trading volume multiple; February 14, 2026, when approximately 387 million shares traded on Nasdaq representing a 10.7x trading volume multiple, and March 18, 2026, when approximately 554 million shares traded on Nasdaq, representing a 15.3x trading volume multiple. Examples of FTD-volume correlation of 70 to 80% correlation on the same or next day includes November 6-7, 2025, with trading volume of 169,777,760 shares, volume of 4.7x the outstanding shares, outstanding FTD cluster of 2,884,449 million shares, and coinciding with a 20.6% stock price decline from $1.17 to $0.93; and the January to February 2026 period during which coordinated volume spikes on January 8, January 15, and February 14, 2026 paired with cumulative FTDs exceeding 11 million shares, resulted in a 61.9% cumulative price decline through February 28, 2026. An example of inclusion on the Nasdaq Threshold Securities List is March 18 through 23, 2026, during which there was a volume spike of 554 million shares and a FTD cluster of 20.5 million shares, maintaining downward price pressure and preventing any recovery toward previous trading levels. An example of Nasdaq Threshold Securities List

27

exploitation is LNAI's status as a threshold security from March 23, 2026 through April 2, 2026, during which Defendants knowingly and intentionally violated Reg SHO Rule 203(b)(3) by maintaining FTDs of 5,631,016 shares on March 27, 2026, specifically on the fifth consecutive listing day when Reg SHO Rule 203(b)(3) mandates mandatory buy-in closure. Rather than curing the threshold list status as required by the 13-calendar-day cure window, Defendants maintained and extended fails-to-deliver through the full 11-day listing period (March 23 through April 2, 2026), generating 20.5 million aggregate shares of fails and suppressing the stock price during this period when the buy-in requirement would have forced price recovery. This deliberate exploitation of the threshold list mechanics to extend the duration of artificial price suppression evidences Defendants' knowledge of Reg SHO requirements and intent to violate them.

116.    These coordinated trading patterns are inconsistent with random market activity. Instead, these patterns evidence a systematic scheme to execute coordinated naked short sales, generate fails-to-deliver (FTDs), manipulated suppression of stock price through artificial volume, and exploiting regulatory thresholds.

117.    Moreover, Defendants acted and continue to act at all times with scienter. Specifically, Defendants know that their naked short selling violates 17 C.F.R. § 242.200; know, understand and manipulate Reg SHO threshold mechanics and Rule 203(b)(3) buy-in requirement; know that coordinated volume spikes depress price; manifested an aligned short-selling profit motive; and knew and understood the shareholder harm that their trading caused.

E.  **Accounts That Engaged in Fraudulent Naked Short Selling of LNAI**

118.    During the period November 5, 2025 through May 4, 2026, trading records obtained through continuing discovery in this case and buy-orders information available independently to Plaintiff-Lunai reveal that Defendants engaged in fraudulent naked short selling of LNAI.

Defendants' scheme to engage in the fraudulent naked short selling included manipulating the market for Lunai's common stock by employing multiple, mutually reinforcing manipulative techniques, including (a) marking the close, to create a false impression of Lunai's true closing valuation; (b) painting the tape, to create a false impression of independent market demand; (c) sham reset transactions, to conceal the true scope of Defendants' naked short position and evade Reg SHO's close-out requirements and regulatory detection; (d) round trip transactions, to generate the appearance of trading volume, establish artificial reference prices, and create a false appearance that a settlement obligation has been satisfied; (e) wash trading, to create a false or misleading appearance of trading volume or activity without any genuine change in beneficial ownership; (f) spoofing or layering, to place orders purporting to create interest on either the buy or sell side with the intent to cancel those orders before execution; (g) short sales as the majority of all trading, to present a trading volume pattern inconsistent with ordinary two-sided market activity and a false impression of artificial supply of shares; and (h) price formation in an empty session, to trade to set a security's price where there is no other counterbalancing genuine trading activity in that session. Each technique is described in detail in the succeeding paragraphs below. Defendants did not employ these techniques in isolation; instead, these were coordinated components of a single scheme with the common purpose and effect of artificially suppressing the market price of Lunai's common stock.

119.    The direct result of Defendants' scheme was and continues to be substantial economic harm to Plaintiff, including dilution-equivalent price suppression, impairment of the company's ability to raise capital on favorable terms, increased cost of capital to the company, removal from the Nasdaq Threshold Securities List and reputational and going-concern harm. Given the ongoing discovery to identify Defendants DOES 5-50, ROE CORPORATIONS 2-50,

29

and XYZ LLCS 6-50, Plaintiff Lunai estimates its current economic damages in the amount of hundreds of millions of dollars.

120. The devastating direct effect of the fraudulent naked short selling scheme also included Lunai being kicked off the Russell 3000 Index and failing to qualify for the Russell 2000 Index.

121. "Marking the Close" is a manipulative trading technique in which a trader places purchase or sale orders at or near the close of the trading session, in a size and manner calculated to influence the reported closing price of a security, rather than for any legitimate investment purpose. Because closing prices are widely disseminated, relied upon for portfolio valuation, margin calculations, and index and benchmark purposes, and often influence trading activity in the following session, artificially inflating or depressing the closing price allows a manipulator to create a false impression of a security's value that persists beyond the manipulative trades themselves.

122. "Painting the Tape" is a manipulative technique in which a trader or group of coordinated traders executes a series of purchases (often in successive, incremental amounts at increasing prices) among accounts they control or with which they coordinate, in order to create a false or misleading appearance of trading activity, demand, or price movement in a security on the consolidated tape. Because the tape is a primary source of real-time information relied upon by other market participants, painting the tape is designed to induce those participants to buy or sell based on a fabricated picture of genuine market interest.

123. "Sham reset transactions" are a manipulative technique most specific to naked short selling in which a matched stock/option -- or stock/stock -- trade is structured so that one side of the trade is never intended to settle, giving the appearance that a fail-to-deliver position has been

30

closed out when it has not. This is a technique used to evade the mandatory close-out requirements of Reg SHO Rule 204. Rather than purchasing or borrowing shares to close out a position as required by 17 C.F.R. § 242.204, sham reset transactions involve entering into a series of paired transactions with a counterparty, often structured as buy-writes in deep in-the-money options or basket trades including the victim-issuer's stock together with other securities, in which Defendants knew, thus acting with scienter, that their trades would not result in actual delivery of these shares. Meanwhile, these sham reset transactions enable the naked short sellers to represent to a clearing firm or broker-dealer, as well as on the issuer's books, that the fail-to-deliver position had been closed out, when in fact the position — and the artificial supply of the issuer's shares it represented — continued uninterrupted as reflected in fails-to-deliver data.

124.     "Round trip transactions" are a manipulative technique involving pre-arranged or coordinated trades in which the same or substantially the same security is bought and sold — often between related accounts, or through a matched counterparty — within a short time frame, at prices and quantities designed to offset one another, without any genuine change in economic exposure or beneficial ownership. Round trip transactions are used to generate the appearance of trading volume, to establish artificial reference prices, or, in the naked short selling context, to create a false appearance that a settlement obligation has been satisfied.

125.     "Wash trading," similar to "round trip transactions, is a manipulative technique that refers to trades in which a party, directly or through affiliated accounts, simultaneously or near-simultaneously buys and sells the same security, resulting in no genuine change in beneficial ownership, for the purpose of creating a false or misleading appearance of trading volume or activity.

126.     "Spoofing" or "layering" is a manipulative technique referring to the placement of

one or more orders with the intent to cancel those orders before execution, in order to create a false impression of buy-side or sell-side demand and induce other market participants to trade at prices favorable to the spoofing party.

127.    "Short sales as the majority of all trading" is a descriptor of manipulative activity that characterizes a manipulative trading scenario in which a majority of total reported trading volume presents as a pattern inconsistent with ordinary two-sided market activity and indicative of the artificial supply of shares created by Defendants' naked short selling.

128.    "Price formation in an empty session" is a descriptor of a manipulative trading phenomenon for a manipulator's trade effectively setting a security's price because there is no other genuine trading activity in that session to counterbalance it. Reg SHO release language describes this manipulation concept relating principally to thinly-traded securities, which are more vulnerable to manipulation precisely because a small number of trades can move the reported price, and that naked short selling can allow manipulators to force prices down further than would be possible in ordinary short-selling conditions.

### Seven Points Capital

129.    Defendant Seven Points Capital, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Seven Points Capital profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

130.    Specifically, Defendant Seven Points Capital's unlawful trading activity to the detriment of Lunai and its shareholders, including, but not limited to:

    a.    On November 5, 2025, the onset date of the manipulative trading campaign, Seven Points Capital executed approximately 655,281 short sale shares of LNAI. On this

date, a locate for 1,123,289 shares was requested, and 181,000 shares were approved for borrowing. The November 5, 2025 trading session was followed by a 20.6% decline in LNAI's closing price from $1.17 to $0.93 over the two days of November 5 and 6, 2025. Seven Points Capital thus executed short sales exceeding the approved locate by approximately 464,281 shares, more than two-thirds of the shares requested. Notwithstanding the unavailability of shares to borrow, such being the lawful means for engaging in short selling, Seven Points Capital executed the short sales in knowing and direct violation of the federal securities laws.

b.  On November 6, 2025, Seven Points Capital executed approximately 2,200 additional short sales of LNAI without a valid locate. Defendant Seven Points Capital proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

c.  On March 17, 2026, Seven Points Capital executed approximately 881,176 additional short sales of LNAI. On this date, a locate for 27,489,917 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Seven Points Capital proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

d.  On March 20, 2026, Seven Points Capital executed approximately 687,000 additional short sales of LNAI. On this date, a locate for 1,914,030 shares was requested; however, zero shares were approved for borrowing. Moreover,

33

independent market data confirmed that there were zero available shares to borrow. Defendant Seven Points Capital proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

e.  On March 26, 2026, Seven Points Capital executed approximately 755,759 additional short sales of LNAI. On this date, a locate for 2,064,835 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Seven Points Capital proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

f.  On April 7, 2026, Seven Points Capital executed approximately 257,474 additional short sales of LNAI. On this date, a locate for 2,064,835 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Seven Points Capital proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

g.  On April 15, 2026, Seven Points Capital executed approximately 13,300 additional short sales of LNAI. On this date, independent market data confirmed that there were zero available shares to borrow. Defendant Seven Points Capital proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

h. On May 4, 2026, Seven Points Capital executed approximately 10,000 additional short sales of LNAI. On this date, independent market data confirmed that there were zero available shares to borrow. Defendant Seven Points Capital proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

131. In aggregate, during the period March 17 through April 7, 2026, Seven Points Capital executed a total of approximately 2,581,409 LNAI short sale shares against a record of zero locate grants on any of the relevant dates. Together with the activity of the November 5, 2025 onset-date, the trading referenced in the foregoing paragraph (124), and additional trading, Seven Points Capital executed a total of approximately 3,369,462 LNAI shares without locate authorization for any but a small fraction of that volume.

132. The naked short sales of approximately 3,369,462 LNAI shares violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Edward Griesedieck*

133. Defendant Edward Griesedieck, during a period including the dates of November 5, 2025 through April 7, 2026 and in near lockstep with his former employer Seven Points Capital, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Griesedieck profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

134. Specifically, Defendant Griesedieck engaged in the following unlawful trading

35

activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, the onset date of the manipulative trading campaign, Griesedieck executed approximately 40,000 short sale shares of LNAI. On this date, a locate for 40,000 shares was requested; however, zero shares were approved for borrowing. Notwithstanding the unavailability of shares to borrow, such being the lawful means for engaging in short selling, Griesedieck executed the short sales in knowing and direct violation of the federal securities laws.

b. On March 16, 2026, Griesedieck executed approximately 36,152 short sale shares of LNAI. Defendant Griesedieck proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

c. On March 17, 2026, Griesedieck executed approximately 812,340 additional short sales of LNAI between two trading accounts. On this date, a locate for 812,340 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Griesedieck proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

d. On April 7, 2026, Griesedieck executed approximately 73,312 additional short sales of LNAI. On this date, a locate for 73,312 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Griesedieck proceeded to execute naked short sales of LNAI in knowing and direct violation of

36

the federal securities laws, notwithstanding the absence of a confirmed locate.

135.    In aggregate, during the period of the trading referenced in the foregoing paragraph (128), and additional trading, Griesedieck executed a total of approximately 961,804 LNAI short sale shares against a record of zero locate grants on any of the relevant dates.

136.    The naked short sales of approximately 961,804 LNAI shares by Griesedieck violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

### Bisoke

137.    Defendant Bisoke, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Bisoke profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

138.    Specifically, Defendant Bisoke engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

   a.    On November 5, 2025, the onset date of the manipulative trading campaign, Bisoke executed approximately 10,108 short sale shares of LNAI. On this date, a locate for 10,108 shares was requested; however, zero shares were approved for borrowing. Notwithstanding the unavailability of shares to borrow, such being the lawful means for engaging in short selling, Bisoke executed the short sales in knowing and direct violation of the federal securities laws.

   b.    On November 25, 2025, Bisoke executed approximately 17,157 additional short

37

sales of LNAI. On this date, a locate for 17,157 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

c. On March 12, 2026, Bisoke executed approximately 89,490 additional short sales of LNAI. On this date, a locate for 89,490 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

d. On March 17, 2026, Bisoke executed approximately 819,551 additional short sales of LNAI. On this date, a locate for 819,951 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

e. On March 26, 2026, Bisoke executed approximately 164,593 additional short sales of LNAI. On this date, a locate for 164,593 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

f.  On April 7, 2026, Bisoke executed approximately 155,720 additional short sales of LNAI. On this date, a locate for 155,720 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

g.  On May 4, 2026, Bisoke executed approximately 42,735 additional short sales of LNAI. On this date, a locate for 42,735 shares was requested; however, zero shares were approved for borrowing. Moreover, independent market data confirmed that there were zero available shares to borrow. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

139.    In aggregate, during the period of the trading referenced in the foregoing paragraph (132), and additional trading, Bisoke executed a total of approximately 1,299,354 LNAI short sale shares against a record of zero locate grants on any of the relevant dates.

140.    The naked short sale of approximately 1,299,354 LNAI shares by Bisoke violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

141.    In the execution of its part in Defendants' manipulative trading scheme, Bisoke opened four separate accounts with the same broker-dealer, in rapid succession as each prior account approached position concentration thresholds.

39

*ETERNALENVY*

142. Defendant ETERNALENVY, during a period including the dates of March 12, 2026 through April 24, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant ETERNALENVY profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

143. Specifically, Defendant ETERNALENVY engaged in unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

   a. On March 12, 2026, ETERNALENVY executed approximately 591,613 short sale shares of LNAI. On this date, ETERNALENVY had no valid borrow authorization for the shares sold short.

   b. On March 16, 2026, one day before the peak coordination session of March 17, 2026, ETERNALENVY executed approximately 391,483 short sale shares of LNAI, establishing an advance short position at prevailing prices of $0.48 per share. On this date, ETERNALENVY had no valid borrow authorization for the shares sold short. ETERNALENVY's March 16 positioning preceded by one day the largest single-day short sale event in the LNAI trading record.

   c. On March 17, 2026, ETERNALENVY executed approximately 6,444,475 additional short sales of LNAI. On this date, independent market data confirmed that there were zero available shares to borrow in the institutional lending market, with borrow fees having risen from 49.5% per annum on March 13, 2026 to 621.45% per annum. Defendant ETERNALENVY proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

d.  On March 20, 2026, ETERNALENVY executed approximately 1,060,000 additional short sales of LNAI. On this date, independent market data reflected that LNAI borrow availability remained at effectively zero and that the annualized borrow rate had reached 2,315.75% per annum at the open of trading. Defendant ETERNALENVY proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

e.  On March 26, 2026, ETERNALENVY executed approximately 1,500,000 additional short sales of LNAI. On this date, LNAI had been on the Nasdaq Threshold Securities List since March 19, 2026. Despite the heightened regulatory scrutiny, Defendant ETERNALENVY proceeded to execute 1,500,000 additional naked short sale shares of LNAI in knowing and direct violation of the federal securities laws.

f.  On April 7, 2026, ETERNALENVY executed approximately 1,755,749 additional short sales of LNAI. This was the date of Lunai's announcement of its first revenue-generating defense collaboration through BioSymetrics. Despite the positive material announcement, Defendant ETERNALENVY proceeded to execute nearly 2 million naked short sales at prices as low as $0.3764 per share, LNAI in knowing and direct violation of the federal securities laws.

g.  On April 24, 2026, four days after the Nasdaq Hearings Panel issued its compliance plan decision, ETERNALENVY executed approximately 63,845 additional short sales of LNAI. Despite that regulatory decision to permit LNAI's continued listing, Defendant ETERNALENVY executed additional naked short sales of LNAI in

41

knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

144.    In aggregate, during the period of the trading referenced in the foregoing paragraph (137), and additional trading, ETERNALENVY executed a total of approximately 11,807,165 LNAI short sale shares, representing approximately 32.5% of LNAI's total outstanding shares as of the trading dates. All of ETERNALENVY's documented short sale activity occurred on dates on which independent market data confirmed zero or near-zero borrow availability of LNAI shares in the institutional lending market.

145.    The naked short sale of approximately 11,807,165 LNAI shares by ETERNALENVY violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Hold Brothers*

146.    Defendant Hold Brothers, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, and profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

147.    Specifically, Defendant Hold Brothers engaged in unlawful trading activity, to the detriment of LNAI and its stockholders, including, but not limited to:

   a.  On November 5, 2025, Hold Brothers executed approximately 461,977 short sale shares of LNAI. As noted above, this date was the onset date of the manipulative trading campaign. These short sales were executed without a valid locate in

42

knowing and direct violation of the federal securities laws.

b.  On November 25, 2025, Hold Brothers executed approximately 6,200 additional short sales of LNAI without a valid locate. Notwithstanding the unavailability of shares to borrow, Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

c.  On February 9, 2026, Hold Brothers executed approximately 800 additional short sales of LNAI without a valid locate. Notwithstanding the unavailability of shares to borrow, Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

d.  On February 10, 2026, Hold Brothers executed approximately 500 additional short sales of LNAI without a valid locate. Notwithstanding the unavailability of shares to borrow, Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

e.  On February 19, 2026, Hold Brothers executed approximately 103 additional short sales of LNAI without a valid locate. Notwithstanding the unavailability of shares to borrow, Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

f.  On March 26, 2026, Hold Brothers executed approximately 45,276 additional short sales of LNAI. On this date, LNAI remained on the Nasdaq Threshold Securities List. Nevertheless, Defendant Hold Brothers executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

g.  On April 7, 2026, the date of LNAI's positive clinical announcement, Hold Brothers executed approximately 135,634 additional short sales of LNAI. These

short sales on the date of a positive corporate announcement are consistent with and reasonably explained by a pattern of manipulative short selling designed to neutralize the market effect of positive news, in knowing and direct violation of the federal securities laws.

h.  On May 1, 2026, Hold Brothers executed approximately 124,073 additional short sales of LNAI without a valid locate. Notwithstanding the unavailability of shares to borrow, Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

i.  On May 4, 2026, Hold Brothers executed approximately 500 additional short sales of LNAI without a valid locate. Notwithstanding the unavailability of shares to borrow, Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

148.    In aggregate, during the period of the trading referenced in the foregoing paragraph (141), and additional trading, Hold Brothers executed a total of approximately 775,063 LNAI short sales through a registered U.S. execution venue. Hold Brothers' trading pattern spans the entire relevant period.

149.    Hold Brothers routed its naked short sale orders through the execution infrastructure of a registered U.S. clearing firm. As a correspondent introducing broker-dealer, Hold Brothers bore direct supervisory responsibility for the naked short selling conducted through its accounts.

150.    These trades, and other similar trades of LNAI by Hold Brothers, violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and

44

(b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*SageTrader*

151. Defendant SageTrader, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

152. Specifically, Defendant SageTrader engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, SageTrader executed approximately 209,831 naked short sale shares of LNAI. On this date, the onset date of the manipulative trading campaign, LNAI experienced 169,777,760 total shares traded. Notwithstanding the acute short selling conditions prevailing on this date, SageTrader executed these short sales without a valid locate, in knowing and direct violation of the federal securities laws.

b. On November 6, 2025, SageTrader executed approximately 1,602 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

c. On November 20, 2025, SageTrader executed approximately 357 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

d. On November 25, 2025, the second major coordination date following the November 5-6 trading cluster, SageTrader executed approximately 34,323 naked short sale shares of LNAI. Notwithstanding the absence of valid locate authorization for these shares, SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

e. On March 12, 2026, SageTrader executed approximately 287,332 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

f. On March 16, 2026, SageTrader executed approximately 18,050 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

g. On March 17, 2026, SageTrader executed approximately 2,255,877 additional short sales of LNAI without a valid locate. This was SageTrader's largest documented LNAI short sale session, executed in knowing and direct violation of the federal securities laws. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

h. On March 18, 2026, SageTrader executed approximately 37,725 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

i.  On March 20, 2026, SageTrader executed approximately 45,043 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

j.  On March 26, 2026, SageTrader executed approximately 83,435 additional short sales of LNAI through a registered U.S. execution venue. On this date, LNAI remained on the Nasdaq Threshold Securities List. Nevertheless, Defendant SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

k.  On March 27, 2026, SageTrader executed approximately 501 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

l.  On April 7, 2026, SageTrader executed approximately 84,551 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

m.  On April 15, 2026, SageTrader executed approximately 16,865 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

n.  On April 24, 2026, SageTrader executed approximately 294,424 naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader

executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

o. On May 4, 2026, SageTrader executed approximately 1,644,345 additional naked short sales of LNAI. Notwithstanding the unavailability of shares to borrow, SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

153. In aggregate, during the period of the trading referenced in the foregoing paragraph (146), and additional trading, SageTrader executed a total of approximately 5,014,261 LNAI naked short sale shares, representing approximately 13.82% of the total outstanding LNAI shares.

154. The naked short sale of approximately 5,014,261 LNAI shares by SageTrader violated Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Tyler Kling*

155. Defendant Tyler Kling, during a period including the dates of November 5, 2025 through March 26, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Kling profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

156. Specifically, Defendant Kling engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, the onset date of the naked short selling coordination, Kling executed approximately 173,611 short sale shares of LNAI without a valid

48

locate, in knowing and direct violation of the federal securities laws.

b.  On November 25, 2025, Kling executed approximately 153,374 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

c.  On March 17, 2026, the peak date of the naked short selling coordination, Kling executed approximately 485,000 short sale shares of LNAI between two separate accounts, without a valid locate, in knowing and direct violation of the federal securities laws.

d.  On March 26, 2026, Kling executed approximately 268,888 naked short sale shares of LNAI. Broker records of Kling's separate trading reveal same-minute coordination of these trades. Despite the absence of a valid locate, Defendant Kling executed the short sale in knowing and direct violation of the federal securities laws.

157.  In aggregate, during the period of the trading referenced in the foregoing paragraph (150), and additional trading, Kling executed a total of approximately 1,080,873 LNAI naked short sale shares.

158.  The naked short sale of approximately 1,080,873 LNAI shares by Kling, on dates corresponding closely to the naked short selling activity of other defendants named above, violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Marlena Malecka Kraska*

159.    Defendant Marlena Malecka Kraska, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Kraska profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

160.    Specifically, Defendant Kraska engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a.    On November 5, 2025, the onset date of the naked short selling coordination, Kraska executed approximately 2,292 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

b.    On November 25, 2025, the onset date of the naked short selling coordination, Kraska executed approximately 196 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

c.    On November 26, 2025, the onset date of the naked short selling coordination, Kraska executed approximately 2,034 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

d.    On February 10, 2026, the onset date of the naked short selling coordination, Kraska executed approximately 2,601 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

e.    On April 15, 2026, the onset date of the naked short selling coordination, Kraska executed approximately 766 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

f.    On May 4, 2026, the same date Defendants Bisoke and SageTrader executed naked

short sales of nearly 2 million LNAI shares, Defendant Marlena Malecka Kraska executed approximately 9,202 naked short sale shares of LNAI.

161.    In aggregate, during the period of the trading referenced in the foregoing paragraph (154), and additional trading, Defendant Kraska executed a total of approximately 17,091 LNAI naked short sale shares. To enable execution of those trades, Defendant Kraska submitted through a trading interface 31 orders.

162.    The timing of Defendant Kraska's naked short sale of LNAI was not incidental and constituted active engagement in fraudulent and manipulative naked short selling of LNAI with one or more other defendants, profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

163.    Defendant Kraska's participation in Defendants' broader naked short selling scheme violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Wojciech Malecki*

164.    Defendant Wojciech Malecki, during a period including the dates of November 5, 2025 through May 1, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Malecki profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

165.    Specifically, Defendant Malecki engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a.    On November 5, 2025, the onset date of the naked short selling coordination,

51

Malecki executed approximately 11,402 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

b. On November 25, 2025, Malecki executed approximately 7,362 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

c. On April 7, 2026, Malecki executed approximately 50,734 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

d. On April 15, 2026, Malecki executed approximately 46,931 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

e. On May 1, 2026, three days before Defendants Bisoke, SageTrader, and Kraska executed a high volume of naked short sales of LNAI shares, Defendant Malecki executed approximately 48,282 naked short sale shares of LNAI.

166. In aggregate, during the period of the trading referenced in the foregoing paragraph (159), and additional trading, Defendant Malecki executed a total of approximately 164,711 LNAI naked short sale shares. To enable execution of those trades, Defendant Malecki submitted through a trading interface 189 orders.

167. Defendants Malecki and Kraska coordinated with each other and one or more other defendants to engage in fraudulent and manipulative naked short selling of LNAI, profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

168. Defendant Malecki's participation in Defendants' broader naked short selling scheme violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course

52

of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Quant Lab SFO FZCO*

169.    Defendant Quant Lab, during a period including the dates of November 5, 2025 through April 15, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Quant Lab profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

170.    Specifically, Defendant Quant Lab engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

    a.   On November 5, 2025, the onset date of the naked short selling coordination, Quant Lab executed approximately 1,914 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

    b.   On November 25, 2025, Quant Lab executed approximately 196 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

    c.   On November 26, 2025, Quant Lab executed approximately 1,383 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

    d.   On April 7, 2026, Quant Lab executed approximately 789 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal securities laws.

    e.   On April 15, 2026, Quant Lab executed approximately 1,044 short sale shares of LNAI without a valid locate, in knowing and direct violation of the federal

securities laws.

171.    In aggregate, during the period of the trading referenced in the foregoing paragraph (164), and additional trading,  Defendant Quant Lab executed a total of approximately 5,326 LNAI naked short sale shares. To enable execution of those trades, Defendant Quant Lab submitted through a trading interface 14 orders. Moreover, Kraska, as the Founder and Chief Executive Officer of Quant Lab, executed or caused to be executed the approximately 5,326 LNAI naked short sale shares.

172.    Defendant Quant Lab, as an instrument controlled by Defendant Kraska, coordinated with Defendants Kraska, Malecki, and one or more other defendants to engage in fraudulent and manipulative naked short selling of LNAI, profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined. For example, on November 25, 2026, both Defendant Quant Lab and Defendant Kraska sold 196 shares at $1.53 per share in the same minute through two different trading venues. Defendant Quant Lab's registered email address bears the name of Defendant Kraska.

173.    Defendant Quant Lab's participation in Defendants' broader naked short selling scheme violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

174.    Examples of some of the manipulative techniques employed by the above-named Defendants and by Defendants Does 5-50, Roe Corporations 2-50, and XYZ LLCs 6-50, inclusive, as part of their naked short selling scheme and coordinated trading activity in further of their enterprise include, but are not limited to:

a. On March 16, 2026, Defendants ETERNALENVY and Griesedieck between them accounted for 74% per cent of the short selling in a trading session that established the following morning's opening depressed stock price;

b. On March 12, 2026, Defendant ETERNALENVY engaged with Defendant Griesedieck in round trip naked short sales and covers inside the same trading session;

c. On March 12, 2026, Defendant ETERNALENVY engaged with a likely known Defendant Doe in round trip naked short sales and covers inside the same eight-minute time frame; and

d. On November 5, 2025, November 25, 2025, March 17, 2026, April 7, 2026, and May 4, 2026, 60 Defendants, including above-named Defendants and likely known Defendants from among Defendants Does 5-50, Roe Corporations 2-50, and XYZ LLCs 6-50, inclusive, recorded naked short selling and coordinated naked short selling activity on those six days alone.

e. Across 139 trading days covered by this Complaint, 299 likely known or identifiable Does, Roe Corporations and XYZ LLCs, including all above-named Defendants, executed and recorded naked short selling and coordinated naked short selling activity. On November 5, 2025, 147 Does, Roe Corporations and XYZ LLCs, including above-named Defendants, recorded short selling and coordinated naked short selling activity. On November 25, 2025, 152 Does, Roe Corporations and XYZ LLCs, including above-named Defendants, recorded short selling and coordinated naked short selling activity. On March 17, 2026, 121 Does, Roe Corporations and XYZ LLCs, including above-named Defendants, recorded short

55

selling and coordinated naked short selling activity. On April 7, 2026, 93 Does, Roe Corporations and XYZ LLCs, including above-named Defendants, recorded short selling and coordinated naked short selling activity. And, on May 4, 2026, 85 Does, Roe Corporations and XYZ LLCs, including above-named Defendants, recorded short selling and coordinated naked short selling activity.

175.    Defendants employed the use of non-traditional communications media via wire to coordinate and execute in coordination their naked short sale trades.

### F.  Additional Actual and Prospective Harm to Lunai

176.    This egregious, fraudulent, and manipulative naked short selling activity in LNAI directly harmed and continues to harm Lunai and its bona fide shareholders. Among the many harms resulting from this manipulative activity, as Lunai disclosed in a Form 8-K filed with the SEC on February 23, 2026, "[o]n February 6, 2026, Lunai [] received a letter from the Listing Qualifications Staff (the 'Staff') of The Nasdaq Stock Market LLC ('Nasdaq') notifying the Company that the Staff had determined to delist the Company's securities from Nasdaq." Lunai also disclosed that it requested timely a hearing before the Nasdaq Hearings Panel to appeal the Staff's determination.

177.    In order to avert and stay a trading suspension and delisting of its stock, Lunai sought review before a Nasdaq Hearings Panel, with a plan to regain compliance under Nasdaq Listing Rules 5550(a)(2) (the "Bid Price Rule") and 5550(b)(1) (the "Stockholders' Equity Rule").

178.    The primary subject of the Staff's delisting determination was Lunai's Bid Price Rule deficiency, under which the Company's common stock had failed for 30 consecutive business days to meet the minimum bid price of $1.00.  The Bid Price Rule deficiency was and continues to be a direct consequence of the depressive effect of fraudulent naked short selling activity on the

price of LNAI.

179.    This 30-day shortfall was the direct result of Defendants' knowing and fraudulent manipulation of the trading of Lunai's stock dating back to November 6, 2025, which finally forced Lunai's closing stock price below $1.00 per share in December 2025.

180.    Under Nasdaq's Stockholders' Equity Rule, an issuer is required to maintain stockholders' equity of at least $2.5 million. Lunai's compliance under this Listing Rule also suffered as a result of the artificial depression of its stock price.

181.    In a Form 8-K filed with the SEC on May 1, 2026, Lunai disclosed that on April 20, 2026, upon review of Lunai's business presentation and compliance plan, the Nasdaq Hearings Panel issued a decision granting Lunai until April 27, 2026 to re-establish compliance with the Stockholders' Equity Rule. In the same decision, the Hearings Panel granted Lunai until June 1, 2026 to demonstrate compliance with the Bid Price Rule, which requires sustaining a closing stock price above the $1.00 minimum bid price for ten consecutive business days.

182.    In the proceeding, the Hearings Panel remarked on Lunai's fundamental value and abnormality of a company in Lunai's market position and financial health, notwithstanding the turmoil in the company's stock listing, incurring a Bid Price Rule deficiency. Put differently, the Hearings Panel recognized the depressive effect of the anomalous short selling of LNAI.

183.    On April 27, 2026, Lunai requested brief extensions from the Hearings Panel until May 1, 2026 to demonstrate Stockholders' Equity Rule compliance and until June 4, 2026 to regain Bid Price Rule compliance.

184.    Also in the Form 8-K filed with the SEC on May 1, 2026, Lunai announced that the Company had completed the merger of Neurobridge into Lunai Bioworks IP, Inc. and then issuance of preferred stock on May 1, 2026, so as to re-establish compliance with the Stockholders'

Equity Rule. *See supra* ¶ 37. However, Lunai's extension request to the Hearings Panel, which would ratify the Neurobridge transaction for the purpose of Stockholders' Equity Rule compliance, remains pending as of this Complaint.

185.    Lunai has already lost access to capital due to the artificial downward pressure on its stock price, such that Lunai now is in the position of its Nasdaq Capital Market continued listing being under imminent threat because of Defendants' manipulative and fraudulent trading practices.

186.    Absent continued expedited discovery into the identities and transaction records of the as yet unidentified Defendants, upon receipt of which Lunai will be in a position to further amend this Complaint, name additional Defendants, and seek injunctive relief and damages, including all damages as may be available through pursuing the herein asserted civil RICO claim, the damage to Lunai's business objectives and going concern status will be irreparable.

### V.   CLAIMS FOR RELIEF

### Count I – Securities Fraud (Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)
### (Against all Defendants)

187.    Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

188.    Lunai's common stock is a "security" within the meaning of Section 3(a)(10) of the Exchange Act (15 U.S.C. § 78c(a)(10)) and is an "equity security" within the meaning of Section 3(a)(11) of the Exchange Act (15 U.S.C. § 78c(a)(11)).

189.    Lunai itself engaged in transactions in its own securities at prices affected by Defendants' manipulative conduct during the relevant period, including through Lunai's issuance of $20 million in convertible preferred equity in connection with the Neurobridge transaction and Lunai's subsequent issuance of preferred stock on May 1, 2026, each of which was issued at value depressed by Defendants' naked short selling and market manipulation described herein, thereby conferring purchaser-seller standing on Lunai under Section 10(b) and Rule 10b-5.

190. Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others, including, but not limited to engaging in the fraudulent schemes described herein, and making materially false and misleading statements.

191. Particularized fraudulent conduct included executing short sales without valid locates or reasonable grounds to borrow; generating persistent FTDs; using sham reset transactions to evade close-outs; marking the close; painting the tape; wash trades; and spoofing/layering, each creating false market signals regarding supply, demand, and settlement integrity.

192. Defendants' scienter is established by Defendants' repeated zero-locate trading on known zero-borrow days, coordinated timing across multiple accounts and entities on peak dates, exploitation of Threshold list mechanics to evade buy-ins, and trading patterns that neutralized positive corporate news.

193. As to certain broker-dealer entity Defendants and their principals, scienter is further established by each entity's documented history of regulatory sanction for supervisory and compliance failures predating the conduct alleged herein which placed each entity and its responsible supervisory personnel on direct notice of its obligations under Reg SHO, such that each entity's continued execution of naked short sales without valid locates constitutes knowing or, at minimum, severely reckless conduct imputable to the entity through its supervisory personnel

59

responsible for trading compliance.

194.   As to the individual and entity Defendants (including foreign entity Defendants), including Griesedieck, Bisoke, ETERNALENVY, Kling, Kraska, Malecki, and Quant Lab, scienter is further established by each such Defendant's repeated, deliberate execution of short sales on dates on which that Defendant knew, based on that Defendant's own locate requests and denials, that no shares had been approved for borrowing, coupled with the timing of that Defendant's trading in coordination with other named Defendants on the peak coordination dates identified throughout this Complaint.

195.   By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] ("Section 10(b)") and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] ("Rule 10b-5").

196.   Section 10(b) and Rule 10b-5 allow private rights of action against primary violators of those provisions. *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).

197.   As a direct and proximate result of Defendants' securities fraud and manipulative trading of the common stock of Lunai, Lunai suffered economic loss and damages including price suppression diminishing market capitalization, loss of access to capital on reasonable terms, increased cost of capital, index removal harm, reputational injury, and expenses associated with Nasdaq proceedings, with damages to be proven at trial.

### COUNT II – Market Manipulation (Section 9(a) of the Exchange Act)
### (Against All Defendants)

198.   Plaintiff *realleges* and incorporates the foregoing paragraphs herein by reference.

199.   Lunai's common stock is a "security" within the meaning of Section 3(a)(10) of the Exchange Act (15 U.S.C. § 78c(a)(10)).

60

200. Section 9(a) of the Exchange Act allows "any person who shall purchase or sell any security at a price which was affected by such act or transaction" to "sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction." 15 U.S.C. § 78i(f).

201. Lunai is an entity engaged in the purchase or sale of its common stocks, which terms include "the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance." 15 U.S.C. § 78c-2(b).

202. As set forth above, Lunai's own securities transactions during the relevant period, including its issuance of convertible preferred equity and preferred stock described herein, were purchases or sales of a security at a price affected by Defendants' manipulative acts and transactions within the meaning of 15 U.S.C. § 78i(f).

203. Defendants executed transactions that were manipulative by intent and design, including executing naked short sales without valid locates or reasonable grounds to borrow; generating persistent FTDs; using sham reset transactions to evade close-outs; marking the close; painting the tape; wash trades; and spoofing/layering, each creating false market signals regarding supply, demand, and settlement integrity. These manipulative trades were designed to and did create a false and misleading appearance of active trading, market depth, and price for LNAI, artificially depressed the company's stock price and misled market participants, including with respect to the market's assessment of the stock's value.

204. Defendants' FTD-generating sales involved no bona fide change in beneficial ownership and were effected to create artificial supply and manipulate price.

205. Lunai's price was affected by such acts and transactions, and Lunai sustained damages as a direct and proximate result, including capital market harms and listing-related

injuries.

206.    As a direct and proximate result of Defendants' manipulation of the price of Lunai's securities on the Nasdaq, Plaintiff has suffered damages in connection with and as a result of the manipulative trading of the common stock of Lunai.

## COUNT III – Civil Conspiracy to Defraud
### (Predicated on Wire-Fraud Conduct Under 18 U.S.C. § 1343)
#### (Against All Defendants)

207.    Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

208.    Title 18 United States Code section 1343, the federal criminal wire fraud statute, defines wire fraud as "[w]hoever, having devised … any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … in interstate … commerce, any writings … for the purpose of executing such scheme or artifice…."

209.    Defendants devised and executed a scheme to defraud and obtain money or property through false pretenses, representations, and promises, transmitting or causing to be transmitted writings by means of interstate wire communications for the purpose of executing the scheme, including electronic order routing, confirmations, and clearing communications associated with naked short sales and sham resets.

210.    The wire communications transmitted in furtherance of this scheme include, without limitation, the electronic locate requests and locate denials, order-routing instructions, and trade confirmation messages transmitted by and among Defendants, and as a result of the trading instructions and trades by and among their broker-dealers and clearing firms, on each of the dates and in the volumes identified above in connection with each named Defendant's short sale activity, including the locate requests referenced above, each of which Plaintiff alleges was transmitted by

interstate wire in furtherance of Defendants' scheme to defraud.

211. Defendants' conduct constitutes a civil conspiracy to defraud under Delaware law. Two or more Defendants agreed, expressly or tacitly, to accomplish an unlawful purpose — namely, to defraud Lunai and manipulate the market for its securities — or to accomplish a lawful purpose by unlawful means, including the wire-transmitted false locate confirmations, order-routing instructions, and trade confirmations described above. The existence of that agreement is evidenced by the coordinated and often same-minute trading described throughout this Complaint, including round-trip transactions between ETERNALENVY and Griesedieck, the coordinated trading between Malecki and Kraska, and Kraska's control of Quant Lab as her corporate instrumentality. Each Defendant committed one or more overt acts in furtherance of that agreement, including the specific wire transmissions identified above, and Defendants' conspiracy was intentional, wrongful, and targeted at Lunai, causing damages exceeding $75,000.

212. Defendants effected their manipulative naked short sales intentionally by means of wire in interstate commerce in order to execute their securities fraud scheme against Lunai.

213. As a direct and proximate result of Defendants' civil conspiracy to defraud, Plaintiff has suffered the economic and market harms described herein, including depressed price, capital impairment, and listing-related damages, in connection with the wire-fraud-predicated conspiracy and manipulative trading of the common stock of Lunai.

### COUNT IV – Racketeering Activity (18 U.S.C. §§ 1962, 1964(c))
**(Against All Defendants)**

214. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

215. Title 18 United States Code section 1962 (18 U.S.C. § 1962), the United States Federal Racketeering Influenced and Corrupt Organizations (RICO) statute, prohibits association with any enterprise "in the conduct of such enterprise's affairs through a pattern of racketeering

activity" and prohibits any conspiracy to so associate.

216. "Racketeering activity" includes "fraud in the sale of securities" and any act which is indictable under 18 U.S.C. § 1343.

217. Pursuant to 18 U.S.C. § 1964, engaging in prohibited racketeering activity may give rise to civil liability for threefold (treble) damages sustained by Plaintiff and the cost of the suit to recover such damages.

218. Defendants associated together as an enterprise and conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, including securities fraud and acts indictable under 18 U.S.C. § 1343 (wire fraud).

219. Defendants structured the association-in-fact enterprise alleged herein as follows: the enterprise's common purpose was to profit from the artificial depression of LNAI's stock price through coordinated naked short selling and related manipulative trading techniques; the relationships among the enterprise's participants are evidenced by the coordinated and often same-minute trading described above, including, among other trades, round trip transactions between ETERNALENVY and Griesedieck, coordinated trading between Malecki and Kraska, and Kraska's control of Quant Lab as her corporate instrumentality; and the enterprise-exhibited longevity to pursue its fraudulent purpose, having operated continuously from November 5, 2025 through May 4, 2026, a period of approximately six months encompassing 139 trading days of coordinated activity.

220. From November 5, 2025 through and including May 4, 2026, Defendants engaged in repeated predicate acts on a common set of coordinated dates, across multiple accounts and entities, evidencing continuity and relationship, and concealed their activities via sham resets and evasion of Reg SHO close-out.

64

221.    Defendants engaged in this coordinated pattern and practice of naked short selling knowingly, each with an intent to defraud and conceal their participation in the enterprise.

222.    As a direct and proximate result of Defendants' racketeering activity, Lunai suffered injury to business and property, including depressed equity value, impaired ability to transact for shareholder benefit, elevated capital costs, and listing-related burdens and expenses.

223.    As a direct and proximate result of Defendants' racketeering activity, Defendants harmed Plaintiff-Lunai's Delaware corporate interests, including impairment of corporate fundraising initiatives, strategic transactions, and shareholder value accretion.

224.    As a direct and proximate result of Defendants' racketeering activity, Plaintiff has suffered damages in connection with and as a result of the enterprise racketeering active by manipulative trading of the common stock of Lunai.

225.    Lunai seeks treble damages and costs as permitted by the RICO statute.

### <u>COUNT V – Common Law Fraud</u>
**(Against All Defendants)**

226.    Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

227.    Defendants made false representations of present fact and engaged in deceptive conduct, including representing that short sales were compliant and settled when Defendants had not borrowed or arranged to borrow shares and used sham resets to falsely signal close-outs and delivery.

228.    Defendants knew or were recklessly indifferent to the falsity of these representations and deceptive practices, acting with intent to defraud, depress Lunai's stock, and profit from the artificial price decline.

229.    Defendants intended that market participants, intermediaries, regulators, and Lunai rely on the false appearance of lawful settlement, genuine market supply, and compliant trading in

LNAI, including through reported consolidated tape data and clearing records.

230.   Lunai directly and actually relied on the false appearance of lawful settlement and genuine market supply created by Defendants' scheme, including by relying on publicly reported trading volume, consolidated tape data, and the absence of any Threshold Securities List designation reflecting Defendants' true, unresolved fail-to-deliver positions, in making specific corporate decisions regarding the timing and terms of Lunai's capital-raising activities, including the terms of the $20 million convertible preferred equity issuance described above, and regarding the content of Lunai's public disclosures responding to its Nasdaq listing deficiencies. Lunai's reliance on the integrity of reported market data was reasonable and justified because Defendants' sham reset transactions and Defendants' other manipulative techniques described herein were specifically designed to and did conceal the true, unsettled nature of Defendants' short positions from public view.

231.   Defendants knew that the representations they made were false or with reckless indifference to the truth.

232.   As a direct and proximate result, Lunai suffered damages including price suppression, increased cost of capital, index removal harm, reputational injury, and listing-related expenses, all to be proven at trial.

233.   Defendants' false representations and deceptive conduct, Defendants' scienter, Defendants' intent, Plaintiff's reasonable reliance, and resulting damages to Plaintiff satisfy the elements of common law fraud.

## COUNT VI – Tortious Interference with Contract

234.   Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

235.   As an issuer with securities listed on the Nasdaq Capital Market, Plaintiff is a party

to a contract with the Nasdaq in the form of a Listing Agreement.

236.    Each Nasdaq-listed issuer is party to a Listing Agreement as a pre-condition to listing. That Listing Agreement with Nasdaq requires, *inter alia*, that companies comply with Nasdaq rules, including sustaining the $1.00 minimum bid price and maintaining minimum stockholders' equity.

237.    Nasdaq's communication in the Listing Qualifications Staff's February 6, 2026 delisting letter described above constituted an adverse action and impairment of Lunai's rights and benefits under its Listing Agreement directly caused by Defendants' interference. Lunai also alleges that Defendants' conduct tortiously interfered with Lunai's prospective continued business relationship with Nasdaq under the Listing Agreement by rendering Lunai's continued performance of, and benefit from, that relationship substantially more difficult and by creating a reasonable probability of its termination absent Lunai's costly remedial efforts.

238.    As parties sophisticated in securities trading, each Defendant was aware that Plaintiff is a party to a Listing Agreement with Nasdaq.

239.    Defendants, each of whom is a sophisticated securities market participant, knew or was substantially certain that Lunai had Listing Agreement obligations and that sustained price depression risked bid-price deficiency and related sanctions, each of which would have a further depressive effect on the price of Lunai stock.

240.    Defendants intentionally engaged in manipulative trading practices—naked short selling, FTD generation, close-out evasion, marking the close, and painting the tape—designed to, and that did, depress Lunai's stock price, functioning as the primary factor causing Lunai's Bid Price Rule deficiency and triggering Nasdaq proceedings.

241.    Defendants lacked justification or privilege to interfere with Lunai's performance

under its Listing Agreement, and their conduct directly and proximately caused Lunai to incur substantial harm, including costs to contest delisting, reputational damage, and market capitalization loss linked to contractual non-compliance exposure.

242.    Defendants' manipulative trading scheme had no justification and caused Plaintiff substantial injury through the damage to Plaintiff's stock price and the material burden of contesting the Nasdaq's delisting determination.

243.    Lunai suffered damages as a result of Defendants' interference, including legal and administrative costs, increased cost of capital, and further losses associated with bid-price and equity compliance remediation. Plaintiff does not seek any relief against, or adjudication of the rights or obligations of, Nasdaq under the Listing Agreement; Plaintiff seeks only monetary damages from Defendants for their tortious interference, such that complete relief may be accorded between Plaintiff and Defendants without Nasdaq's joinder as a party.

## VI.    JURY TRIAL DEMANDED

244.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all the issues so triable.

## VII.    REQUESTED RELIEF

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff against Defendants:

1. For compensatory and special damages in an amount to be determined at trial;

2. For injunctive relief;

3. For prejudgment interest and post-judgment interest;

4. For costs incurred in this action;

5. For reasonable attorneys' fees; and

6.  For such other and further relief as the Court deems just and appropriate.

/s/ Sidney S. Liebesman
Sidney S. Liebesman (DE ID 3702)
Carmella L. Cinaglia (DE ID 7032)
FOX ROTHSCHILD LLP
1201 N. Market St., Suite 1200
Wilmington, DE  19801
Tel.: (302) 622-4237
sliebesman@foxrothschild.com
ccinaglia@foxrothschild.com

Jacob S. Frenkel (*admitted pro hac vice*)
Brian S. Yu (DE ID 6482)
DICKINSON WRIGHT PLLC
1825 I Street, N.W., Suite 900
Washington, D.C.  20006
Tel: (202) 457-0160
jfrenkel@dwlaw.com
byu@dwlaw.com

Dated: August 3, 2026                *Attorneys for Plaintiff*

69