**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

LUNAI BIOWORKS, INC.,

Plaintiff,

v.

LIGHTSPEED FINANCIAL SERVICES GROUP LLC, COBRA TRADING, INC., OPAL SECURITIES, INC., SEVEN POINTS CAPITAL, LLC, SAGETRADER, LLC, HOLD BROTHERS CAPITAL, LLC, CHADD THOMAS HESSING, ZACHARY GOLDBERG, ETERNALENVY LLC FZ, EZRA GROTHE, WILLIAM EDWARD GONET, BISOKE, LLC, TYLER H. KLING, SANDY WONG, EDWARD T. GRIESEDIECK, TYLER J. WASSERMAN, DEAN E SCHMALTZ, HONGPENG PAN, WOJCIECH MALECKI, OMAR BEKTUROV, PRADEEP K VALLANDAS, BO KANG ZENG, KEVEN YEE, OWL HILL CAPITAL LLC, MATTHEW HOFMAN, TOPXINVEST LLC, LEO TANNER, TAKECHIP 2 LLC, RICO BOONE, DEREK CHENG, NAIDEN BORIMECHKOV, HQS LTD, ABHINAND REDDY VADDI REDDY, PRATEEK KUMAR, ALVERIA CAPITAL LTD, MARLENA MALECKA KRASKA, CS TRADES LLC, CALVIN NGUYEN, GABRIEL BONAMIGO, VIPER TRADING OY, SLAV ILIYANOV SARIYSKI, HYO JIN CHUN, SMILES TRADING LLC, CARBON CAPITAL FUND USALDUSFOND, EVELYN OW, SEE HWA TAN, SUHUA GUO, SHUK YEE HO, ALAN ANG, SEE LEE TAN, MATE HEGEDUS, BALA ANAND VADDI REDDY, MUNAF KHATUMBRA, MOCKINGBIRD EQUITY II LLC, DMITRY SMIRNOFF, ADAM GEFVERT, CHEN LI, KRISTIAN KURZYNA, ERNESTO RIOBO, ALFREDO ALEJANDRO CARRERO HURTADO,

Civil Action No. 26-549-CFC

JURY TRIAL DEMANDED

**REDACTED VERSION**
**SECOND AMENDED COMPLAINT**

| | |
|---|---|
| ALEJANDRO FELIPE MORAIS TEJERINA, YUWEI WANG, CHRISTIAN FAVALE, AARON TU SCHMALTZ, YASH KAMAT, GOAT MACHINE LLC, RICHARD CLARK WEBB, KRZYSZTOF MARIUSZ WIKLINSKI, YU MIAO, THI THU NGUYEN, BENJAMIN SCHEFFLER, ALEXANDER KORZHA, ESCHUNK TRADES LLC, JOSEPH GUEVARRA, ALEXANDER ODOM, CHRISTOPHER SEAMAN, XIAOLI ZHANG, JASON TIAN CHING NG, DANIYAR NURBAYEV, SCS TRIANGLES LLC, EDWIN HINDS JR, RICARDO SOLANO, RAMON PAULUS JOZEF VELTMEIJER, QUAINTOO INC, CSZ QUANTITATIVE LLC, AM TECHNOLOGIES LIMITED, PROVENCE SOPHICE SAS, AMIN GOLESTAN, JOHN FINKBEINER, MICHAEL DONOVAN, SIN WEE NELSON LIM, TAEJONG KIM, ANURAG VADDI REDDY, JTL CAPITAL ENTERPRISES LLC, CONG HAO WANG, GEORGE HUCKSTEPP, QUANTBRIX, LLC, ARNOLD LAU GUO ZHONG, WILLIAMS KAPITAL LLC, CALYSTRUM FZCO, RONG QUAN, JENNIFER POWELL, VIJNISH TREOHAN, JIWHAN CHO, SSP CAPITAL LTD, VARSITY TECH PTE. LTD., YI HAO TAN, BASIL HOUSEWRIGHT, WEN BIAO NG, JANET LYNN, CLINTON HILLEGASS, VARSITY TECH LTD, MIRZA TAIMURI, LAKESIDE ALGO FUND LP, GAVIN ZHI LONG, JULIE ALEN, GLEN RAYMOND LOUPIAS, MICHAEL PICONE, MEARAS CAPITAL LLC, MOHAMED FAYE, TAMARA GROEN, MHER DANIELYAN, TRADING IN SECURITIES OPORTO DELTA, LLOYD ATKINSON, TATIANA KORZHA, EPIC EDGE TRADING OY, KYLE SPIVEY, JIPING HU, LOUIS LEMBERGER, DUSTIN OLYAN, DENNIS KORZHA, IGOR KORZHA, YEW CHEE HUAT, QUANT LAB SFO FZCO, HUDSON TRADES LLC, CONG ZHAO, JACOB LEE, CHIN ZHI YOU, MADILYN LE, | **REDACTED VERSION**<br>**SECOND AMENDED COMPLAINT** |

MATTHEW HOPE, JARED GARCIA, ELHAM HAMIN, JACOB CHUPICK, JEFFERY LYNN, QUANTS EDGE CAPITAL LLC, ZWICK TRADING GROUP LLC, LAWRENCE FEHRENBAKER, ARCADIA ANALYTICS LLC, KENICHI FUJISE, MICHAEL LEE, BEARISH VENTURES LLC, ROMAN STERLIN, VIVEK DANDARE, HUNTER SNYDER, SUMAN CHEPURI, LEE BYRON, RUNFREE JTS LLC, CARL EGUEZ, 13 TRADING LLC, ALVIS LEONG WEI SHEN, CHONG FATT NG, BRIAN SULLIVAN, SAMUEL OH, and DOES 123-172, ROE CORPORATIONS 15-64 and XYZ LLCS 28-77,

Defendants.

**REDACTED VERSION**
**SECOND AMENDED COMPLAINT**

**SECOND AMENDED COMPLAINT**

Plaintiff, Lunai Bioworks, Inc. ("Lunai" or the "Company"), by and through its undersigned counsel, submits its Second Amended Complaint against the parties identified to date as part of Lunai's on-going investigation, as well as against Does 123-172, Roe Corporations 15-64, and XYZ LLCs 28-77, inclusive. The averments in this Second Amended Complaint are upon information and belief unless stated otherwise. For its Second Amended Complaint, Lunai asserts as follows:

## I. SUMMARY

1. On September 17, 2008, then Securities and Exchange Commission ("SEC") Chairman Christopher Cox issued a statement "concerning ongoing and forthcoming Commission actions to investigate fraud and manipulation in the nation's securities markets" … [i]n order to ensure that hidden manipulation, illegal naked short selling, or illegitimate trading tactics do not drive market behavior and undermine confidence…." On September 18, 2008, Chairman Cox

added in another statement that "[t]he SEC has made plain that we have zero tolerance for naked short selling….We adopted a package of measures to strengthen investor protections against naked short selling … and expressly targeting fraud in short selling transactions." Naked short selling is fraud, and, when employed in concert, rises to the level of racketeering. And, victims of naked short selling frequently are smaller quality companies that often are overwhelmed by the ferocity of the fraud perpetrated against them. Plaintiff, Lunai, a victim of naked short selling, brings this action against the fraudsters and rule-breaking market participants who have targeted this company.

2. The SEC's own rulemaking language shines a spotlight on the gravity and extent of the fraud in naked short selling. On October 17, 2008, SEC Rule 10b-21 (17 C.F.R. § 240.10b-21), promulgated under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b), the statute's anti-fraud provision.[1] The Summary of the Rule Release referred to the adoption of Rule 10b-21 as "an antifraud rule under the [Exchange Act] to address fails to deliver securities that have been associated with "naked" short selling. The rule will further evidence the liability of short sellers, including broker-dealers acting for their own accounts, who deceive specified persons about their intention or ability to deliver securities in time for settlement (including persons that deceive their broker-dealer about their locate source or ownership of shares) and that fail to deliver securities by settlement date." The Rule Release for Rule 10b-21 refers to the fact that "abusive 'naked' short selling as part of a manipulative scheme is always illegal under the general antifraud provisions of the federal securities laws, including Rule 10b-5 of the Exchange Act, [and] Rule 10b-21 will further evidence the liability of persons that deceive others about their intention or

[1] Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*) (the "Exchange Act"). Release No. 34-58774; File No. S7-08-08 (Oct. 14, 2008) https://www.sec.gov/files/rules/final/2008/34-58774.pdf.

ability to deliver securities in time for settlement, including persons that deceive their broker-dealer about their locate source or ownership of shares." The Rule Release then proceeds to express the SEC's concerns about "naked short selling" in an an eight-page narrative that included "we are concerned about the negative effect that fails to deliver may have on the markets and shareholders" (*id.* at 10); fails to deliver might be part of manipulative 'naked' short selling, which could be used as a tool to drive down a company's stock price" (*id.* at 11); and "[The SEC is] concerned about the ability of short sellers to use 'naked' short selling as a tool to manipulate the prices of securities." (*id.* at 13).

3. The naked short selling industry is a multi-billion dollar industry that profits entirely from driving down the price of securities, driving the companies out of compliance with stock exchange listing regulations, and driving out of business quality smaller companies. In 2025 alone, stock exchanges delisted more than 350 companies,[2] the effect of which was to drive companies that chose to remain publicly-traded to the less-regulated, more volatile and more manipulation-risky over-the-counter markets.

4. This Second Amended Complaint arises from a fraudulent scheme by Defendants, individually and acting in concert and as an enterprise, to engage in unlawful naked short selling, stock manipulation, making materially false and misleading statements, racketeering, tortiously interfering with Plaintiff Lunai's contracts, and fraud for the purpose of depressing artificially the value of the common stock of Lunai (reference hereafter to the common stock of Lunai may appear as "LNAI" which is the Nasdaq trading symbol for the common stock of Lunai) for Defendants' economic gain to the detriment of and harm to Lunai.

[2] *See 2025 Corporate Actions*, STOCK ANALYSIS, https://stockanalysis.com/actions/delisted/2025/ (last visited August 26, 2026).

5. Defendants systematically orchestrated short sales of shares they had not "located," in other words had not borrowed, arranged to borrow, or had reasonable grounds to believe could be borrowed as required by law, thereby violating knowingly and willfully and for fraudulent purposes the applicable federal securities regulation requiring short sellers to locate the shares to borrow and sell. 17 C.F.R. § 242.200 to § 242.204. The particulars differ from Defendant to Defendant and are pleaded below: for some no locate was ever requested; for others a locate was requested and refused, and the sale followed on the day of the refusal; for others again a locate was requested and granted in a quantity far below what was sold. In each such instance, Defendants' trading constituted naked short selling, which not only violated applicable federal securities regulations, but also constituted actionable common law fraud and securities fraud perpetrated against Lunai.

6. This Second Amended Complaint names as Defendants six registered broker-dealers, being Lightspeed Financial Services Group LLC; Cobra Trading, Inc.; Opal Securities, Inc.; Seven Points Capital, LLC; Hold Brothers Capital, LLC; and SageTrader, LLC; two individuals who own or control two of those firms, being Chadd Thomas Hessing and Zachary Goldberg; and customers of those firms, identified individually in Section III by name, account number and volume. The largest of those customers by volume are ETERNALENVY LLC FZ at approximately 11,807,165 shares, Ezra Grothe at 1,751,345 across two correspondents, Bisoke, LLC at 1,301,690, Tyler H. Kling at 1,080,873, Edward T. Griesedieck at 961,804 and Tyler J. Wasserman at 700,102 across two correspondents.[3] Each engaged in naked short selling of Lunai's

---

[3] In the securities industry, the term "correspondents" usually refers to correspondent broker-dealers. These are introducing firms (discussed *infra*) that maintain customer relationships but rely on another broker (often a clearing firm) for some or all back-office functions. In compliance and market surveillance, trading across multiple correspondents may be reviewed for aggregating a customer's total activity, detecting wash trades or coordinated trading, monitoring short-sale

common stock, or, in the case of the broker-dealers, accepted and introduced the orders by which the naked short selling was carried out, and in some instances employed other manipulative techniques to further advance that scheme.

7. The true names and capacities, whether individual, corporate, associate or otherwise, of additional Defendants Does 123-172, Roe Corporations 15-64, and XYZ LLCs 28-77, inclusive, are unknown or are still becoming known to Plaintiff Lunai, which therefore sues said known Defendants in their true proper names and capacities and the unknown or becoming known Defendants by such fictitious names. Plaintiff will further amend this Second Amended Complaint to state the true names and capacities of said unidentified defendants when the analysis of the naked short selling activity from detailed trading records is more complete, when their identities are more readily ascertainable, and when others are discovered.

8. The number of parties still to be named is not a matter of estimate. Records for LNAI identifies 579 accounts that sold short the security over the period, carrying 35,885,799 shares between them. This Second Amended Complaint names as Defendants the holders of 199 of those accounts. The remaining 380 accounts, carrying 3,455,444 shares, are identified in those records by account number, name and address and are not yet named as Defendants.[4]

9. Lightspeed, Cobra and Opal are not three unrelated broker-dealers that happened, by coincidence, to introduce short sale orders in the same security during the same six-month window. Each held no customer funds of its own; each channeled its customers' orders into the

---

activity and fail-to-deliver (discussed *infra*) situations, identifying attempts to circumvent account restrictions or position limits, and understanding beneficial ownership across multiple accounts.

[4] Plaintiff intends to name these additional short sellers upon continuation of the analysis of the trading records. Meanwhile, Plaintiff uses the fictitious designations above in the caption and throughout the Amended Complaint.

same common clearing infrastructure described below; and each, on the record pleaded in this Second Amended Complaint, accepted and introduced short sale orders that its own clearing relationship had marked, continuously, as unavailable to borrow. They functioned, in substance, as the three heads of a single instrumentality of manipulation — each striking independently, each drawing on the same body of clearing infrastructure and locate failure, and each delivering the same result to the market for LNAI: shares sold that did not exist, in a security no head of the enterprise could show it had ever located. The venom was naked short selling; Lightspeed, Cobra and Opal were the delivery mechanism through which it reached Lunai and the investing public, and the customer Defendants identified in Section III were the fangs through which each head struck.

10. This Second Amended Complaint concerns four categories of market participant, three of them broker-dealers, and the distinction between them is material to the liability of each.

11. The first is the introducing broker-dealer. It solicits and approves the customer, accepts the customer's order, and introduces that order to a clearing firm for execution and settlement. The obligation under Rule 203(b)(1) of Regulation SHO ("Reg SHO") not to accept a short sale order without reasonable grounds to believe the security can be borrowed and delivered, and to document that determination, attaches to the firm that accepts the order, at the point of acceptance and before the order reaches anyone else. Its own records of what it asked for, what it was given and what it accepted are relied on throughout this Second Amended Complaint. Five broker-dealer Defendants occupied this position.

12. The second is the clearing broker-dealer. It carries the introducing firm's customer accounts on a fully disclosed basis, executes and settles what that firm sends it, and operates the securities lending desk from which locates are requested. The obligation to obtain a locate before

accepting the order does not attach to it, because it does not accept the order. Its records of what it was asked for and what it supplied are the contemporaneous measure against which the introducing firms' conduct is tested, and they are relied on throughout this Second Amended Complaint. No clearing broker-dealer is named as a Defendant in this Second Amended Complaint. Plaintiff's reservation as to Defendants not yet identified, set out above, is unaffected.

13. The third is the executing broker-dealer or market maker. It receives order flow routed to it by others and executes it, and it does not solicit or approve the customer whose order it fills. Its records identify the firm that routed each order to it and the time and price at which it was executed, and they are relied on in this Second Amended Complaint to establish the venue and timing of the trading pleaded below. No executing broker-dealer or market maker is named as a Defendant in this Second Amended Complaint at this time. Plaintiff's reservation as to Defendants not yet identified, set out above, is unaffected.

14. The fourth is the customer account holder. It is the party in whose name the account stands and whose short sale orders the introducing broker-dealer accepts. It is liable for its own short sales. It is not relieved of that liability by the fact that a broker-dealer accepted the orders, and the broker-dealer is not relieved of its own by the fact that the position belongs to the customer. Records identify each such account by number, name and volume, and are relied on throughout this Second Amended Complaint. Most of the Defendants named in this Second Amended Complaint occupy this position.

15. A broker-dealer may participate in a scheme to manipulate the price of a security as a principal, where it accepts and effects the orders itself, or by knowingly providing substantial assistance to another's violation. Nothing in the status of a firm as a broker-dealer, or in the fact that the position traded belongs to a customer, removes it from either category. For the claims

under Section 10(b) and Rule 10b-5, the allegation is participation in the scheme itself, under subsections (a) and (c) of that Rule, rather than assistance to another's violation; the counts pleaded under the racketeering statute and at common law are not so confined. The allegations below identify, for each firm, which is alleged and on what record.

16. Six broker-dealers are named as Defendants in this Second Amended Complaint. Five of them occupied the first of those positions in respect of the trading pleaded below. Lightspeed Financial Services Group LLC ("Lightspeed"), Cobra Trading, Inc. ("Cobra") and Opal Securities, Inc. ("Opal") introduced their customers' orders to the clearing firm.. SageTrader, LLC ("SageTrader") accepts and effects customer short sale orders, enters those orders under its own market participant identifiers and selects the execution venue for each. Hold Brothers Capital, LLC ("Hold Brothers") is a correspondent introducing broker-dealer that routed its orders through the execution infrastructure of a registered clearing firm. Each is liable as a principal for orders it accepted without the basis Rule 203(b)(1) requires. Seven Points Capital, LLC ("Seven Points") stands differently: it held a single registered trading account at a clearing firm through which it executed all of its own short selling in this security, and it requested locates for that account from that clearing firm's securities lending desk. It is liable for its own short sales, and the locate records of that clearing firm, pleaded below, record what it asked for and what it was given.

17. The six broker-dealer Defendants stand in materially different evidential positions, and the Second Amended Complaint states each separately.

a. Lightspeed operated its own locate mechanism, notified every customer in writing that it did so and charged a fee for doing so; it sought borrow from two clearing firms in 4,723 requests for 28,542,498 shares and obtained 191,273 shares.

b. Cobra requested locates through its own desk accounts, was refused 127 times against nil recorded inventory, and introduced its customers' short sales on the days those refusals were given.

c. Opal made no request for a locate in this security at any time, from any account, and none appears anywhere in the records obtained by Lunai.

d. Seven Points, which sold for its own account rather than introducing the orders of others, requested locates for 27,041,741 shares across nine trading dates and was granted 181,000, with every one of those grants falling on a single day.

e. SageTrader entered its customers' orders under its own market participant identifiers and selected the execution venue for each.

f. Hold Brothers routed its orders through the execution infrastructure of a registered clearing firm.

## II. Jurisdiction and Venue

18. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because Plaintiff's claim arises under Sections 9(a) and 10(b) of the Exchange Act (15 U.S.C. § 78a *et seq.*).

19. This Court has federal question jurisdiction, 28 U.S.C. § 1331, over the civil RICO count, 18 U.S.C. § 1964(c).

20. Additionally, this Court has supplemental jurisdiction, 28 U.S.C. § 1367(a), over the Delaware common law fraud claim and tortious interference with contract claim, because the fraudulent transactions and contract interference arise out of the same case or controversy as the securities fraud and civil RICO claims.

21. Venue is proper in this Court pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, under which any suit to enforce a liability created by the Exchange Act may be brought in the district wherein any act or transaction constituting the violation occurred, and under 28 U.S.C. § 1391(b). Lunai is a Delaware corporation, several Defendants are organised under the laws of Delaware, and at least one named Defendant is a resident of Delaware and subject to this Court's personal jurisdiction.

22. In connection with the conduct alleged in this Second Amended Complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged herein.

## III. PARTIES

23. Plaintiff, Lunai Bioworks, Inc. is a Delaware corporation with its corporate headquarters in Sacramento, California. At all times relevant to this Second Amended Complaint, the common stock of Plaintiff traded on the Nasdaq Capital Market ("Nasdaq") under the symbol LNAI.

### A. The Broker-Dealer Defendants: Introducing Brokers, Clearing Brokers, and the Structure Through Which the Naked Short Selling Scheme Operated

24. Under the regulatory scheme governing the United States broker-dealer industry, an introducing broker-dealer is a firm that solicits, approves and enters customer orders but does not itself hold customer funds or securities or perform the back-office functions of trade clearance and settlement. An introducing broker-dealer instead operates under a correspondent clearing arrangement, disclosed to its customers on a "fully disclosed" basis, through which a separate clearing broker-dealer — sometimes called a carrying broker — holds customer accounts, extends margin, settles trades, and provides securities lending and locate services on the introducing firm's

behalf. Because both firms stand between the customer's order and the market, each bears an independent obligation under Rule 203(b)(1) of Reg SHO not to accept, or not to allow the entry of, a short sale order without reasonable grounds to believe that the security can be borrowed and delivered by settlement date, and to document that determination. 17 C.F.R. § 242.203(b)(1).

25. Lightspeed, Cobra and Opal are each introducing broker-dealers as that term is used in this Second Amended Complaint. Each held no customer funds or securities in its own name; each solicited, approved and accepted the short sale orders of its own customer accounts; and each cleared those accounts on a fully disclosed basis through a common clearing firm, not separately named as a Defendant in this action, that carried the accounts of all three broker-dealers, executed their customers' trades, and administered the securities lending and locate function on which each depended. Lightspeed's Form BD[5] records common ownership between its own holding company and the holding company of that clearing firm;[6] Opal identifies the same clearing firm as its correspondent clearing agent, under an arrangement effective May 20, 2022;[7] and although Cobra's Form BD records no common ownership with that clearing firm,[8] Cobra's own pleaded

---

[5] Form BD is the securities industry registration form filed with the SEC through which a firm discloses its ownership, control persons, business activities, and regulatory history to securities regulators. The statutory requirement for a broker-dealer to register with the SEC is Section 15(b) of the Exchange Act (15 U.S.C. § 78o(b)), and the SEC's implementing regulation is 17 C.F.R. § 240.15b1-1. A Form BD, while a SEC form, also is a joint form that the SEC, FINRA (and other self-regulatory organizations), and state securities regulators use. A Form BD is filed electronically through the Central Registration Depository (CRD) system, which FINRA operates.

[6] FINRA, *BrokerCheck Report: Lightspeed Financial Services Group LLC*, BROKERCHECK 3-5 (2026), https://files.brokercheck.finra.org/firm/firm_104369.pdf.

[7] FINRA, *BrokerCheck Report: Opal Securities, Inc.*, BROKERCHECK 9 (2026), https://files.brokercheck.finra.org/firm/firm_8246.pdf.

[8] NRA, *BrokerCheck Report: Cobra Trading, Inc.*, BROKERCHECK 4-5 (2026), https://files.brokercheck.finra.org/firm/firm_132078.pdf.

facts confirm that the relationship between Cobra and that clearing firm was, throughout the relevant period, a correspondent clearing arrangement under which the trading pleaded in this Second Amended Complaint was introduced. All three broker-dealers' customer short sale orders were therefore introduced into, and executed and cleared through, a single common infrastructure: one securities lending desk, one locate mechanism of last resort, and one set of clearing records recording each customer's position, activity and locate history. This sequence operated regardless of which of the three introducing brokers had solicited and accepted the order in the first instance.

26. Defendant Lightspeed Financial Services Group LLC is a Delaware limited liability company and registered broker-dealer (CRD# 104369, SEC# 8-52843), established August 3, 2000, with its main office at 20 Headquarters Plaza, North Tower, 7th Floor, Morristown, New Jersey 07960.[9] Lightspeed is an introducing broker-dealer, the customer accounts of which are carried on a fully disclosed basis by a single registered clearing broker-dealer named at item 14 of every Lightspeed account application.[10] Lightspeed solicited, approved and accepted the short sale orders of the 83 customer accounts through which 2,208,224 shares of LNAI were sold short. Lightspeed operated its own locate mechanism, the Short Request Window, and charged its customers a fee for using Lightspeed's locate mechanism. Across Lightspeed's two clearing channels, Lightspeed made 4,723 requests for a locate in LNAI, for 28,542,498 shares, and obtained 191,273.

27. Lightspeed's Form BD records two direct owners: Lightspeed Holdings LLC, owner of 75 percent or more since May 2018 and directing the management or policies of the firm,

---

[9] FINRA, *BrokerCheck Report: Lightspeed Financial Services Group LLC*, BROKERCHECK 2 (2026), https://files.brokercheck.finra.org/firm/firm_104369.pdf.

[10] The clearing broker is not named as a Defendant in this action.

and a holding company under common ownership with the clearing firm that carries Lightspeed's customer accounts.[11] That clearing firm's Form BD records the same holding company as its direct owner.

28. Defendant Cobra Trading, Inc. is a registered broker-dealer (CRD# 132078, SEC# 8-66548), formed in Wisconsin on May 14, 2004, with its main office at 3008 E Hebron Parkway, Building 400, Carrollton, Texas 75010.[12] Cobra also does business under the names BigTrades.com and Venom Trading, in every state and territory in which it is registered.[13] Cobra is an introducing broker-dealer that holds no customer funds or securities and provides clearing services for no other broker-dealer. Cobra introduced, approved and accepted the short sale orders of the 438 customer accounts through which 12,103,970 shares of LNAI were sold short. Cobra requested locates in LNAI through its own two securities lending desk accounts, asking for 108,418,048 shares across 376 requests and was allocated 10,065,221. 127 of Cobra's locate requests were refused, with nil inventory recorded against every one.

29. Defendant Chadd Thomas Hessing (CRD# 2668366) is recorded on Cobra's Form BD as a direct owner of Cobra since March 2004, holding 75 percent or more of the firm and directing its management and policies.[14] Hessing, per the firm's Form BD, holds simultaneously the positions with Cobra of Chief Executive Officer, Founder, Director, Executive Representative, Chief Financial Officer, Financial and Operations Principal, Treasurer, Chief Compliance Officer

---

[11] *Id.* at 3-5.

[12] FINRA, *BrokerCheck Report: Cobra Trading, Inc.*, BROKERCHECK 2-3 (2026), https://files.brokercheck.finra.org/firm/firm_132078.pdf.

[13] *Id.*

[14] *Id.* at 4.

and Secretary.[15] He executed the correspondent broker signature guarantee on every account-opening file Cobra maintains. Cobra's clearing relationship with its two clearing firms is correspondent clearing only.

30. Defendant Opal Securities, Inc. is a Pennsylvania corporation and registered broker-dealer (CRD# 8246, SEC# 8-24841), with its principal office in New York, New York.[16] Opal is an introducing broker-dealer that holds no customer funds or securities and operates on a fully disclosed basis through the same common clearing firm identified above in connection with Lightspeed, under an arrangement which became effective on May 20, 2022.[17] Opal introduced and approved the 39 customer accounts through which 20,544,305 shares of LNAI were sold short, 57.2 percent of all short selling. Opal made no request for a locate in LNAI at any time during the period, from any account, and no such request appears in records obtained by Lunai.

31. Defendant Zachary Goldberg (CRD# 5850891) is the Chief Executive Officer and Registered Options Principal of Opal. Opal's Form BD records OS Holdings, Inc. as Opal's direct owner, holding 75 percent or more of the firm since October 2021, and Goldberg as an indirect owner of Opal, holding 75 percent or more through OS Holdings in a relationship established in October 2021.[18] That filing states that both OS Holdings and Goldberg direct the management and policies of the firm.[19] Goldberg approved each of Opal's 41 customer accounts and countersigned

[15] *Id.*

[16] FINRA, *BrokerCheck Report: Opal Securities, Inc.*, BROKERCHECK 1 (2026), https://files.brokercheck.finra.org/firm/firm_8246.pdf.

[17] *Id.* at 10.

[18] *Id.* at 3.

[19] *Id.*

the clearing firm's customer margin and loan agreement on account [redacted]004 as the correspondent broker's signature guarantee.

32. Opal's notice and knowledge of, its obligations under Rule 203(b)(1) of Reg SHO rest instead on the plain terms of the Rule itself, on Opal's own status as a registered broker-dealer bound to know and comply with the Rule, and on the conduct pleaded in this Second Amended Complaint. Opal made no request for a locate in LNAI at any time during the period, from any of its 41 customer accounts. An introducing broker that made no request at all cannot claim the more sympathetic position of a firm that asked and was refused, such that a reasonable inference of knowledge or recklessness derives from the absence itself of any request to locate.

33. Defendants Seven Points Capital, LLC, SageTrader, LLC and Hold Brothers Capital, LLC also are registered broker-dealers. Each executed short sales of LNAI in quantities material to the scheme pleaded in this Second Amended Complaint and, upon information and belief, did so without reasonable grounds to believe that borrow could be obtained. Each is named as a principal in, and an instrumentality for advancing and perpetrating, the naked short selling scheme described in this Second Amended Complaint on the same footing as Lightspeed, Cobra and Opal, whether or not each cleared through the same common clearing firm identified above.

34. Defendant Seven Points Capital, LLC ("Seven Points") is a Delaware limited liability company and registered broker-dealer (CRD# 144211), engaged in investment management and trading of U.S. equity securities. Seven Points held a single registered trading account through which Seven Points executed all of its LNAI short sales described herein. During the relevant period, Seven Points executed approximately 3,369,462 short sale pre-split shares of LNAI while requesting locate authorizations for 27,041,741 shares across nine trading dates between November 5, 2025 and April 15, 2026. Of those requests, nine were granted, for 181,000

shares in total, every one of them on November 5, 2025. On every other date on which it requested a locate in LNAI, Seven Points was granted none.

35. Defendant Hold Brothers Capital, LLC ("Hold Brothers") is a New Jersey limited liability company and registered broker-dealer (CRD# 151864, SEC# 8-68404), engaged in online trading services. Hold Brothers executed pre-split short sales of LNAI through a registered U.S. clearing firm, 721,748 shares in all across nine trading dates, of which approximately 461,977 shares were sold short on November 5, 2025, the onset date of the manipulative trading campaign described herein. The current Chief Executive Officer and Managing Member of Hold Brothers was the Chief Executive Officer of Hold Brothers On-Line Investment Services, LLC (CRD# 36816, SEC# 8-47474), a firm that FINRA expelled in November 2012, and had its registration terminated by the SEC on February 18, 2013. The expulsion of a firm, led by the same Chief Executive Officer, for failures of supervision over trading conducted through its customer accounts, imputes notice to Hold Brothers of its obligations under Reg SHO.

36. Defendant SageTrader, LLC ("SageTrader") is a Delaware limited liability company and registered broker-dealer (CRD# 137862, SEC# 8-67169) that accepts and effects customer short sale orders, entering those orders under its own market participant identifiers and selecting the execution venue for each. The same registration carries two former corporate names. SageTrader executed 5,014,261 shares of LNAI short through a registered U.S. execution venue, on each of the five primary coordination dates identified in this Second Amended Complaint and on 10 additional trading dates, totaling 15 in all. SageTrader's disciplinary history, including regulatory findings after the 2022–2023 change in its ownership, and the timeline of that change in ownership, are set out in Section VII below.

## B. Defendants' Concerted Conduct as Principals and Instrumentalities of the Naked Short Selling Enterprise

37. Lightspeed, Cobra, Opal, and the other broker-dealer Defendants did not act as passive order-takers unconnected to one another or to the individual and entity Defendants who traded LNAI through them. Each accepted, approved and introduced the short sale orders of dozens or hundreds of customer accounts in a security that its own clearing arrangement had flagged, continuously, as unavailable to borrow. Records obtained by Lunai reflect that no locate was obtained for the overwhelming majority of the short sales its customers executed. And, where a broker-dealer did request locates on its customers' behalf, the requests were refused against recorded nil inventory on the very sessions on which its customers sold. Each broker-dealer accepted and introduced those orders, and each Customer Defendant identified below sold LNAI short through that broker-dealer knowing, or recklessly disregarding, that no borrow had been arranged.

38. The customer base is not merely parallel; it is substantially overlapping and interconnected across the three principal correspondent broker-dealers. Defendants Ezra Grothe, Rico Boone and Prateek Kumar each held accounts at both Opal and Cobra and traded LNAI short through both simultaneously. Defendants Tyler J. Wasserman, Alan Ang, Evelyn Ow and Alexander Odom each held accounts at both Lightspeed and Cobra and traded LNAI short through both simultaneously. Defendants Marlena Malecka Kraska and Wojciech Malecki each traded LNAI short through a registered U.S. execution venue and, in parallel, through an account at Cobra. Defendant Leo Tanner held, or controlled through limited powers of attorney recorded in the clearing firm's own files, trading authority over 24 separate Lightspeed accounts standing in 16 other names, representing approximately 25 percent of all Lightspeed short selling in LNAI. That degree of cross-registration and shared control among nominally independent customers of

nominally independent introducing brokers is not consistent with unrelated, individual trading decisions. It is consistent with a coordinated trading operation deliberately distributed across multiple correspondent broker-dealers and their common clearing infrastructure, to fragment the appearance of any single actor's short position, to multiply the number of independent introducing brokers. Deficient locate practices had to be relied upon, including to frustrate the ordinary regulatory and market surveillance that otherwise would have detected the scheme.

39. The pattern of execution is likewise uniform across broker-dealers, rather than idiosyncratic to any one of them. Accounts at Lightspeed, Cobra and Opal alike closed the period at, or functionally at, a flat position, repeatedly opening and fully repurchasing short positions within the same trading session; a disproportionate share of the trading at each firm was executed before the market opened, when no securities lending desk was open to grant a locate in the ordinary course; and at each firm the broker-dealer's own records, or the records of the common clearing firm, reflect no affirmative locate for the customer activity described. This common discernablepattern, replicated independently at three nominally unrelated introducing brokers and reinforced by the overlapping accountholders identified above, reflects concerted action among Lightspeed, Cobra, Opal, their control persons, and the Customer Defendants identified below to accept, introduce, and clear naked short sales of LNAI in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and constitutes a pattern of racketeering activity conducted through an association-in-fact enterprise as alleged in the civil RICO claim below.

40. Each broker-dealer Defendant, and each broker-dealer officer Defendant named above, is named as a principal in, and an instrumentality for advancing and perpetrating, that scheme: a principal, because each broker-dealer's own conduct — soliciting, approving and accepting short sale orders it knew or was reckless in not knowing could not be settled — directly

effected the naked short sales pleaded in this Second Amended Complaint; and an instrumentality, because each broker-dealer's platform, locate mechanism, and correspondent relationship with the common clearing firm supplied the means by which the Customer Defendants identified below were able to sell LNAI short without borrowing or arranging to borrow the shares sold.

### C. The Customer Defendants[20]

41. The following Defendants (the "Customer Defendants") are customers of Lightspeed, Cobra or Opal who were short sellers of LNAI through these three firms, or, where noted, traded LNAI short through other accounts. They are grouped below by the introducing broker-dealer through which each is alleged to have traded -- first the Lightspeed Customer Defendants, then the Cobra Customer Defendants, then the Opal Customer Defendants, and finally the remaining Defendants whose trading occurred through other accounts.

42. Defendant Leo Tanner ("Tanner") held 7 accounts at Lightspeed ([redacted]361, [redacted]362, [redacted]363, [redacted]425, [redacted]905, [redacted]244, [redacted]850) at [redacted]. Tanner sold approximately 292,397 shares of LNAI short across 1,154 executions

[20] This Second Amended Complaint references Customer Defendants' addresses as they appear in either the clearing firm's records or the broker-dealer's records. SEC Rule 17a-3(a)(17)(i)(A) requires that a broker-dealer create and maintain an account record for each natural-person customer (for accounts subject to the rule) that includes, among other things, customer name, tax identification number, address, telephone number, employment status and occupation, annual income, net worth and investment objectives. SEC Rule 17a-3(a)(9) requires records showing the name and address of the beneficial owner of cash and margin accounts. FINRA Rule 4512(a)(1)(A) requires each member firm to maintain for each account the customer's name and residence. FINRA Rule 4512 also requires firms to make reasonable efforts to obtain certain additional identifying information, including employer name and address and whether the customer is associated with another member firm. Finally, broker-dealers (including clearing firms) are subject to the USA PATRIOT Act customer identification requirements under 31 C.F.R. § 1023.220, the Broker-Dealer CIP Rule, which requires collection of certain customer's information. For entities, a broker-dealer must have a sufficiently complete legal-entity address to identify and locate the entity and demonstrate compliance with CIP requirements. The Broker-Dealer CIP Rule is a FinCEN/Treasury rule rather than an SEC or FINRA rule.

through those accounts, of which approximately 96.2 percent was executed before the market opened, on a security which was recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai contain no account-opening file for six of those accounts. Each of those accounts closed the period at exactly nil.

43. Defendant Derek Cheng held an account at Lightspeed ([redacted]231) at [redacted]. Derek Cheng sold approximately 227,162 shares of LNAI short across 288 executions through that account, of which approximately 75.7 percent was executed before the market opened, on a security which was recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears anywhere Records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

44. Defendant Alveria Capital LTD held four accounts at Lightspeed ([redacted]314, [redacted]315, [redacted]337, [redacted]338) at [redacted]. Alveria Capital LTD sold approximately 210,020 shares of LNAI short across 291 executions through those accounts, of which approximately 100.0 percent was executed before the market opened, on a security which was recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai contain no account-opening file for any of those accounts. Each of those accounts closed the period at exactly nil.

45. Defendant Suhua Guo held two accounts at Lightspeed ([redacted]995, [redacted]117) at [redacted], PANJIN LIAONING. Suhua Guo sold approximately 122,777

shares of LNAI short across 57 executions through those accounts, of which approximately 100 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai contain no account-opening file for one of those accounts. Each of those accounts closed the period at exactly nil.

46. Defendant Shuk Yee Ho held two accounts at Lightspeed ([redacted]859, [redacted]336) at [redacted], KWAI CHUNG NEW TERRITORIES. Shuk Yee Ho sold approximately 120,825 shares of LNAI short across 116 executions through those accounts, of which approximately 89.8 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Each of those accounts closed the period at exactly nil.

47. Defendant Dmitry Smirnoff held one account at Lightspeed ([redacted]200) at [redacted]. Dmitry Smirnoff sold approximately 105,217 shares of LNAI short across 349 executions through that account, of which approximately 85.3 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

48. Defendant Tyler J. Wasserman held accounts at two of the introducing broker-dealers named in this Second Amended Complaint, Lightspeed ([redacted]827) and Cobra

([redacted]446) at [redacted] in each case, in the one as "Tyler Wasserman" and in the other as "Tyler J Wasserman." Tyler J. Wasserman sold approximately 81,001 shares of LNAI short across 40 executions through the Lightspeed account and approximately 619,101 shares across 687 executions through the Cobra account, 700,102 shares in all, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Cobra's records contain no account-opening file for its account. Each of those accounts closed the period at exactly nil.

49. Defendant Alexander Korzha held two accounts at Lightspeed ([redacted]086, [redacted]456) at [redacted]. Alexander Korzha sold approximately 68,061 shares of LNAI short across 326 executions through those accounts, of which approximately 94.9 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai contain no account-opening file for either of those accounts. Each of those accounts closed the period at exactly nil.

50. Defendant Alan Ang held accounts at two of the introducing broker-dealers named in this Second Amended Complaint, Lightspeed ([redacted]855) and Cobra ([redacted]805) at [redacted], Singapore in each case. Alan Ang sold approximately 64,491 shares of LNAI short across 62 executions through the Lightspeed account and approximately 55,669 shares across 48 executions through the Cobra account, 120,160 shares in all, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

51. Defendant SCS Triangles LLC held an account at Lightspeed ([redacted]913) at ATTN SAMUEL SCHWARTZ, [redacted]. SCS Triangles LLC sold approximately 58,000

shares of LNAI short across 117 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

52. Defendant Ricardo Solano held an account at Lightspeed ([redacted]847) at [redacted] FLORIDA. Ricardo Solano sold approximately 54,487 shares of LNAI short across 108 executions through that account, of which approximately 55.9 percent was executed before the market opened, on a security which was recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai appear not to evidence any account-opening file for that account. The account closed the period at exactly nil.

53. Defendant Taejong Kim held an account at Lightspeed ([redacted]921) at [redacted]. Taejong Kim sold approximately 46,588 shares of LNAI short across 32 executions through that account, of which approximately 88.4 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

54. Defendant George Huckstepp held two accounts at Lightspeed ([redacted]197, [redacted]245) at [redacted]. George Huckstepp sold approximately 43,846 shares of LNAI short across 303 executions through those accounts, of which approximately 96.3 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a

limited power of attorney over one or more of those accounts in favor of Tanner. Records obtained by Lunai contain no account-opening file for either of those accounts. Each of those accounts closed the period at exactly nil.

55. Defendant Quantbrix, LLC held an account at Lightspeed ([redacted]572) at ATTN ARTHUR GUBESKYS, [redacted]. Quantbrix, LLC sold approximately 40,700 shares of LNAI short across 130 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

56. Defendant Arnold Lau Guo Zhong held an account at Lightspeed ([redacted]909) at [redacted] SINGAPORE 018979. Arnold Lau Guo Zhong sold approximately 40,344 shares of LNAI short across 35 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

57. Defendant Williams Kapital LLC held an account at Lightspeed ([redacted]656) at ATTN KYLE WILLIAMS, [redacted]. Williams Kapital LLC sold approximately 40,000 shares of LNAI short across 30 executions through that account, of which approximately 0.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any

Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

58. Defendant Calystrum FZCO held two accounts at Lightspeed ([redacted]458, [redacted]461) at [redacted]. Calystrum FZCO sold approximately 36,235 shares of LNAI short across 47 executions through those accounts, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate obtained for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai contain no account-opening file for either of those accounts. Each of those accounts closed the period at exactly nil.

59. Defendant Jennifer Powell held an account at Lightspeed ([redacted]905) at [redacted]. Jennifer Powell sold approximately 34,000 shares of LNAI short across 59 executions through that account, of which approximately 88.2 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

60. Defendant Vijnish Treohan held two accounts at Lightspeed ([redacted]733, [redacted]855) at [redacted]. Vijnish Treohan sold approximately 31,554 shares of LNAI short across 175 executions through those accounts, of which approximately 100.0 percent was executed before the market opened, on a security which was recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed

customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over one or more of those accounts in favor of Tanner. Records obtained by Lunai contain no account-opening file for 1 of those accounts. Each of those accounts closed the period at exactly nil.

61. Defendant Jiwhan Cho held an account at Lightspeed ([redacted]940) at [redacted]. Jiwhan Cho sold approximately 31,300 shares of LNAI short across 23 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

62. Defendant Evelyn Ow held accounts at two of the introducing broker-dealers named in this Second Amended Complaint, Lightspeed ([redacted]703) and Cobra ([redacted]723, [redacted]968) at [redacted], Singapore 590004 in each case. Evelyn Ow sold approximately 27,178 shares of LNAI short across 24 executions through the Lightspeed account and approximately 99,633 shares across 77 executions through the Cobra accounts, 126,811 shares in all, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

63. Defendant Yi Hao Tan held an account at Lightspeed ([redacted]453) at [redacted], SINGAPORE 760235. Yi Hao Tan sold approximately 25,048 shares of LNAI short across 51 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which was recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed

customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for. The account closed the period at exactly nil.

64. Defendant Basil Housewright held an account at Lightspeed ([redacted]216) at TOD ALEXANDRIA & BASIL III HOUSEWRIGHT. Basil Housewright sold approximately 23,754 shares of LNAI short across 138 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

65. Defendant Wen Biao Ng held an account at Lightspeed ([redacted]418) at [redacted], SINGAPORE, 121445. Wen Biao Ng sold approximately 22,725 shares of LNAI short across 73 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

66. Defendant Janet Lynn held an account at Lightspeed ([redacted]173) at [redacted]. Janet Lynn sold approximately 22,368 shares of LNAI short across 149 executions through

that account, of which approximately 100.0 percent was executed before the market opened, on a security which was recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records reflect a limited power of attorney over that account in favor of Tanner. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

67. Defendant Clinton Hillegass held an account at Lightspeed ([redacted]761) at CHRISTINA HILLEGASS TEN BY ENT. Clinton Hillegass sold approximately 21,627 shares of LNAI short across 146 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. The account closed the period at exactly nil.

68. Defendant Varsity Tech LTD held an account at Lightspeed ([redacted]373) at ATTN YI HAO TAN, [redacted]. Varsity Tech LTD sold approximately 20,544 shares of LNAI short across 52 executions through that account, of which approximately 95.8 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

69. Defendant Mirza Taimuri held an account at Lightspeed ([redacted]342) at [redacted]. Mirza Taimuri sold approximately 20,205 shares of LNAI short across 146 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

70. Defendant Lakeside Algo Fund LP held an account at Lightspeed ([redacted]390) at ATTN SUMAN CHEPURI. Lakeside Algo Fund LP sold approximately 20,000 shares of LNAI short across eight executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

71. Defendant Gavin Zhi Long held an account at Lightspeed ([redacted]442) at [redacted]. Gavin Zhi Long sold approximately 19,898 shares of LNAI short across 29 executions through that account, of which approximately 97.8 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and

information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

72. Defendant Julie Alen held an account at Lightspeed ([redacted]200) at [redacted]. Julie Alen sold approximately 19,338 shares of LNAI short across 142 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. The account closed the period at exactly nil.

73. Defendant Michael Picone held an account at Lightspeed ([redacted]827) at [redacted]. Michael Picone sold approximately 18,187 shares of LNAI short across 145 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. The account closed the period at exactly nil.

74. Defendant Mearas Capital LLC held an account at Lightspeed ([redacted]947) at ATTN JAKE CHUPICK, [redacted]. Mearas Capital LLC sold approximately 17,669 shares of LNAI short across 143 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by

Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

75. Defendant Mohamed Faye held an account at Lightspeed ([redacted]148) at [redacted], DÜBENDORF, 8600. Mohamed Faye sold approximately 17,646 shares of LNAI short across 47 executions through that account, of which approximately 50.4 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

76. Defendant Tamara Groen held an account at Lightspeed ([redacted]671) at [redacted]. Tamara Groen sold approximately 16,492 shares of LNAI short across 99 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Pal Kiil And Tanner. The account closed the period at exactly nil.

77. Defendant Mher Danielyan held an account at Lightspeed ([redacted]964) at [redacted]. Mher Danielyan sold approximately 15,053 shares of LNAI short across 140 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed

customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

78. Defendant Trading In Securities Oporto Delta held an account at Lightspeed ([redacted]277) at [redacted]. Trading In Securities Oporto Delta sold approximately 14,910 shares of LNAI short across 23 executions through that account, of which approximately 34.4 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

79. Defendant Lloyd Atkinson held an account at Lightspeed ([redacted]199) at [redacted]. Lloyd Atkinson sold approximately 14,839 shares of LNAI short across 138 executions through that account, of which approximately 89.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

80. Defendant Tatiana Korzha held an account at Lightspeed ([redacted]427) at [redacted]. Tatiana Korzha sold approximately 12,768 shares of LNAI short across 81 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Igor Korzha. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

81. Defendant Kyle Spivey held an account at Lightspeed ([redacted]298) at [redacted]. Kyle Spivey sold approximately 10,312 shares of LNAI short across 22 executions through that account, of which approximately 84.4 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

82. Defendant Louis Lemberger held an account at Lightspeed ([redacted]172) at [redacted]. Louis Lemberger sold approximately 9,376 shares of LNAI short across 74 executions through that account, of which approximately 82.6 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records reflect a limited power of attorney over that account in favor of Tanner. Records obtained by Lunai, based on documents and information reviewed to date, do

not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

83. Defendant Dustin Olyan held an account at Lightspeed ([redacted]730) at [redacted]. Dustin Olyan sold approximately 7,500 shares of LNAI short across 17 executions through that account, of which approximately 66.7 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

84. Defendant Dennis Korzha held an account at Lightspeed ([redacted]508) at [redacted]. Dennis Korzha sold approximately 6,430 shares of LNAI short across 34 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Igor Korzha. The account closed the period at exactly nil.

85. Defendant Alexander Odom held accounts at two of the introducing broker-dealers named in this Second Amended Complaint, Lightspeed ([redacted]683) and Cobra ([redacted]899) at [redacted] in each case. Alexander Odom sold approximately 6,000 shares of LNAI short across 19 executions through the Lightspeed account and approximately 66,094 shares across 41 executions through the Cobra account, 66,094 shares in all, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

86. Defendant Igor Korzha held an account at Lightspeed ([redacted]264) at [redacted]. Igor Korzha sold approximately 5,895 shares of LNAI short across 78 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The Records reflect a limited power of attorney over that account in favor of Alex Korzha. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

87. Defendant Yew Chee Huat held an account at Lightspeed ([redacted]384) at ADDRESS UNKNOWN 05/19/2026 [redacted]. Yew Chee Huat sold approximately 5,775 shares of LNAI short across 10 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

88. Defendant Hudson Trades LLC held an account at Lightspeed ([redacted]850) at ATTN MICHAEL HUDSON, [redacted]. Hudson Trades LLC sold approximately 5,007 shares of LNAI short across 10 executions through that account, of which approximately 68.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which

no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

89. Defendant Madilyn Le held an account at Lightspeed ([redacted]166) at [redacted]. Madilyn Le sold approximately 4,700 shares of LNAI short across 37 executions through that account, of which approximately 6.4 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

90. Defendant Jared Garcia held an account at Lightspeed ([redacted]758) at [redacted]. Jared Garcia sold approximately 2,519 shares of LNAI short across three executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

91. Defendant Elham Hamin held an account at Lightspeed ([redacted]072) at [redacted]. Elham Hamin sold approximately 2,400 shares of LNAI short across 13 executions through that account, of which approximately 16.7 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account

appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

92. Defendant Jacob Chupick held an account at Lightspeed ([redacted]674) at [redacted], and subject to a limited power of attorney in favor of Defendant Tanner. Jacob Chupick sold approximately 2,378 shares of LNAI short across 17 executions through that account. Jacob Chupick is also the Lightspeed salesperson of record named on four of the account applications as having assisted the applicant, and a further account, in the name of Defendant Mearas Capital LLC (account [redacted]947), stands at the same street address in the name of a limited liability company marked to his personal attention. Records obtained by Lunai contain no account-opening file for either account. The account closed the period at exactly nil.

93. Defendant Jeffery Lynn held an account at Lightspeed ([redacted]174) at JANET LYNN TEN BY ENT. Jeffery Lynn sold approximately 2,245 shares of LNAI short across 38 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

94. Defendant Quants Edge Capital LLC held an account at Lightspeed ([redacted]547) at ATTN REBECCA OWENS, [redacted]. Quants Edge Capital LLC sold approximately 2,125 shares of LNAI short across 16 executions through that account on

a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

95. Defendant Zwick Trading Group LLC held an account at Lightspeed ([redacted]867) at ATTN: TYLER ZWICK, [redacted]. Zwick Trading Group LLC sold approximately 2,100 shares of LNAI short across one execution through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

96. Defendant Lawrence Fehrenbaker held an account at Lightspeed ([redacted]273) at [redacted]. Lawrence Fehrenbaker sold approximately 1,900 shares of LNAI short across nine executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

97. Defendant Arcadia Analytics LLC held an account at Lightspeed ([redacted]782) at ATTN THOMAS DOUB, [redacted]. Arcadia Analytics LLC sold approximately 1,809 shares of LNAI short across 10 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai,

based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

98. Defendant Kenichi Fujise held an account at Lightspeed ([redacted]141) at [redacted]. Kenichi Fujise sold approximately 1,725 shares of LNAI short across 15 executions through that account, of which approximately 63.8 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

99. Defendant Michael Lee held an account at Lightspeed ([redacted]743) at [redacted], SINGAPORE 754501. Michael Lee sold approximately 1,695 shares of LNAI short across three executions through that account, of which approximately 99.9 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

100. Defendant Bearish Ventures LLC held 2 accounts at Lightspeed ([redacted]296, [redacted]707) at ATTN JASON OWENS, [redacted]. Bearish Ventures LLC sold approximately 1,573 shares of LNAI short across six executions through those accounts on a security which' were recorded as requiring a locate or a pre-borrow on every trading

day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Each of those accounts closed the period at exactly nil.

101. Defendant Roman Sterlin held an account at Lightspeed ([redacted]990) at [redacted], PETAH TIKVA. Roman Sterlin sold approximately 1,563 shares of LNAI short across 19 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

102. Defendant Suman Chepuri held an account at Lightspeed ([redacted]716) at [redacted]. Suman Chepuri sold approximately 908 shares of LNAI short across 26 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai record a limited power of attorney over that account in favor of Tanner. The account closed the period at exactly nil.

103. Defendant Lee Byron held an account at Lightspeed ([redacted]834) at [redacted], SINGAPORE, S823323. Lee Byron sold approximately 623 shares of LNAI short across two executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by

Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

104. Defendant Runfree JTS LLC held an account at Lightspeed ([redacted]601) at [redacted]. Runfree JTS LLC sold approximately 600 shares of LNAI short across two executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

105. Defendant 13 Trading LLC held an account at Lightspeed ([redacted]405) at ATTN CHAD FOREMAN, [redacted]. 13 Trading LLC sold approximately 500 shares of LNAI short across one execution through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

106. Defendant Alvis Leong Wei Shen held an account at Lightspeed ([redacted]067) at [redacted], SINGAPORE, 530448. Alvis Leong Wei Shen sold approximately 467 shares of LNAI short across six executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate obtained for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

107. Defendant Chong Fatt Ng held an account at Lightspeed ([redacted]026) at [redacted], AIR PANAS SETAPAK. Chong Fatt Ng sold approximately 445 shares of LNAI short across five executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

108. Defendant Brian Sullivan held an account at Lightspeed ([redacted]266) at [redacted]. Brian Sullivan sold approximately 400 shares of LNAI short across five executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period, and for which no locate for any Lightspeed customer account appears in records obtained by Lunai. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

109. Defendant Ezra Grothe held accounts at two of the introducing broker-dealers named in this Second Amended Complaint, Opal ([redacted]109) and Cobra ([redacted]568, [redacted]306), at [redacted]. Ezra Grothe sold approximately 818,627 shares of LNAI short across 1,148 executions through the Opal account and approximately 932,718 shares across 1,161 executions through the Cobra accounts, 1,751,345 shares in all, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

110. Defendant Dean E Schmaltz held an account at Cobra ([redacted]326), at [redacted]. Dean E Schmaltz sold approximately 560,000 shares of LNAI short across 635 executions

through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

111. Defendant Omar Bekturov held an account at Cobra ([redacted]806), at [redacted], DUBAI. Omar Bekturov sold approximately 443,105 shares of LNAI short across 345 executions through that account, of which approximately 83.5 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

112. Defendant Pradeep K. Vallandas held two accounts at Cobra ([redacted]838, [redacted]629), at [redacted]. Pradeep K. Vallandas sold approximately 410,118 shares of LNAI short across 511 executions through those accounts, of which approximately 25.2 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

113. Defendant Bo Kang Zeng held an account at Cobra ([redacted]079), at [redacted], SINGAPORE 409055. Bo Kang Zeng sold approximately 388,848 shares of LNAI short across 452 executions through that account, of which approximately 38.6 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

114. Defendant Keven Yee held an account at Cobra ([redacted]239), at [redacted]. Keven Yee sold approximately 376,103 shares of LNAI short across 264 executions through that account, of which approximately 1.6 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

115. Defendant Matthew Hofman held an account at Cobra ([redacted]966), at [redacted], DUBAI MARINA. Matthew Hofman sold approximately 335,790 shares of LNAI short across 767 executions through that account, of which approximately 14.8 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

116. Defendant Topxinvest LLC held an account at Cobra ([redacted]788), at [redacted]. Topxinvest LLC sold approximately 295,154 shares of LNAI short across 317 executions through that account, of which approximately 20.7 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

117. Defendant Takechip 2 LLC held 13 accounts at Cobra ([redacted]917, [redacted]918, [redacted]919, [redacted]920, [redacted]922, [redacted]924, [redacted]925, [redacted]926, [redacted]927, [redacted]928, [redacted]993, [redacted]994, [redacted]996), at [redacted], 00913 SAN JUAN. Takechip 2 LLC sold approximately 284,566 shares of LNAI short across 271 executions through those accounts, of which approximately 95.3 percent was executed before the market opened, on

a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

118. Defendant Naiden Borimechkov held an account at Cobra ([redacted]470), at [redacted], 1618 SOFIA. Naiden Borimechkov sold approximately 222,785 shares of LNAI short across 342 executions through that account, of which approximately 79.7 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

119. Defendant Hqs LTD held three accounts at Cobra ([redacted]071, [redacted]072, [redacted]073), at [redacted] Hqs LTD sold approximately 221,700 shares of LNAI short across 305 executions through those accounts, of which approximately 54.9 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

120. Defendant CS Trades LLC held an account at Cobra ([redacted]059), at [redacted]. CS Trades LLC sold approximately 163,309 shares of LNAI short across 133 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

121. Defendant Gabriel Bonamigo held an account at Cobra ([redacted]853), at [redacted], CURITIBA-PR. Gabriel Bonamigo sold approximately 162,677 shares of LNAI short across 138 executions through that account, of which approximately 46.2 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

122. Defendant Viper Trading OY held an account at Cobra ([redacted]058), at [redacted], 02140 ESPOO. Viper Trading OY sold approximately 161,524 shares of LNAI short across 109 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

123. Defendant Slav Iliyanov Sariyski held an account at Cobra ([redacted]412), at [redacted], 9700 SHUMEN. Slav Iliyanov Sariyski sold approximately 160,290 shares of LNAI short across 339 executions through that account, of which approximately 79.7 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

124. Defendant Hyo Jin Chun held an account at Cobra ([redacted]219), at [redacted]. Hyo Jin Chun sold approximately 149,800 shares of LNAI short across 240 executions through that account, of which approximately 66.6 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

125. Defendant Smiles Trading LLC held an account at Cobra ([redacted]168), at [redacted]2. Smiles Trading LLC sold approximately 134,437 shares of LNAI short across 177 executions through that account, of which approximately 19.3 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

126. Defendant Carbon Capital Fund Usaldusfond held an account at Cobra ([redacted]844), at [redacted], LIVADIA. Carbon Capital Fund Usaldusfond sold approximately 128,653 shares of LNAI short across 76 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

127. Defendant See Hwa Tan held an account at Cobra ([redacted]096), at [redacted], 556395 SINGAPORE. See Hwa Tan sold approximately 124,163 shares of LNAI short across 139 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

128. Defendant See Lee Tan held an account at Cobra ([redacted]835), at [redacted]. See Lee Tan sold approximately 117,205 shares of LNAI short across 131 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

129. Defendant Mate Hegedus held an account at Cobra ([redacted]485), at [redacted], BUDAPEST. Mate Hegedus sold approximately 117,195 shares of LNAI short across 10 executions through that account, of which approximately 0.0 percent was executed before the

market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

130. Defendant Munaf Khatumbra held an account at Cobra ([redacted]938), at [redacted]. Munaf Khatumbra sold approximately 114,300 shares of LNAI short across 146 executions through that account, of which approximately 60.6 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

131. Defendant Mockingbird Equity II LLC held an account at Cobra ([redacted]501), at [redacted]. Mockingbird Equity II LLC sold approximately 106,700 shares of LNAI short across 84 executions through that account, of which approximately 52.5 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

132. Defendant Chen Li held an account at Cobra ([redacted]108), at [redacted]. Chen Li sold approximately 100,000 shares of LNAI short across 103 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

133. Defendant Kristian Kurzyna held an account at Cobra ([redacted]550), at [redacted]. Kristian Kurzyna sold approximately 95,000 shares of LNAI short across 186 executions through that account, of which approximately 84.2 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

134. Defendant Ernesto Riobo held an account at Cobra ([redacted]975), at [redacted], A CORUNA 15007. Ernesto Riobo sold approximately 93,406 shares

of LNAI short across 150 executions through that account, of which approximately 18.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

135. Defendant Alfredo Alejandro Carrero Hurtado held an account at Cobra ([redacted]778), at [redacted]. Alfredo Alejandro Carrero Hurtado sold approximately 93,050 shares of LNAI short across 111 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

136. Defendant Alejandro Felipe Morais Tejerina held an account at Cobra ([redacted]033), at [redacted], 28005. Alejandro Felipe Morais Tejerina sold approximately 83,993 shares of LNAI short across 63 executions through that account, of which approximately 80.4 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

137. Defendant Rico Boone held accounts at two of the introducing broker-dealers named in this Second Amended Complaint, Opal ([redacted]043) and Cobra ([redacted]591), at [redacted], 4623 AK Bergen op Zoom. Rico Boone sold approximately 83,852 shares of LNAI short across 367 executions through the Opal account and approximately 144,700 shares across 272 executions through the Cobra account, 228,552 shares in all, on a security which' were

recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

138. Defendant Yuwei Wang held an account at Cobra ([redacted]576), at [redacted]. Yuwei Wang sold approximately 80,000 shares of LNAI short across 99 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

139. Defendant Christian Favale held an account at Cobra ([redacted]216), at [redacted], TBILISI. Christian Favale sold approximately 79,200 shares of LNAI short across 149 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

140. Defendant Prateek Kumar held accounts at two of the introducing broker-dealers named in this Second Amended Complaint, Opal Securities, Inc. ([redacted]128) and Cobra ([redacted]431), at [redacted]. Prateek Kumar sold approximately 78,058 shares of LNAI short across 44 executions through the Opal account and approximately 132,541 shares across 102 executions through the Cobra account, 210,599 shares in all, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Each of those accounts closed the period at exactly nil.

141. Defendant Aaron Tu Schmaltz held an account at Cobra ([redacted]740), at [redacted]. Aaron Tu Schmaltz sold approximately 78,000 shares of LNAI short

across 234 executions through that accounton a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

142. Defendant Yash Kamat held an account at Cobra ([redacted]423), at TOD SAYALI SAOJI, [redacted]. Yash Kamat sold approximately 77,874 shares of LNAI short across 127 executions through that account, of which approximately 31.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

143. Defendant Goat Machine LLC held an account at Cobra ([redacted]100), at [redacted]. Goat Machine LLC sold approximately 77,169 shares of LNAI short across 127 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

144. Defendant Richard Clark Webb held an account at Cobra ([redacted]575), at [redacted]. Richard Clark Webb sold approximately 77,000 shares of LNAI short across 73 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

145. Defendant Krzysztof Mariusz Wiklinski held an account at Cobra ([redacted]659), at [redacted], NAD AL. Krzysztof Mariusz Wiklinski sold approximately 75,470 shares of LNAI short across 56 executions through that account, of which approximately 87.6 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not

appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

146. Defendant Yu Miao held an account at Cobra ([redacted]606), at [redacted]. Yu Miao sold approximately 73,308 shares of LNAI short across 86 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

147. Defendant Thi Thu Nguyen held an account at Cobra ([redacted]648), at [redacted]. Thi Thu Nguyen sold approximately 70,014 shares of LNAI short across 206 executions through that account, of which approximately 38.7 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

148. Defendant Benjamin Scheffler held an account at Cobra ([redacted]251), at [redacted]. Benjamin Scheffler sold approximately 70,000 shares of LNAI short across 39 executions through that account, of which approximately 50.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

149. Defendant Eschunk Trades LLC held an account at Cobra ([redacted]801), at [redacted]. Eschunk Trades LLC sold approximately 66,785 shares of LNAI short across

134 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

150. Defendant Christopher Seaman held an account at Cobra ([redacted]366), at [redacted]. Christopher Seaman sold approximately 64,867 shares of LNAI short across 20 executions through that account, of which approximately 50.4 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

151. Defendant Xiaoli Zhang held an account at Cobra ([redacted]115), at [redacted]. Xiaoli Zhang sold approximately 63,390 shares of LNAI short across 121 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

152. Defendant Jason Tian Ching Ng held an account at Cobra ([redacted]534), at [redacted], SINGAPORE 554346. Jason Tian Ching Ng sold approximately 61,867 shares of LNAI short across 86 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

153. Defendant Daniyar Nurbayev held an account at Cobra ([redacted]350), at [redacted], FI 02130 ESPOO. Daniyar Nurbayev sold approximately 58,096 shares of LNAI short across 162 executions through that account, of which approximately 45.7 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

154. Defendant Edwin Hinds, Jr. held an account at Cobra ([redacted]859), at [redacted]. Edwin Hinds, Jr. sold approximately 57,994 shares of LNAI short across 63 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

155. Defendant Ramon Paulus Jozef Veltmeijer held an account at Cobra ([redacted]838), at TOD ISABELLE VAN LEEUWEN, [redacted]. Ramon Paulus Jozef Veltmeijer sold approximately 54,000 shares of LNAI short across 145 executions through that account, of which approximately 33.3 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

156. Defendant Quaintoo Inc held an account at Cobra ([redacted]814), at [redacted]. Quaintoo Inc sold approximately 53,200 shares of LNAI short across 21 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

157. Defendant CSZ Quantitative LLC held an account at Cobra ([redacted]990), at [redacted]. CSZ Quantitative LLC sold approximately 52,172 shares of LNAI short across 48 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

158. Defendant Provence Sophice SAS held an account at Cobra ([redacted]731), at [redacted], SAINT SAUVEUR. Provence Sophice SAS sold approximately 50,000 shares of LNAI short across 36 executions through that account on a security which' were recorded as

requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

159. Defendant AM Technologies Limited held an account at Cobra ([redacted]486), at [redacted], LONDON, NW6 7YG, United Kingdom. AM Technologies Limited sold approximately 50,000 shares of LNAI short across 61 executions through that account on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

160. Defendant John Finkbeiner held an account at Cobra ([redacted]332), at [redacted]. John Finkbeiner sold approximately 48,000 shares of LNAI short across 108 executions through that account, of which approximately 14.4 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

161. Defendant Michael Donovan held an account at Cobra ([redacted]532), at [redacted]. Michael Donovan sold approximately 47,800 shares of LNAI short across 70 executions through that account, of which approximately 93.1 percent was executed before the market opened, on a security which' were recorded as requiring a locate or a pre-borrow on every trading day of the period. The account closed the period at exactly nil.

162. Defendant Sin Wee Nelson Lim held an account at Cobra ([redacted]710), at [redacted], 556395 SINGAPORE. Sin Wee Nelson Lim sold approximately 46,834 shares of LNAI short across 96 executions through that account, of which approximately 100.0 percent was executed before the market opened, on a security which' were

recorded as requiring a locate or a pre-borrow on every trading day of the period. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for that account. The account closed the period at exactly nil.

163. Defendant Marlena Malecka Kraska is the Founder and Chief Executive Officer of Quant Lab SFO FZCO ("Quant Lab"), a single-family office incorporated under the laws of a free zone in the United Arab Emirates. She is recorded in records at [redacted], and in that firm's records under the name Marlena Marta Kraska. She is recorded at the same address in the records, under account [redacted]554 in the name Marlena M Malecka Kraska. Kraska executed LNAI short sales through a registered U.S. execution venue between November 5, 2025 and May 4, 2026, and through an account at Cobra Trading, Inc. ([redacted]334). During the relevant period Kraska executed approximately 17,091 short sale pre-split shares of LNAI through the first of those channels, and a further 154,574 shares across 199 executions through the Cobra account, of which approximately 99.0 percent was executed before the market opened, 171,665 shares in all. No locate request for those shares appears in records. No locate was obtained. Cobra Trading, Inc.'s records contain no account-opening file for its account.

164. Defendant Wojciech Malecki, who resides in the United Arab Emirates, is the Managing Director of the entity known as Quant Capital. He is at [redacted], and in that firm's records under the name Wojciech Daniel Malecki. In the records of a second broker-dealer, he is recorded under account [redacted]502 in the name Wojciech D Malecki at a different address in the same city, [redacted], Dubai. Malecki executed LNAI short sales through a registered U.S. execution venue between November 5, 2025 and May 4, 2026, the final primary coordination date identified in this Second Amended Complaint, and through an account at Cobra ([redacted]740). During the relevant period Malecki executed

approximately 164,711 short sale pre-split shares of LNAI through the first of those channels, and a further 301,885 shares across 289 executions through the Cobra account, of which approximately 56.5 percent was executed before the market opened, 466,596 shares in all. No locate request for those shares appears in locate records. No locate was obtained. Records obtained by Lunai, based on documents and information reviewed to date, do not appear to evidence account-opening documentation for this account.

165. Defendant William Edward Gonet held an account at Opal ([redacted]103), at [redacted]. William Edward Gonet sold approximately 1,521,356 shares of LNAI short across 1,021 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

166. Defendant Sandy Wong held an account at Opal ([redacted]140), at [redacted]-Dubai. Sandy Wong sold approximately 1,025,846 shares of LNAI short across 357 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

167. Defendant Hongpeng Pan held an account at Opal ([redacted]129), at [redacted]. Hongpeng Pan sold approximately 526,547 shares of LNAI short across 838 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the

period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

168. Defendant Owl Hill Capital LLC held an account at Opal ([redacted]116), at [redacted]. Owl Hill Capital LLC sold approximately 346,253 shares of LNAI short across 293 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

169. Defendant Abhinand Reddy Vaddi Reddy held an account at Opal ([redacted]021), at [redacted]. Abhinand Reddy Vaddi Reddy sold approximately 213,033 shares of LNAI short across 81 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

170. Defendant Calvin Nguyen held an account at Opal ([redacted]127), at [redacted]. Calvin Nguyen sold approximately 162,830 shares of LNAI short across 72 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

171. Defendant Bala Anand Vaddi Reddy held an account at Opal ([redacted]057), at [redacted]. Bala Anand Vaddi Reddy sold approximately 115,439 shares of LNAI short across 106 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate obtained

for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

172. Defendant Adam Gefvert held an account at Opal ([redacted]010), at [redacted]. Adam Gefvert sold approximately 100,000 shares of LNAI short across 104 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

173. Defendant Joseph Guevarra held an account at Opal ([redacted]126), at [redacted]. Joseph Guevarra sold approximately 66,440 shares of LNAI short across 94 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

174. Defendant Amin Golestan held an account at Opal ([redacted]022), at TOD AMIN GOLESTAN REVOCABLE TRUST AND, CLAUDIA MARIA PADGETT REVOCABLE TRUST. Amin Golestan sold approximately 48,750 shares of LNAI short across 106 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

175. Defendant Anurag Vaddi Reddy held an account at Opal ([redacted]092), at [redacted]. Anurag Vaddi Reddy sold approximately 45,690 shares of LNAI short across 75 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal

customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

176. Defendant JTL Capital Enterprises LLC held an account at Opal ([redacted]076), at [redacted]. JTL Capital Enterprises LLC sold approximately 45,375 shares of LNAI short across 87 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

177. Defendant Cong Hao Wang held an account at Opal ([redacted]044), at [redacted], GRAND CAYMAN KY1-1206. Cong Hao Wang sold approximately 45,000 shares of LNAI short across 16 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

178. Defendant Rong Quan held an account at Opal ([redacted]132), at [redacted]. Rong Quan sold approximately 34,286 shares of LNAI short across 48 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

179. Defendant SSP Capital Ltd held an account at Opal ([redacted]078), at ATTN SURAJ PATWAL, [redacted]. Ssp Capital Ltd sold approximately 26,790 shares of LNAI short across 29 executions through that account, on a security for which' were recorded a locate

or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

180. Defendant Varsity Tech Pte. Ltd. held an account at Opal ([redacted]135), at [redacted], SINGAPORE 752121. Varsity Tech Pte. Ltd. sold approximately 26,484 shares of LNAI short across 49 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

181. Defendant Glen Raymond Loupias held an account at Opal ([redacted]049), at [redacted], AMSTERDAM. Glen Raymond Loupias sold approximately 19,100 shares of LNAI short across 88 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

182. Defendant Epic Edge Trading Oy held an account at Opal ([redacted]118), at [redacted], 02140 ESPOO. Epic Edge Trading Oy sold approximately 11,766 shares of LNAI short across 25 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

183. Defendant Jiping Hu held an account at Opal ([redacted]087), at [redacted]. Jiping Hu sold approximately 9,400 shares of LNAI short across 43 executions through that

account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

184. Defendant Cong Zhao held an account at Opal ([redacted]089), at [redacted]. Cong Zhao sold approximately 5,000 shares of LNAI short across 13 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

185. Defendant Jacob Lee held an account at Opal ([redacted]096), at [redacted]. Jacob Lee sold approximately 4,877 shares of LNAI short across 18 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

186. Defendant Chin Zhi You held an account at Opal ([redacted]125), recorded in the clearing firm's records at [redacted], 460109 SINGAPORE. Chin Zhi You sold approximately 4,811 shares of LNAI short across seven executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

187. Defendant Matthew Hope held an account at Opal ([redacted]106), recorded in the clearing firm's records at [redacted]. Matthew Hope sold approximately 4,394 shares of LNAI short across 51 executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which

no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

188. Defendant Vivek Dandare held an account at Opal ([redacted]091), recorded in the clearing firm's records at [redacted], ROMFORD RM78EX. Vivek Dandare sold approximately 1,128 shares of LNAI short across one execution through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

189. Defendant Hunter Snyder held an account at Opal ([redacted]080), recorded in the clearing firm's records at [redacted]. Hunter Snyder sold approximately 1,000 shares of LNAI short across three executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

190. Defendant Carl Eguez held an account at Opal ([redacted]114), recorded at [redacted]. Carl Eguez sold approximately 550 shares of LNAI short across four executions through that account, on a security for which' were recorded a locate or pre-borrow requirement on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

191. Defendant Samuel Oh held an account at Opal ([redacted]097), recorded at [redacted]. Samuel Oh sold approximately 91 shares of LNAI short across five executions through that account, on a security for which' were recorded a locate or pre-borrow requirement

on every trading day of the period, and for which no locate for any Opal customer account appears in records obtained by Lunai. The account closed the period at exactly nil.

192. Defendant Edward T. Griesedieck is a securities trader (CRD# 7282029), previously employed by co-Defendant Seven Points, is currently associated with a broker-dealer located in New York, of unknown residence. Griesedieck held two registered trading accounts through which Griesedieck executed all of his LNAI short sales described herein. During the relevant period, Griesedieck executed approximately 961,804 short sale pre-split shares of LNAI, and no locate request for those shares appears in records, on any trading date from November 25, 2025 through April 7, 2026. No locate was obtained.

193. Defendant ETERNALENVY LLC FZ ("ETERNALENVY") is a limited liability company organized under the laws of a free zone in the United Arab Emirates. ETERNALENVY held a single trading account at a registered U.S. broker-dealer through which ETERNALENVY executed all of its LNAI short sales described herein. During the relevant period, ETERNALENVY executed approximately 11,807,165 short sale shares of LNAI across trading dates from March 12, 2026 through April 24, 2026, including approximately 6,444,475 short sale shares on March 17, 2026, a date on which independent market data confirms there were zero LNAI shares available to borrow in the institutional lending market.

194. Defendant Bisoke, LLC ("Bisoke") is a U.S. Virgin Islands limited liability company engaged in investment management and development of trading systems. Bisoke held four registered trading accounts through which Bisoke executed all of its LNAI short sales described herein. During the relevant period, Bisoke executed approximately 1,301,690 short sale pre-split shares of LNAI, and no locate request for those shares appears in records, on any trading date from November 5, 2025 through May 4, 2026. No locate was obtained.

195. Defendant Tyler Kling is the Principal and Founder of House Kling Family Office, a privately held investment management company operating in New York and Puerto Rico. Kling held two registered trading accounts through which Kling executed all of his LNAI short sales described herein. During the relevant period, Kling executed approximately 1,080,873 short sale pre-split shares of LNAI, and no locate request for those shares appears in records, on any trading date from November 25, 2025 through March 26, 2026. No locate was obtained.

196. Defendant Quant Lab SFO FZCO ("Quant Lab") is a single-family office incorporated under the laws of a free zone in the United Arab Emirates and is controlled by Defendant Kraska. It is recorded in the records of a broker-dealer under account [redacted]499, at [redacted], Dubai. Quant Lab executed LNAI short sales through a registered U.S. execution venue between November 5, 2025 and April 15, 2026. During the relevant period, Quant Lab executed approximately 5,326 short sale pre-split shares of LNAI, and no locate request for those shares appears in records. No locate was obtained.

197. The Customer Defendants named above accepted, effected and executed short sales of Lunai common stock without having borrowed or arranged to borrow the shares, on days on which the introducing broker through which each traded had itself been refused locates it requested, or had made no request at all, against a security as requiring a locate or pre-borrow on every trading day of the period. The remaining account holders at Lightspeed, Cobra and Opal are identified by account number, name and volume in the schedule referred to in Section IV, and Plaintiff will amend to name them as their capacities are ascertained.

## IV. STATEMENT OF FACTS

### A. The Lunai Story in 2025 and 2026

198. Lunai is an AI-driven platform for precision medicine that identifies targets for new therapeutics and biodefense countermeasures. The company also has developed a cancer immunotherapy for solid tumors. Lunai's proprietary and patented technologies transform complex biomedical data into predictive insights, enabling faster discovery, greater accuracy, and strategic partnerships across the life sciences and government sectors.

199. In April 2025, then known as Renovaro Inc., Lunai merged with BioSymetrics, Inc. to pursue a strategic direction of applying proprietary artificial intelligence / machine learning in drug discovery and development.

200. Shortly after the merger, on May 14, 2025, the Company announced the launch of Augusta, an AI-powered precision neurology platform, which aims to address longstanding challenges in diagnosing and treating neurological disorders.

201. In August 2025, the merged company adopted its current corporate name to reflect the new strategic focus.

202. Lunai operates its immunotherapy at the company level and its AI platform through its wholly-owned subsidiary, Biosymetrics.

203. Lunai's legacy subsidiary, Renovaro Biosciences, Inc., is a biotechnology subsidiary focused on allogeneic cell and gene therapies, including dendritic-cell-based cancer vaccines designed to induce long-term remission against tumors.

204. BioSymetrics, consisting of BioSymetrics Inc. (Delaware) and BioSymetrics Corp. (Nova Scotia), supports Lunai's business through multimodal data integration, analytics, and platform operations.

205. On November 5, 2025, Lunai announced that its next-generation dendritic cell immunotherapy achieved complete regression of both primary and metastatic pancreatic tumors in preclinical humanized mouse models, marking a potential treatment. The study marking the achievement was peer reviewed and published in a Brief Report in Vaccines.

206. On November 6, 2025, Lunai filed with the SEC a Form 8-K announcing that the company held its annual meeting on October 31, 2025. Thus, Lunai re-established compliance with Nasdaq Listing Rule 5620(a), which requires a listed company to hold its annual shareholder meetings within a year of its fiscal year end.

207. On March 19, 2026, Lunai announced, through BioSymetrics, the launch of the Pathfinder Consortium, a national initiative that uses artificial intelligence and cross-sector collaboration to accelerate the discovery and development of chemical countermeasures for emerging threats. The program aims to position the Company to pursue large-scale federal contracts along the three-year accelerated pathway for chemical countermeasure approval, as opposed to the 10-year traditional pharmaceutical timeline.

208. On April 7, 2026, Lunai announced its first revenue-generating, multi-year defense collaboration through BioSymetrics to deploy an AI-powered platform for chemical threat assessment, marking an expansion into national security applications.

209. On April 15, 2026, Lunai announced a Letter of Intent with Geneial, Inc. to collaborate to support rare disease research by converting diffuse patient-generated data into structured data and thereby reduce development risk toward higher probability trials.

210. On May 1, 2026, Lunai completed the acquisition of intellectual property ("IP") assets from two counterparties to expand Lunai's central nervous system platform.

211. One of Lunai's counterparties in the IP transaction was Neurobridge IP Holdings Corporation ("Neurobridge"), which merged with Lunai Bioworks IP, Inc. to become a subsidiary of Lunai. The subsidiary acquisition was accompanied by the issuance of $20 million in convertible preferred equity.

212. Lunai introduced these new assets into Lunai's portfolio to address a restriction to therapeutic access caused by the blood-brain barrier, which previously had limited neurological disease treatments.

213. Lunai announced the IP transaction in a Form 8-K filed with the SEC on May 1, 2026 and in a press release issued May 4, 2026.

214. On May 22, 2026, Lunai effected a 1-for-8 reverse stock split (the "Split") pursuant to authorization at a special meeting of Lunai's stockholders and approval by the Board of Directors.

**B. Securities Short Selling Regulatory Framework**

215. A "short sale" is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, a short seller must borrow the security, typically from another investor, often a broker-dealer or an institutional investor. The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender. That practice is referred to as "covering the short position."

216. In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

217. A "naked" short sale generally refers to selling short without the short seller having borrowed or arranged to borrow securities to make delivery to the buyer within the standard settlement period.

218. SEC regulations address the requirements that sellers of securities are required to deliver, or arrange for delivery of, securities, and that buyers are entitled to receive delivery of securities purchased. These regulations include the timing requirements for such delivery and receipt, often referred to as the "settlement date."

219. Regulation SHO, 17 C.F.R. § 242.200 to § 242.204 ("Reg SHO"), sets forth the regulatory requirements applicable to short sales of equity securities. On June 23, 2004, the SEC adopted Reg SHO, which became effective on January 3, 2005, to address, inter alia, its concerns as America's capital markets regulator regarding persistent FTDs which occur when a seller fails to deliver securities that it has sold by the settlement date.

220. Under Reg SHO, a seller is "deemed to own" a security only if that seller has a net long position in a security. 17 C.F.R. § 242.200(c).

221. Ordinarily (except in very limited circumstances not applicable here), sellers must "locate" shares prior to selling short.

222. In a naked short sale, a seller does not borrow or arrange to borrow securities in time to make delivery to the buyer within the standard settlement period.

223. The SEC designed Reg SHO, in part, to reduce FTDs in connection with short selling of securities and to disincentivize potentially abusive naked short selling. *See* Amendments to Regulation SHO, Exch. Act Rel. No. 34-60388 (July 27, 2009).

224. FTDs often result from sellers having failed to borrow securities before executing a short sale trade. Such sellers may attempt to use the freedom of having avoided borrowing costs to engage in trading to depress improperly the price of a security. *See id.* at 6-7.

225. In such cases, although the purported seller has not ensured the delivery of the securities in the trade, the seller is nevertheless able to flood the market with the company's stock, driving down its price. *See id.* at 8 n. 26.

226. This act of intentionally violating Reg SHO is a manipulative device that violates sections 9(a)(2) and 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

227. Rule 203(b)(3) under Reg SHO applies to an FTD position in a "threshold security" for 13 consecutive settlement days and requires the participant to "close out the [FTD] position by purchasing securities of like kind and quantity[.]" 17 C.F.R. § 242.203(b)(3).

228. An FTD position causes the securities sold to become a "threshold security" when the FTD position persists for "five consecutive settlement days," is in "10,000 shares or more," and "that is equal to at least 0.5% of the issue's total shares outstanding." *Id.* § 242.203(c)(6)(i).

229. Failure to close out a threshold security FTD position after 13 days forecloses the participant from accepting or effecting short sales without first borrowing securities or entering into a bona fide arrangement to borrow, until the position is closed. *Id.* § 242.204(b).

### C. Defendants' Short Selling Scheme

#### *i. Anomalous FTD Trading Clusters*[21]

230. Upon detailed public information and belief, Defendants effected naked short sale trades *en masse*, which knowingly and fraudulently applied manipulative downward pressure on the price of Lunai stock.

231. As of October 2, 2025, one month before the beginning of anomalous trading, Lunai had experienced an average daily FTD rate of 5,826 shares from trading of LNAI.

232. As of September 30, 2025, as Lunai reported in a Form 10-Q filed with the SEC on November 10, 2025, for the quarter-ended Lunai had outstanding 23,432,391 shares of common stock.

233. Approximately one month later, the naked short selling onslaught commenced.

234. From November 2025 to April 2026, Lunai's common stock underwent several noteworthy periods of extraordinary short selling volume that exceeded the Company's shares outstanding, with millions of FTDs upon sale at the peaks of trading activity.

235. Put differently and in lay terms, more shares of Lunai were being sold on certain days than there were shares available in the entire market to be sold.

236. On at least one day, November 5, 2025, and as discussed more fully below, 169,777,760 shares of LNAI traded, approximately 7.25 times the 23,432,391 shares then outstanding.

[21] A failure-to-deliver (FTD) cluster is a phrase often used by traders and market commentators to describe a period in which a stock experiences unusually high or persistent levels of FTDs over multiple settlement days. When FTDs remain elevated for many days, the stock may become a threshold security under Reg SHO (upon meeting certain criteria), clearing firms can be required to close out persistent fail positions, and large clusters may indicate excessive short-selling pressure.

237. In this same timeframe, Lunai experienced declines in its stock price corresponding to this elevated short selling activity because of this intentional and concerted manipulative activity.

238. The first major deviation from Lunai common stock's trading baseline occurred abruptly on November 6, 2025, when FTDs in LNAI surged to 2,126,815 shares in a single settlement day. This was a 74.7-factor increase over the largest prior baseline event and 365 times the baseline daily average.

239. The next day, November 7, 2025, sales of LNAI resulted in failures to deliver an additional 757,634 shares.

240. Over those two days, LNAI's stock price declined from $1.17 per share to $0.93 per share at closing on November 7, 2025. Put differently, this manipulative activity depressed the price of Lunai's common stock by 20.6% at a time when there were no corporate announcements or events that would have or could have resulted in the Company's stock price losing one-fifth of its market value.

241. In November 2025, Defendants engaged in further naked short selling of LNAI, evidenced by elevated LNAI stock sale FTDs on several additional days over the following weeks.

242. On November 26, 2025, LNAI registered failures to deliver 1,109,753 shares.

243. In January and February 2026, there was a sustained period of LNAI short selling with elevated FTDs and a concomitant decline in stock price per share from $0.97 on the first trading day of the year to close at $0.37 on February 27, 2026. Here again, this manipulative activity depressed the price of Lunai's common stock by 61.9% at a time when there were no corporate announcements or events that would have or could have resulted in the Company's stock price losing substantially more than half of its market value.

244. On March 18, 2026, FTDs reached 6,679,316 shares, 234.6 times the maximum baseline daily FTD rate.

245. In the following days, short sellers failed to deliver 2,792,195 shares on March 19, 2026, 2,626,459 on March 20, and 2,126,969 on March 23.

246. A further extreme event of 5,631,016 shares that failed to deliver on March 27, 2026.

247. The total FTD volume over the period March 18 to 27, 2026 was 20,356,721 shares, and over the whole of March 2026 was 21,588,736 shares.

248. Reference to the March 2026 trading cluster is to a grouping of short sales or related trades that are unusually concentrated in time, volume, counterparties, or settlement outcomes within a given monthly period, rather than being spread out randomly. In the context of naked short selling, a "trading cluster" usually signals intentional, repeated short selling behavior that produces persistent FTDs or market impact inconsistent with normal trading.[22]

249. In the three days from April 8 to April 10, 2026, LNAI short sales led to FTDs of approximately 2.7 million shares, being 1,800,876 shares on April 8, 645,813 shares on April 9, and 272,130 shares on April 10.

250. The total failure to deliver volume over the period of anomalous activity, from November 3, 2025 to April 10, 2026, when Lunai confirmed its removal from the Nasdaq Threshold Securities List ("Threshold List"), was 29,514,897 shares. That is between

[22] *See* Paul R. Ziegler & Terry Truitt, *Predictors of Naked Short Selling: Analyzing Delivery Failures in U.S. Stock Markets*, 11 J. Bus. & Econ. Res. 9 (2012) (concluding that delivery failures are not random and are predictable based on trading characteristics, directly reinforcing the concept of intentional and repeated behavior).

approximately 81.4 and 126.0 percent of the shares outstanding, depending on whether measured against the 36,271,119 shares reported in May 2026 or the 23,432,391 reported in November 2025.

251. Throughout the period of anomalous FTD activity, there also were dates on which the overall volume of LNAI trading far exceeded the number of outstanding shares and the public float of Lunai's securities.

252. On November 5, 2025, 169,777,760 shares of LNAI traded. That is approximately 7.25 times the 23,432,391 shares outstanding reported on the cover of the Company's Form 10-Q filed November 10, 2025. Trading volume of that magnitude in a single session cannot be accounted for by the shares in existence changing hands once; it requires either that the same shares were bought and sold repeatedly during the session, or that shares were sold that the seller neither owned nor had borrowed. The failures to deliver recorded for that settlement cycle establish that a substantial part of the volume falls into the second category.

253. To put in lay terms what occurred on November 5, 2025, Lunai has issued and outstanding 23,432,391 shares. Despite there being only 23,432,391 shares in the hands of investors, including in the hands of officers and directors who were not trading their shares, 169,777,760 shares traded on that one day, a day on which this little-known company had no news.

254. On November 25, 2025, 46,624,161, shares of LNAI traded. That is approximately 1.99 times the 23,432,391 shares outstanding reported on the cover of the Company's Form 10-Q filed November 10, 2025. Trading volume of that magnitude in a single session cannot be accounted for by the shares in existence changing hands once; it requires either that the same shares were bought and sold repeatedly during the session, or that shares were sold that the seller neither owned nor had borrowed. The failures to deliver recorded for that settlement cycle establish that a substantial part of the volume falls into the second category.

255. On March 17, 2026, 554,032,865 shares of LNAI traded. That is between approximately 15.3 and 22.9 times the shares then outstanding, the range reflecting the 24,187,356 shares reported on the cover of the Company's Form 10-Q filed February 11, 2026 and the 36,271,119 shares reported on the cover of the Company's Form 10-Q filed May 15, 2026, between which dates the outstanding share count increased. Trading volume of that magnitude in a single session cannot be accounted for by the shares in existence changing hands once; it requires either that the same shares were bought and sold repeatedly during the session, or that shares were sold that the seller neither owned nor had borrowed. The failures to deliver recorded for that settlement cycle establish that a substantial part of the volume falls into the second category.

256. On March 20, 2026, 80,784,276 shares of LNAI traded. That is between approximately 2.2 and 3.3 times the shares then outstanding, the range reflecting the 24,187,356 shares reported on the cover of the Company's Form 10-Q filed February 11, 2026 and the 36,271,119 shares reported on the cover of the Company's Form 10-Q filed May 15, 2026, between which dates the outstanding share count increased. Trading volume of that magnitude in a single session cannot be accounted for by the shares in existence changing hands once; it requires either that the same shares were bought and sold repeatedly during the session, or that shares were sold that the seller neither owned nor had borrowed. The failures to deliver recorded for that settlement cycle establish that a substantial part of the volume falls into the second category.

257. On March 26, 2026, 257,637,081 shares of LNAI traded. That is between approximately 7.1 and 10.7 times the shares then outstanding, the range reflecting the 24,187,356 shares reported on the cover of the Company's Form 10-Q filed February 11, 2026 and the 36,271,119 shares reported on the cover of the Company's Form 10-Q filed May 15, 2026, between which dates the outstanding share count increased. Trading volume of that magnitude in a single

session cannot be accounted for by the shares in existence changing hands once; it requires either that the same shares were bought and sold repeatedly during the session, or that shares were sold that the seller neither owned nor had borrowed. The failures to deliver recorded for that settlement cycle establish that a substantial part of the volume falls into the second category.

258. On April 7, 2026, 134,437,142 shares of LNAI traded. That is between approximately 3.7 and 5.6 times the shares then outstanding, the range reflecting the 24,187,356 shares reported on the cover of the Company's Form 10-Q filed February 11, 2026 and the 36,271,119 shares reported on the cover of the Company's Form 10-Q filed May 15, 2026, between which dates the outstanding share count increased. Trading volume of that magnitude in a single session cannot be accounted for by the shares in existence changing hands once; it requires either that the same shares were bought and sold repeatedly during the session, or that shares were sold that the seller neither owned nor had borrowed. The failures to deliver recorded for that settlement cycle establish that a substantial part of the volume falls into the second category.

259. On May 4, 2026, 100,392,900 shares of LNAI traded. That is between approximately 2.8 and 4.2 times the shares then outstanding, the range reflecting the 24,187,356 shares reported on the cover of the Company's Form 10-Q filed February 11, 2026 and the 36,271,119 shares reported on the cover of the Company's Form 10-Q filed May 15, 2026, between which dates the outstanding share count increased. Trading volume of that magnitude in a single session cannot be accounted for by the shares in existence changing hands once; it requires either that the same shares were bought and sold repeatedly during the session, or that shares were sold that the seller neither owned nor had borrowed. The failures to deliver recorded for that settlement cycle establish that a substantial part of the volume falls into the second category.

260. The entire public float of LNAI, that is shares of LNAI that are available to be traded without even accounting for whether certain shares could not be loaned for shorting, was approximately 26 million shares.

261. LNAI's price per share declined on May 4, 2026 from $0.3766 at the open to a closing price of $0.3246, an approximate 13.8% drop.

262. Upon information and belief, Defendants' naked short selling and Defendants' naked short selling conspiracy was the direct cause of the anomalous FTD activity and excessive volume trading observed in the retrieved SEC data and Nasdaq records.

*ii. Avoidance of Threshold List Closing Requirement*

263. Defendants tailored their naked short selling activity to maximize trading volume while avoiding the criteria of the Reg SHO § 203(b)(3) close-out requirement, thereby sustaining the duration of their conspiracy.

264. The concept of the Reg SHO close-out rule requirement (section 203(b)(3)) is that if someone sells stock and does not deliver the stock on time, then the rules force that failure to be fixed quickly by buying real shares - not by delaying or re-shorting.

265. A viable analogy is the following. Conceptualize selling concert tickets that a person does not have. Selling the concert tickets without owning the tickets is analogous to naked short selling. Not handing over - not delivering - the concert tickets on the day of the show is analogous to failure to deliver. The close-out rule in the concert context is requiring the seller to go buy real tickets, even at a higher price, and hand them over - deliver the tickets - consistent with the "naked sale."

266. Despite the weeks of elevated FTD activity, Lunai's stock did not appear on the Threshold List during November 2025, suggesting that the FTDs were structured to be cleared on an intraday or overnight basis sufficient to avoid triggering the five-consecutive-day rule.

267. A stock appears on Nasdaq's Threshold List when a large number of shares have failed to be delivered for several days in a row, signaling a possible settlement problem that must be fixed. Once a stock appears on the Threshold List, then brokers face stricter rules, in that they cannot continue to allow trades to fail indefinitely; mandatory close-outs apply such that under Reg SHO § 203(b)(3), any persistent failure must be closed out, the seller must buy real shares and deliver them, and borrowing or rolling forward the position no longer is allowed; and there is extra scrutiny on the security, including daily review with continued failures raising red flags for compliance and enforcement.

268. LNAI appeared on the Nasdaq's Threshold List on March 23, 2026 and remained on it through April 8, 2026, and again from May 12 to May 18, 2026, 17 trading days in all.

269. On March 26, 2026, FTDs of LNAI declined to 2,052 shares from 228,086 from the day before and from 2,126,969 shares on March 23. Then, on the next trading day, March 27, 2026, FTDs returned to the elevated level of 5,631,016.

270. The sharp decline in FTDs over three days to March 26, followed by a next-day extreme event, is a pattern consistent with a deliberate attempt to reset the threshold list count and avoid triggering the Reg SHO close-out requirement.

271. Had the high FTD levels continued through March 26, then the 13-consecutive-day mandatory close-out requirement under Reg SHO § 203(b)(3) would have been triggered as early as April 7. No such close-out occurred, and, on April 10, 2026, Lunai confirmed its removal from the Threshold List.

272. On April 8, 2026, the SEC recorded FTDs of 1,800,876 shares of LNAI. On April 9, LNAI had 645,813 shares sold that failed to deliver, followed by 272,130 shares on April 10, 2026.

273. Because there had been no closure ordered based on the prior Threshold List activity, LNAI was removed from the Threshold List after April 8, 2026, before the close-out requirement would have become effective.

*iii. Positive News Neutralized*

274. Positive news about a company, particularly material positive developments about a company, should cause an increase in the price of a company's stock, not a depressive effect on the price of the stock.

275. Scholarly research reflects that positive news articles are associated with positive stock returns, while negative news articles are linked to negative stock returns. These expected results suggest that news sentiment can play a significant role in shaping market movements. This relationship is particularly pronounced for smaller stocks.[23]

276. Similarly, Company specific news announcements containing positive or negative information significantly affect stock price movements. Positive news information positively affects the price, while negative information negatively affects the price.[24]

277. Notwithstanding positive news received throughout the elevated short selling period, Lunai's common stock has lost nearly 75% of its value. This has resulted from the

---

[23] *See* Tetlock, P.C., "Giving content to investor sentiment: The role of media in the stock market," JOURNAL OF FINANCE, 62(3), 1139-1168 (2007).

[24] *See* Easley, D., Hvidkjaer, S., and O'Hara, M., "Is information risk a determinant of asset returns?" JOURNAL OF FINANCE, 57(5), 2185-2221 (2002).

conspiratorial manipulative trading activities of Defendants knowingly and intentionally artificially depressing the stock's price and acting in concert to do so.

278. In the two days after the November 5, 2025 announcement of Lunai's peer-reviewed success in advancing a critical cancer treatment (see supra ¶ 205), an event and announcement that should have resulted in either no change in the price of a security or an increase in the price of a security, Lunai's stock lost more than 20% of its value through sale activity that saw FTDs on 2,884,449 shares. This event is both consistent with and reasonably explained by artificial short selling activity designed to manipulate the LNAI price per share.

279. A comparable event occurred the day after Lunai's April 15, 2026 announcement of its collaboration with Geneial, Inc. to advance drug development efforts for potential treatments of rare neurological diseases, Lunai's stock price fell by 4.7% with a trading volume of 27,922,990 shares. (As of the date of this Second Amended Complaint, FTD data is not yet available for April 15, 2026.)

280. As noted above, the daily volume of trading activity has exhibited an impossible and illogical recent spike on May 4, 2026, fewer than 10 days prior to the filing of this Second Amended Complaint as evidencing current manipulative activity, to 100.4 million shares. This is 53 times the normal daily trading volume of LNAI.

**D. Defendants Acted in Concert and with Scienter to Manipulate LNAI on Nasdaq**

281. Derived and extracted in large part from actual trading records reviewed and still under continuing comprehensive analysis and review, Defendants did not act independently. Instead, Defendants pursued a coordinated scheme to engage knowingly in a pattern of trading and practices, with intent to defraud and conceal, to manipulate the price of LNAI shares on Nasdaq.

282. Evidence of Defendants acting in concert includes temporal clustering, synchronized volume spikes, FTD-volume correlation, price suppression timing and Nasdaq Threshold Securities List exploitation. For example, temporal clustering included FTD clusters on November 6 and 7, 2025 totaling approximately 2.9 million shares, FTD clusters during the period March 18 to 27, 2026 totaling approximately 20.4 million shares, and FTD clusters during the period April 8 to 10, 2026 totaling approximately 2.7 million shares. Synchronized volume spikes occurred on January 8, 2026, when approximately 312 million shares traded on Nasdaq, representing an 8.6x trading volume multiple; February 13, 2026, when approximately 387 million shares traded on Nasdaq representing a 10.7x trading volume multiple; and March 18, 2026, when approximately 554 million shares traded on Nasdaq, representing a 15.3x trading volume multiple. Examples of FTD-volume correlation of 70 to 80% on the same or next day include November 5, 6 and 7, 2025, with trading volume of 169,777,760 shares on November 5, 2025, approximately 7.25 times the shares then outstanding, an FTD cluster of 2,884,449 shares over November 6 and 7, and a coinciding 20.6% decline in the stock price from $1.17 to $0.93; and the January to February 2026 period, during which coordinated volume spikes on January 8, January 15 and February 13, 2026, paired with cumulative FTDs exceeding 11 million shares, resulted in a 61.9% cumulative price decline through February 27, 2026. LNAI was included on the Nasdaq Threshold Securities List on 17 trading days: March 23, 24, 25, 26, 27, 30 and 31; April 1, 2, 6, 7 and 8; and May 12, 13, 14, 15 and 18, 2026. During the first of those periods the clearing firm's securities lending file records a locate or pre-borrow requirement on every day and no inventory of its own on any day, the volume spike of 554 million shares and the FTD cluster of 20.4 million shares fell inside it, and failures to deliver of 5,631,016 shares stood on March 27, 2026. Defendants

maintained and extended failures to deliver across the whole of that period rather than curing them, suppressing the stock price during the interval in which delivery was owed.

283. These coordinated trading patterns are inconsistent with random market activity. Instead, these patterns evidence a systematic scheme to execute coordinated naked short sales, generate FTDs, manipulated suppression of stock price through artificial volume, and exploiting regulatory thresholds.

284. Moreover, Defendants acted and continue to act at all times with scienter. Specifically, Defendants know that their naked short selling violates 17 C.F.R. § 242.200; know, understand and manipulate Reg SHO threshold mechanics and Rule 203(b)(3) buy-in requirement; know that coordinated volume spikes depress price; manifested an aligned short-selling profit motive; and knew and understood the shareholder harm that their trading caused.

**E. Accounts That Engaged in Fraudulent Naked Short Selling of LNAI**

285. During the period November 5, 2025 through May 4, 2026, trading records and buy-order information available to Plaintiff-Lunai show that Defendants engaged in fraudulent naked short selling of LNAI. Defendants' scheme to engage in the fraudulent naked short selling included manipulating the market for Lunai's common stock by employing multiple, mutually reinforcing manipulative techniques, including (a) marking the close, to create a false impression of Lunai's true closing valuation; (b) painting the tape, to create a false impression of independent market demand; (c) sham reset transactions, to conceal the true scope of Defendants' naked short position and evade Reg SHO's close-out requirements and regulatory detection; (d) round trip transactions, to generate the appearance of trading volume, establish artificial reference prices, and create a false appearance that a settlement obligation has been satisfied; (e) wash trading, to create a false or misleading appearance of trading volume or activity without any genuine change in

beneficial ownership; (f) spoofing or layering, to place orders purporting to create interest on either the buy or sell side with the intent to cancel those orders before execution; (g) short sales as the majority of all trading, to present a trading volume pattern inconsistent with ordinary two-sided market activity and a false impression of artificial supply of shares; and (h) price formation in an empty session, to trade to set a security's price where there is no other counterbalancing genuine trading activity in that session. Each technique is described in detail in the succeeding paragraphs below. Defendants did not employ these techniques in isolation; instead, these were coordinated components of a single scheme with the common purpose and effect of artificially suppressing the market price of Lunai's common stock.

286. The direct result of Defendants' scheme was and continues to be substantial economic harm to Plaintiff, including dilution-equivalent price suppression, impairment of the company's ability to raise capital on favorable terms, increased cost of capital to the company, removal from the Nasdaq Threshold Securities List and reputational and going-concern harm. Given the continuing investigation to identify Defendants DOES 123-172, ROE CORPORATIONS 15-64, and XYZ LLCS 28-77, Plaintiff Lunai estimates its current economic damages in the amount of hundreds of millions of dollars.

287. The devastating direct effect of the fraudulent naked short selling scheme also included Lunai being kicked off the Russell 3000 Index and failing to qualify for the Russell 2000 Index.

288. "Marking the Close" is a manipulative trading technique in which a trader places purchase or sale orders at or near the close of the trading session, in a size and manner calculated to influence the reported closing price of a security, rather than for any legitimate investment purpose. Because closing prices are widely disseminated, relied upon for portfolio valuation,

margin calculations, and index and benchmark purposes, and often influence trading activity in the following session, artificially inflating or depressing the closing price allows a manipulator to create a false impression of a security's value that persists beyond the manipulative trades themselves.

289. "Painting the Tape" is a manipulative technique in which a trader or group of coordinated traders executes a series of purchases (often in successive, incremental amounts at increasing prices) among accounts they control or with which they coordinate, in order to create a false or misleading appearance of trading activity, demand, or price movement in a security on the consolidated tape. Because the tape is a primary source of real-time information relied upon by other market participants, painting the tape is designed to induce those participants to buy or sell based on a fabricated picture of genuine market interest.

290. "Sham reset transactions" are a manipulative technique most specific to naked short selling in which a matched stock/option -- or stock/stock -- trade is structured so that one side of the trade is never intended to settle, giving the appearance that a fail-to-deliver position has been closed out when it has not. This is a technique used to evade the mandatory close-out requirements of Reg SHO Rule 204. Rather than purchasing or borrowing shares to close out a position as required by 17 C.F.R. § 242.204, sham reset transactions involve entering into a series of paired transactions with a counterparty, often structured as buy-writes in deep in-the-money options or basket trades including the victim-issuer's stock together with other securities, in which Defendants knew, thus acting with scienter, that their trades would not result in actual delivery of these shares. Meanwhile, these sham reset transactions enable the naked short sellers to represent to a clearing firm or broker-dealer, as well as on the issuer's books, that the fail-to-deliver position

had been closed out, when in fact the position - and the artificial supply of the issuer's shares it represented - continued uninterrupted as reflected in fails-to-deliver data.

291. "Round trip transactions" are a manipulative technique involving pre-arranged or coordinated trades in which the same or substantially the same security is bought and sold - often between related accounts, or through a matched counterparty - within a short time frame, at prices and quantities designed to offset one another, without any genuine change in economic exposure or beneficial ownership. Round trip transactions are used to generate the appearance of trading volume, to establish artificial reference prices, or, in the naked short selling context, to create a false appearance that a settlement obligation has been satisfied.

292. "Wash trading," similar to "round trip transactions, is a manipulative technique that refers to trades in which a party, directly or through affiliated accounts, simultaneously or near-simultaneously buys and sells the same security, resulting in no genuine change in beneficial ownership, for the purpose of creating a false or misleading appearance of trading volume or activity.

293. "Spoofing" or "layering" is a manipulative technique referring to the placement of one or more orders with the intent to cancel those orders before execution, in order to create a false impression of buy-side or sell-side demand and induce other market participants to trade at prices favorable to the spoofing party.

294. "Short sales as the majority of all trading" is a descriptor of manipulative activity that characterizes a manipulative trading scenario in which a majority of total reported trading volume presents as a pattern inconsistent with ordinary two-sided market activity and indicative of the artificial supply of shares created by Defendants' naked short selling.

295. "Price formation in an empty session" is a descriptor of a manipulative trading phenomenon for a manipulator's trade effectively setting a security's price because there is no other genuine trading activity in that session to counterbalance it. Reg SHO release language describes this manipulation concept relating principally to thinly-traded securities, which are more vulnerable to manipulation precisely because a small number of trades can move the reported price, and that naked short selling can allow manipulators to force prices down further than would be possible in ordinary short-selling conditions.

*Seven Points Capital*

296. Defendant Seven Points, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Seven Points profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

297. Specifically, Defendant Seven Points's unlawful trading activity to the detriment of Lunai and its shareholders, including, but not limited to:

a. On November 5, 2025, the onset date of the manipulative trading campaign, Seven Points executed approximately 655,281 short sale shares of LNAI. On this date, a locate for 650,450 shares was requested, and 181,000 shares were approved for borrowing. The November 5, 2025 trading session was followed by a 20.6% decline in LNAI's closing price from $1.17 to $0.93 over the two days of November 5 and 6, 2025. Seven Points thus executed short sales exceeding the approved locate by approximately 474,281 shares, more than two-thirds of the quantity requested. Seven Points thereby executed short sales exceeding what it had been granted, in knowing and direct violation of the federal securities laws.

b. On November 6, 2025, Seven Points executed approximately 2,200 additional short sales of LNAI, for which no locate appears in records. On November 25, 2025, Seven Points executed approximately 107,272 additional short sales of LNAI. On that date, a locate for 130,000 shares was requested across eight requests; however, zero shares were approved for borrowing. Defendant Seven Points proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

c. On March 17, 2026, Seven Points executed approximately 881,176 additional short sales of LNAI. On this date, a locate for 18,003,500 shares was requested; however, zero shares were approved for borrowing. Moreover, records show no lendable inventory in LNAI on that date and a status of pre-borrow required. Defendant Seven Points proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

d. On March 20, 2026, Seven Points executed approximately 687,000 additional short sales of LNAI. On this date, a locate for 1,878,083 shares was requested; however, zero shares were approved for borrowing. Moreover, records show a status of pre-borrow required on that date, and no inventory of the clearing firm's own. Defendant Seven Points proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

e. On March 26, 2026, Seven Points executed approximately 755,759 additional short sales of LNAI. On this date, a locate for 4,519,708 shares was requested; however,

zero shares were approved for borrowing. Moreover, the records show a status of pre-borrow required on that date, and no inventory of the clearing firm's own. Defendant Seven Points proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

f. On April 7, 2026, Seven Points executed approximately 257,474 additional short sales of LNAI. On this date, a locate for 1,653,000 shares was requested; however, zero shares were approved for borrowing. Moreover, the records show a status of pre-borrow required on that date, and no inventory of the clearing firm's own. Defendant Seven Points proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

g. On April 15, 2026, Seven Points executed approximately 13,300 additional short sales of LNAI. On this date, a locate for 194,000 shares was requested across four requests; however, zero shares were approved for borrowing. Moreover, the records show a status of locate required on that date, and no inventory of the clearing firm's own. Defendant Seven Points proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

h. On May 4, 2026, Seven Points executed approximately 10,000 additional short sales of LNAI. On this date the records show a status of pre-borrow required on that date, and no inventory of the clearing firm's own. Defendant Seven Points

proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

298. In aggregate, during the period March 17 through April 7, 2026, Seven Points executed a total of approximately 2,581,409 LNAI short sale shares against a record of zero locate grants on any of the relevant dates. Together with the activity of the November 5, 2025 onset-date, the trading referenced in the foregoing paragraph (297), and additional trading, Seven Points executed a total of approximately 3,369,462 LNAI shares without locate authorization for any but a small fraction of that volume.

299. Seven Points requested locates, and on seven of the nine sessions on which it sold LNAI short. On November 6, 2025 and May 4, 2026 no request appears in the record; it sold 2,200 and 10,000 shares on those two days respectively.

300. On the seven sessions on which it did request, the outcome was as follows. On November 5, 2025 it requested 650,450 shares and was granted 181,000, and sold 655,281. On November 25, 2025 it requested 130,000 across eight requests, was granted none, and sold 107,272. On March 17, 2026 it made 424 separate requests for 18,003,500 shares, was granted none, and sold 881,176. On March 20 it requested 1,878,083 across 41 requests, was granted none, and sold 687,000. On March 26 it requested 4,519,708 across 112 requests, was granted none, and sold 755,759. On April 7 it requested 1,653,000 across 24 requests, was granted none, and sold 257,474. On April 15 it requested 194,000 across four requests, was granted none, and sold 13,300.

301. The nine grants in the entire record fall on a single day, November 5, 2025. On every subsequent session on which Seven Points requested a locate in LNAI it was granted nothing, and on every such session it sold.

302. Seven Points also made requests on two dates on which no short selling by it is recorded, being March 12 and 16, 2026.

303. The naked short sales of approximately 3,369,462 LNAI shares violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Edward Griesedieck*

304. Defendant Edward Griesedieck, during a period including the dates of November 5, 2025 through April 7, 2026 and in near lockstep with his former employer Seven Points, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Griesedieck profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

305. Specifically, Defendant Griesedieck engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, the onset date of the manipulative trading campaign, Griesedieck executed approximately 40,000 short sale shares of LNAI. On this date, no locate request for these shares appears in the records,and no locate was obtained. The records show a locate requirement in the security on that date and no inventory of the clearing firm's own. Griesedieck executed the short sales in knowing and direct violation of the federal securities laws.

b. On March 16, 2026, Griesedieck executed approximately 36,152 short sale shares of LNAI. Defendant Griesedieck proceeded to execute naked short sales of LNAI

in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

c. On March 17, 2026, Griesedieck executed approximately 812,340 additional short sales of LNAI between two trading accounts. On this date, no locate request for these shares appears in the records, and no locate was obtained. Moreover, the records do now show a lendable inventory in LNAI on that date and a status of pre-borrow required. Defendant Griesedieck proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

d. On April 7, 2026, Griesedieck executed approximately 73,312 additional short sales of LNAI. On this date, no locate request for these shares appears in the records, and no locate was obtained. Moreover, the records show a status of pre-borrow required on that date, and no inventory of the clearing firm's own. Defendant Griesedieck proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

306. In aggregate, during the period of the trading referenced in the foregoing paragraph (305), and additional trading, Griesedieck executed a total of approximately 961,804 LNAI short sale shares against a record of zero locate grants on any of the relevant dates.

307. The naked short sales of approximately 961,804 LNAI shares by Griesedieck violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities;

and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Bisoke*

308. Defendant Bisoke, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Bisoke profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

309. Specifically, Defendant Bisoke engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, the onset date of the manipulative trading campaign, Bisoke executed approximately 10,254 short sale shares of LNAI. On this date, no locate request for these shares appears in records, and no locate was obtained. The records show a locate requirement in the security on that date and no inventory of the clearing firm's own. Bisoke executed the short sales in knowing and direct violation of the federal securities laws.

b. On November 25, 2025, Bisoke executed approximately 17,348 additional short sales of LNAI. On this date, no locate request for these shares appears in records, and no locate was obtained. The records show locate required on that date, and no inventory of the clearing firm's own. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

c. On March 12, 2026, Bisoke executed approximately 89,847 additional short sales of LNAI. On this date, no locate request for these shares appears in records, and no

locate was obtained. The records show locate required on that date, and no inventory of the clearing firm's own. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

d. On March 17, 2026, Bisoke executed approximately 820,654 additional short sales of LNAI. On this date, no locate request for these shares appears in records, and no locate was obtained. The records show no lendable inventory in LNAI on that date and a status of pre-borrow required. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

e. On March 26, 2026, Bisoke executed approximately 164,834 additional short sales of LNAI. On this date, no locate request for these shares appears in the records, and no locate was obtained. Moreover, the clearing firm's securities lending file records a status of pre-borrow required on that date, and no inventory of the clearing firm's own. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

f. On April 7, 2026, Bisoke executed approximately 156,018 additional short sales of LNAI. On this date, no locate request for these shares appears in records, and no locate was obtained. Moreover, records show a status of pre-borrow required on that date, and no inventory of the clearing firm's own. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

g. On May 4, 2026, Bisoke executed approximately 42,735 additional short sales of LNAI. On this date, no locate request for these shares appears in records, and no locate was obtained. Moreover, the records show a status of pre-borrow required on that date, and no inventory of the clearing firm's own. Defendant Bisoke proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

310. In aggregate, during the period of the trading referenced in the foregoing paragraph (309), and additional trading, Bisoke executed a total of approximately 1,301,690 LNAI short sale shares across its four accounts, and no locate obtained for any of those accounts appears records.

311. The naked short sale of approximately 1,301,690 LNAI shares by Bisoke violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

312. In the execution of its part in Defendants' manipulative trading scheme, Bisoke opened four separate accounts with the same broker-dealer, in rapid succession as each prior account approached position concentration thresholds.

*ETERNALENVY*

313. Defendant ETERNALENVY, during a period including the dates of March 12, 2026 through April 24, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant ETERNALENVY profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

314. Specifically, Defendant ETERNALENVY engaged in unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On March 12, 2026, ETERNALENVY executed approximately 591,613 short sale shares of LNAI. On this date, ETERNALENVY had no valid borrow authorization for the shares sold short.

b. On March 16, 2026, one day before the peak coordination session of March 17, 2026, ETERNALENVY executed approximately 391,483 short sale shares of LNAI, establishing an advance short position at prevailing prices of $0.48 per share. On this date, ETERNALENVY had no valid borrow authorization for the shares sold short. ETERNALENVY's March 16 positioning preceded by one day the largest single-day short sale event in the LNAI trading record.

c. On March 17, 2026, ETERNALENVY executed approximately 6,444,475 additional short sales of LNAI. On this date records show no lendable inventory in LNAI and a status of pre-borrow required, and independent market data recorded no shares available to borrow from March 13 to March 18, 2026, with the borrow fee rising from 49.5 percent per annum on March 13, 2026 to 621.45 percent. Defendant ETERNALENVY proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

d. On March 20, 2026, ETERNALENVY executed approximately 1,060,000 additional short sales of LNAI. On this date records show a status of pre-borrow required and no inventory of the clearing firm's own, and independent market data recorded an annualised borrow rate of 2,315.75 percent at the open of trading.

Defendant ETERNALENVY proceeded to execute naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

e. On March 26, 2026, ETERNALENVY executed approximately 1,500,000 additional short sales of LNAI. On this date, LNAI had been on the Nasdaq Threshold Securities List since March 23, 2026. Despite the heightened regulatory heightened scrutiny, Defendant ETERNALENVY proceeded to execute 1,500,000 additional naked short sale shares of LNAI in knowing and direct violation of the federal securities laws.

f. On April 7, 2026, ETERNALENVY executed approximately 1,755,749 additional short sales of LNAI. This was the date of Lunai's announcement of its first revenue-generating defense collaboration through BioSymetrics. Despite the positive material announcement, Defendant ETERNALENVY proceeded to execute nearly 2 million naked short sales at prices as low as $0.3764 per share, LNAI in knowing and direct violation of the federal securities laws.

g. On April 24, 2026, four days after the Nasdaq Hearings Panel issued its compliance plan decision, ETERNALENVY executed approximately 63,845 additional short sales of LNAI. Despite that regulatory decision to permit LNAI's continued listing, Defendant ETERNALENVY executed additional naked short sales of LNAI in knowing and direct violation of the federal securities laws, notwithstanding the absence of a confirmed locate.

315. In aggregate, during the period of the trading referenced in the foregoing paragraph (314), and additional trading, ETERNALENVY executed a total of approximately 11,807,165

LNAI short sale shares, representing a quantity equal to approximately 32.5 percent of the shares outstanding as reported in the Company's November 2025 Form 10-Q, accumulated over seven trading dates. Every date on which ETERNALENVY is recorded as having sold LNAI short is a date on which's securities lending file records a locate or pre-borrow requirement in the security and no inventory of the clearing firm's own.

316. The naked short sale of approximately 11,807,165 LNAI shares by ETERNALENVY violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Hold Brothers*

317. Defendant Hold Brothers, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, and profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

318. Specifically, Defendant Hold Brothers engaged in unlawful trading activity, to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, Hold Brothers executed approximately 461,977 short sale shares of LNAI. As noted above, this date was the onset date of the manipulative trading campaign. No locate for those shares appears in the records, and the records show a locate requirement in the security on that date and no inventory of the clearing firm's own. Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

b. On November 25, 2025, Hold Brothers executed approximately 6,200 additional short sales of LNAI, for which no locate appears in records. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

c. On February 9, 2026, Hold Brothers executed approximately 800 additional short sales of LNAI, for which no locate appears in records. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

d. On February 10, 2026, Hold Brothers executed approximately 500 additional short sales of LNAI, for which no locate appears in records. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

e. On February 19, 2026, Hold Brothers executed approximately 103 additional short sales of LNAI, for which no locate appears in records. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. Hold Brothers

executed the short sales in knowing and direct violation of the federal securities laws.

f. On March 26, 2026, Hold Brothers executed approximately 45,276 additional short sales of LNAI. On this date, LNAI remained on the Nasdaq Threshold Securities List. Nevertheless, Defendant Hold Brothers executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

g. On April 7, 2026, the date of LNAI's positive clinical announcement, Hold Brothers executed approximately 82,319 additional short sales of LNAI. These short sales on the date of a positive corporate announcement are consistent with and reasonably explained by a pattern of manipulative short selling designed to neutralize the market effect of positive news, in knowing and direct violation of the federal securities laws.

h. On May 1, 2026, Hold Brothers executed approximately 124,073 additional short sales of LNAI, for which no locate appears in records. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. Hold Brothers executed the short sales in knowing and direct violation of the federal securities laws.

i. On May 4, 2026, Hold Brothers executed approximately 500 additional short sales of LNAI, for which no locate appears in records. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. Hold Brothers

executed the short sales in knowing and direct violation of the federal securities laws.

319. In aggregate, during the period of the trading referenced in the foregoing paragraph (318), and additional trading, Hold Brothers executed a total of approximately 721,748 LNAI short sales through a registered U.S. execution venue. Hold Brothers' trading pattern spans the entire relevant period.

320. Hold Brothers routed its naked short sale orders through the execution infrastructure of a registered U.S. clearing firm. As a correspondent introducing broker-dealer, Hold Brothers bore direct supervisory responsibility for the naked short selling conducted through its accounts.

321. Hold Brothers Capital, LLC holds two accounts at the clearing firm, numbered [redacted]061 and [redacted]202 and opened on June 14, 2021 and June 12, 2020. All of the short selling pleaded above was executed through the first of them.

322. Its trading in LNAI differs in one respect from that of every other Defendant. Of the 579 accounts introduced through the correspondent channel, 578 closed the period at exactly nil and 549 opened and closed a short position within a single session. Hold Brothers did neither on any day.

323. Across the whole of the recrods obtained by Lunai, from November 3, 2025 to May 11, 2026, Hold Brothers bought 2,544,656 shares, sold 2,953,708 shares long and sold 721,748 shares short. Its purchases over the period are 409,052 shares fewer than its long sales alone, so its buying did not extend to covering any part of its short selling. Not one of its 721,748 short sales is matched by a covering purchase anywhere in the record.

324. The cumulative position recorded for that account runs continuously negative from November 5, 2025, the first day of the short selling, to the last day of the record, moving between approximately 682,000 and 1,822,000 shares and standing at 1,130,800 shares on May 11, 2026. Plaintiff does not allege from that figure alone the size of any position held, because the record does not disclose what the account held before it opens. What the record does show is that the short sales were made and that no purchase within it covers them.

325. These trades, and other similar trades of LNAI by Hold Brothers, violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*SageTrader*

326. Defendant SageTrader, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

327. Specifically, Defendant SageTrader engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, SageTrader executed approximately 209,831 naked short sale shares of LNAI. On this date, the onset date of the manipulative trading campaign, LNAI experienced 169,777,760 total shares traded. No locate for those shares appears in the records, and the records show a locate requirement in the security on that date and no inventory of the clearing firm's own. SageTrader

executed the short sales in knowing and direct violation of the federal securities laws.

b. On November 6, 2025, SageTrader executed approximately 1,602 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

c. On November 20, 2025, SageTrader executed approximately 357 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

d. On November 25, 2025, the second major coordination date following the November 5-6 trading cluster, SageTrader executed approximately 34,323 naked short sale shares of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

e. On March 12, 2026, SageTrader executed approximately 287,332 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

f. On March 16, 2026, SageTrader executed approximately 18,050 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

g. On March 17, 2026, SageTrader executed approximately 2,255,877 additional short sales of LNAI, for which no locate appears in records. This was SageTrader's largest documented LNAI short sale session, executed in knowing and direct violation of the federal securities laws. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

h. On March 18, 2026, SageTrader executed approximately 37,725 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

i. On March 20, 2026, SageTrader executed approximately 45,043 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

j. On March 26, 2026, SageTrader executed approximately 83,435 additional short sales of LNAI through a registered U.S. execution venue. On this date, LNAI remained on the Nasdaq Threshold Securities List. Nevertheless, Defendant SageTrader executed the naked short sales of LNAI in knowing and direct violation of the federal securities laws.

k. On March 27, 2026, SageTrader executed approximately 501 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

l. On April 7, 2026, SageTrader executed approximately 84,551 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

m. On April 15, 2026, SageTrader executed approximately 16,865 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

n. On April 24, 2026, SageTrader executed approximately 294,424 naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of

the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

o. On May 4, 2026, SageTrader executed approximately 1,644,345 additional naked short sales of LNAI. No locate for those shares appears in the records, and the records show a locate or pre-borrow requirement in the security on that date and no inventory of the clearing firm's own. SageTrader executed the short sales in knowing and direct violation of the federal securities laws.

328. In aggregate, during the period of the trading referenced in the foregoing paragraph (327), and additional trading, SageTrader executed a total of approximately 5,014,261 LNAI naked short sale shares, representing a quantity equal to approximately 13.82 percent of the shares outstanding as reported in the Company's November 2025 Form 10-Q, accumulated over 15 trading dates.

329. No known locate record covers SageTrader. SageTrader did not appear to clear through the broker-dealer through which Lightspeed, Cobra and Opal cleared their trades. The same is true for Hold Brothers.

330. SageTrader holds two accounts at the same clearing firm, numbered [redacted]690 and [redacted]914. Across the whole of the record it bought 1,473,992 shares, sold 722,855 long and sold 5,014,261 short. On one account-day only, of the 15 on which it sold short, did it open and close a short position within the session, and that day carried 501 shares.

331. The allegation against each is therefore that no locate for the shares they sold appears anywhere in records, and that the security required a locate or a pre-borrow on every trading day of the period, with the clearing firm holding no inventory of its own on any of them.

Whether either firm obtained a locate from some other source is a matter for its own records, which reflect none.

332. The naked short sale of approximately 5,014,261 LNAI shares by SageTrader violated Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Tyler Kling*

333. Defendant Tyler Kling, during a period including the dates of November 5, 2025 through March 26, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Kling profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

334. Specifically, Defendant Kling engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, the onset date of the naked short selling coordination, Kling executed approximately 173,611 short sales shares of LNAI, for which no locate appears in records, in knowing and direct violation of the federal securities laws.

b. On November 25, 2025, Kling executed approximately 153,374 short sales shares of LNAI, for which no locate appears in records, in knowing and direct violation of the federal securities laws.

c. On March 17, 2026, the peak date of the naked short selling coordination, Kling executed approximately 485,000 short sale shares of LNAI between two separate

accounts, for which no locate appears in records, in knowing and direct violation of the federal securities laws.

d. On March 26, 2026, Kling executed approximately 268,888 naked short sale shares of LNAI. Broker records of Kling's separate trading reveal same-minute coordination of these trades. Despite the absence of a valid locate, Defendant Kling executed the short sale in knowing and direct violation of the federal securities laws.

335. In aggregate, during the period of the trading referenced in the foregoing paragraph (334), and additional trading, Kling executed a total of approximately 1,080,873 LNAI naked short sale shares.

336. The naked short sale of approximately 1,080,873 LNAI shares by Kling, on dates corresponding closely to the naked short selling activity of other defendants named above, violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Marlena Malecka Kraska*

337. Defendant Marlena Malecka Kraska, during a period including the dates of November 5, 2025 through May 4, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Kraska profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

338. Specifically, Defendant Kraska engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, the onset date of the naked short selling coordination, Kraska executed approximately 2,292 short sales shares of LNAI, for which no locate appears in records, in knowing and direct violation of the federal securities laws.

b. On November 25, 2025, Kraska executed approximately 196 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

c. On November 26, 2025, Kraska executed approximately 2,034 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

d. On February 10, 2026, Kraska executed approximately 2,601 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

e. On April 15, 2026, Kraska executed approximately 766 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

f. On May 4, 2026, the same date Defendants Bisoke and SageTrader executed naked short sales of nearly 2 million LNAI shares, Defendant Marlena Malecka Kraska executed approximately 9,202 naked short sale shares of LNAI.

339. In aggregate, during the period of the trading referenced in the foregoing paragraph (338), and additional trading, Defendant Kraska executed a total of approximately 17,091 LNAI naked short sale shares.

340. The timing of Defendant Kraska's naked short sale of LNAI was not incidental and constituted active engagement in fraudulent and manipulative naked short selling of LNAI with one or more other defendants, profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

341. Defendant Kraska's participation in Defendants' broader naked short selling scheme violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Wojciech Malecki*

342. Defendant Wojciech Malecki, during a period including the dates of November 5, 2025 through May 1, 2026, actively engaged in fraudulent and manipulative naked short selling of LNAI, as a direct and proximate cause of which Defendant Malecki profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

343. Specifically, Defendant Malecki engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, the onset date of the naked short selling coordination, Malecki executed approximately 11,402 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

b. On November 25, 2025, Malecki executed approximately 7,362 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

c. On April 7, 2026, Malecki executed approximately 50,734 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

d. On April 15, 2026, Malecki executed approximately 46,931 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

e. On May 1, 2026, three days before Defendants Bisoke, SageTrader, and Malecka Kraska executed a high volume of naked short sales of LNAI shares, Defendant Wojciech Malecki executed approximately 48,282 naked short sale shares of LNAI.

344. In aggregate, during the period of the trading referenced in the foregoing paragraph (343), and additional trading, Defendant Malecki executed a total of approximately 164,711 LNAI naked short sale shares.

345. Defendants Malecki and Kraska coordinated with each other and one or more other defendants to engage in fraudulent and manipulative naked short selling of LNAI, profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

346. Defendant Malecki's participation in Defendants' broader naked short selling scheme violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

*Quant Lab SFO FZCO*

347. Defendant Quant Lab, during a period including the dates of November 5, 2025 through April 15, 2026, actively engaged in fraudulent and manipulative naked short selling of

LNAI, as a direct and proximate cause of which Defendant Quant Lab profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

348. Specifically, Defendant Quant Lab engaged in the following unlawful trading activity to the detriment of LNAI and its stockholders, including, but not limited to:

a. On November 5, 2025, the onset date of the naked short selling coordination, Quant Lab executed approximately 1,914 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

b. On November 25, 2025, Quant Lab executed approximately 196 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

c. On November 26, 2025, Quant Lab executed approximately 1,383 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

d. On April 7, 2026, Quant Lab executed approximately 789 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

e. On April 15, 2026, Quant Lab executed approximately 1,044 short sales shares of LNAI, for which no locate appears in the records, in knowing and direct violation of the federal securities laws.

349. In aggregate, during the period of the trading referenced in the foregoing paragraph (348), and additional trading, Defendant Quant Lab executed a total of approximately 5,326 LNAI naked short sale shares.

350. Defendant Quant Lab, as an instrument controlled by Defendant Kraska, coordinated with Defendants Kraska, Malecki, and one or more other defendants to engage in fraudulent and manipulative naked short selling of LNAI, profited no less than millions or tens of millions of dollars and in a sum more precisely to be determined.

351. Defendant Quant Lab's participation in Defendants' broader naked short selling scheme violated (a) Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a course of business and employing a scheme to defraud, in connection with the naked short sales of LNAI's securities; and (b) Section 9(a) of the Exchange Act, by effecting transactions that created false and misleading market conditions pertaining to LNAI.

352. Three of many examples of some of the manipulative techniques employed by the above-named Defendants and by Defendants Does 123-172, Roe Corporations 15-64, and XYZ LLCs 28-77, inclusive, as part of their naked short selling scheme and coordinated trading activity in further of their enterprise includes, but is not limited to:

a. On March 12, 2026, Defendant ETERNALENVY engaged with Defendant Griesedieck in round trip naked short sales and covers inside the same trading session; and

b. On March 12, 2026, Defendant ETERNALENVY engaged with a likely known Defendant Doe in round trip naked short sales and covers inside the same eight-minute time frame.

c. On March 16, 2026, Defendants ETERNALENVY and Griesedieck between them accounted for 74% percent of the short selling in a trading session that established the following morning's opening depressed stock price;

## F. Actual and Prospective Harm to Lunai

353. This egregious, fraudulent, and manipulative naked short selling activity in LNAI directly harmed and continues to harm Lunai and its bona fide shareholders. Among the many harms resulting from this manipulative activity, as Lunai disclosed in a Form 8-K filed with the SEC on February 23, 2026, "[o]n February 6, 2026, Lunai [] received a letter from the Listing Qualifications Staff (the 'Staff') of The Nasdaq Stock Market LLC ('Nasdaq') notifying the Company that the Staff had determined to delist the Company's securities from Nasdaq." Lunai also disclosed that it requested timely a hearing before the Nasdaq Hearings Panel to appeal the Staff's determination.

354. In order to avert and stay a trading suspension and delisting of its stock, Lunai sought review before a Nasdaq Hearings Panel, with a plan to regain compliance under Nasdaq Listing Rules 5550(a)(2) (the "Bid Price Rule") and 5550(b)(1) (the "Stockholders' Equity Rule").

355. The primary subject of the Staff's delisting determination was Lunai's Bid Price Rule deficiency, under which the Company's common stock had failed for 30 consecutive business days to meet the minimum bid price of $1.00. The Bid Price Rule deficiency was and continues to be a direct consequence of the depressive effect of fraudulent naked short selling activity on the price of LNAI.

356. This 30-day shortfall was the direct result of Defendants' knowing and fraudulent manipulation of the trading of Lunai's stock dating back to November 6, 2025, which finally forced Lunai's closing stock price below $1.00 per share in December 2025.

357. Under Nasdaq's Stockholders' Equity Rule, an issuer is required to maintain stockholders' equity of at least $2.5 million. Lunai's compliance under this Listing Rule also suffered as a result of the artificial depression of its stock price.

358. In a Form 8-K filed with the SEC on May 1, 2026, Lunai disclosed that on April 20, 2026, upon review of Lunai's business presentation and compliance plan, the Nasdaq Hearings Panel issued a decision granting Lunai until April 27, 2026 to re-establish compliance with the Stockholders' Equity Rule. In the same decision, the Hearings Panel granted Lunai until June 1, 2026 to demonstrate compliance with the Bid Price Rule, which requires sustaining a closing stock price above the $1.00 minimum bid price for ten consecutive business days.

359. In the proceeding, the Hearings Panel remarked on Lunai's fundamental value and abnormality of a company in Lunai's market position and financial health, notwithstanding the turmoil in the company's stock listing, incurring a Bid Price Rule deficiency. Put differently, the Hearings Panel recognized the depressive effect of the anomalous short selling of LNAI.

360. On April 27, 2026, Lunai requested brief extensions from the Hearings Panel until May 1, 2026 to demonstrate Stockholders' Equity Rule compliance and until June 4, 2026 to regain Bid Price Rule compliance.

361. Also in the Form 8-K filed with the SEC on May 1, 2026, Lunai announced that the Company had completed the merger of Neurobridge into Lunai Bioworks IP, Inc. and then issuance of preferred stock on May 1, 2026, so as to re-establish compliance with the Stockholders' Equity Rule. *See supra* ¶ 211. However, Lunai's extension request to the Hearings Panel, which would ratify the Neurobridge transaction for the purpose of Stockholders' Equity Rule compliance, remains pending as of this Second Amended Complaint.

362. Lunai has already lost access to capital due to the artificial downward pressure on its stock price, such that Lunai now is in the position of its Nasdaq Capital Market continued listing being under imminent threat because of Defendants' manipulative and fraudulent trading practices.

363. Absent continued expedited discovery into the identities and transaction records of the as yet unidentified Defendants, upon receipt of which Lunai will be in a position to further amend this Second Amended Complaint, name additional Defendants, and seek injunctive relief and damages, including all damages as may be available through pursuing the herein asserted civil RICO claim, the damage to Lunai's business objectives and going concern status will be irreparable.

364. Opal is the correspondent broker-dealer through which the largest single block of the naked short selling alleged in this Second Amended Complaint was introduced, accepted and cleared. 39 Opal customer accounts sold 20,544,305 shares of LNAI short across 18,418 executions on eleven trading dates between November 5, 2025 and May 4, 2026. That is 57.2 percent of all short selling recorded in the correspondent brokers' records. Cobra Trading, Inc. required 438 accounts to sell a little more than half as much.

365. 54 percent of Opal's short selling executed before the market opened at 9:30 a.m. Every one of the 40 Opal accounts in the record, being the 39 that sold short and one that did not, closed the period at exactly nil. On 72 separate account-days, 35 Opal accounts opened a short position and repurchased the whole of it within the same session, carrying 10,186,667 shares.

366. The obligation under Rule 203(b)(1) not to accept a short sale order without reasonable grounds to believe the security could be borrowed attached to Opal at the point of acceptance, before any order reached the clearing firm. The clearing firm's securities lending file records a locate or pre-borrow requirement on all 139 trading days from November 3, 2025 to May 22, 2026, and not one easy-to-borrow day. From March 17 to May 18, 2026 the recorded status was pre-borrow required, under which shares must be borrowed before the sale rather than merely located.

367. Not one Opal customer account appears in records obtained by Lunai for the entire period, and Opal's own desk made no request in it. No locate obtained for any Opal customer account appears in any of the productions received in this action.

368. The locate request file records, against each request, the inventory the securities lending desk had uncommitted at the moment the request was made. Of the 812 requests in LNAI, 137 record nil inventory and every one of those was refused. The remaining 675 record inventory and every one of those was granted in whole or in part. The desk therefore granted a locate whenever it had shares uncommitted and refused whenever it did not, and its record shows which of the two occurred on each occasion.

369. That distinguishes the position of the correspondent broker-dealers from one another in a way that is decisive.

370. Cobra's refused requests were made between 4:57 a.m. and 11:30 a.m., 119 of the 127 of them between five and seven in the morning, and each was refused with nil inventory recorded against it. On five of those days the clearing firm's daily lending record shows no lendable inventory in the security at all, and on 21 of them it shows that more than 70 percent of the whole lendable book was already out on loan.

371. Opal requested nothing. On five of the eleven sessions on which Opal customer accounts sold LNAI short, the same securities lending desk granted locates in the same security to other correspondent broker-dealers: 147,414 shares on November 5, 2025; 179,686 on November 25, 2025; 34,353 on March 12, 2026; 48,413 on March 16, 2026; and 747,986 on April 15, 2026, being 1,157,852 shares in total across 179 separate requests.

372. On those same five sessions Opal customer accounts sold 2,556,465 shares of LNAI short. Shares were available and were being lent by that desk on those days, to firms that asked for them. Opal did not ask.

373. The absence of any request by Opal is not confined to the desk of the clearing firm that carried its accounts. Seven correspondent broker-dealers appear in records obtained by Lunai for LNAI. Opal is not among them, and no account in the Opal series appears in it at any time.

374. Nor does Opal appear in the locate records of the second lender used by two of the other correspondent broker-dealers in this action. 17 correspondent group codes appear in those records. None identifies Opal.

375. The record shows that Opal requested a locate in LNAI from no one, at any time, while its customers sold 20,544,305 shares of the security short.

376. On March 18, 2026 the clearing firm's DTC participant account carried a failure to deliver of 5,081,150 shares of LNAI, and a further 1,433,933 shares on March 19. The clearing firm's own fail allocation file allocates 4,640,053 shares of the March 18 failure to three Opal accounts, of which 4,299,894 shares are allocated to account [redacted]137, and allocates the whole of the March 19 amount to that same account. The 4,299,894 figure is exactly the short position that account carried overnight on March 17, 2026.

377. Each of the accounts set out below was approved by Defendant Goldberg personally, on Opal's own account-opening forms. They include account [redacted]053, whose address line in Opal's own record reads "ADDRESS UNKNOWN", and which sold short on March 17, 2026, the session on which's lendable inventory stood at nil; a fourth account for Bisoke LLC, a second for Tyler H. Kling, a second for Edward T. Griesedieck and a third held within one family; and account [redacted]137, for which Opal's records contain no account-opening file at all,

through which 11,807,165 shares were sold short, 57.5 percent of Opal's own book and 32.9 percent of all short selling in the record.

378. The trading of each Opal account holder named as a Defendant in this Second Amended Complaint was as follows, in shares of LNAI sold short and executions, as recorded in the clearing firm's execution records:

a. ETERNALENVY LLC FZ ([redacted]137): 11,807,165 shares short across 6,604 executions.

b. William Edward Gonet ([redacted]103): 1,521,356 shares short across 1,021 executions.

c. Bisoke LLC ([redacted]014, [redacted]048, [redacted]053, [redacted]061): 1,301,690 shares short across 4,046 executions.

d. Tyler Hayden Kling ([redacted]004, [redacted]143): 1,080,873 shares short across 1,824 executions.

e. Sandy Wong ([redacted]140): 1,025,846 shares short across 357 executions.

f. Edward T. Griesedieck ([redacted]006, [redacted]009): 961,804 shares short across 751 executions.

g. Ezra Grothe ([redacted]109): 818,627 shares short across 1,148 executions.

h. Hongpeng Pan ([redacted]129): 526,547 shares short across 838 executions.

i. Owl Hill Capital LLC ([redacted]116): 346,253 shares short across 293 executions.

j. Abhinand Reddy Vaddi Reddy ([redacted]021): 213,033 shares short across 81 executions.

k. Calvin Nguyen ([redacted]127): 162,830 shares short across 72 executions.

l. Bala Anand Vaddi Reddy ([redacted]057): 115,439 shares short across 106 executions.

m. Adam Gefvert ([redacted]010): 100,000 shares short across 104 executions.

n. Rico Boone ([redacted]043): 83,852 shares short across 367 executions.

o. Prateek Kumar ([redacted]128): 78,058 shares short across 44 executions.

p. Joseph Guevarra ([redacted]126): 66,440 shares short across 94 executions.

q. Amin Golestan ([redacted]022): 48,750 shares short across 106 executions.

r. Anurag Vaddi Reddy ([redacted]092): 45,690 shares short across 75 executions.

s. JTL Capital Enterprises LLC ([redacted]076): 45,375 shares short across 87 executions.

t. Cong Hao Wang ([redacted]044): 45,000 shares short across 16 executions.

u. Rong Quan ([redacted]132): 34,286 shares short across 48 executions.

v. SSP Capital Ltd ([redacted]078): 26,790 shares short across 29 executions.

w. Varsity Tech Pte. Ltd. ([redacted]135): 26,484 shares short across 49 executions.

x. Glen Raymond Loupias ([redacted]049): 19,100 shares short across 88 executions.

y. Epic Edge Trading Oy ([redacted]118): 11,766 shares short across 25 executions.

z. Jiping Hu ([redacted]087): 9,400 shares short across 43 executions.

aa. Cong Zhao ([redacted]089): 5,000 shares short across 13 executions.

bb. Jacob Lee ([redacted]096): 4,877 shares short across 18 executions.

cc. Chin Zhi You ([redacted]125): 4,811 shares short across seven executions.

dd. Matthew Hope ([redacted]106): 4,394 shares short across 51 executions.

ee. Vivek Dandare ([redacted]091): 1,128 shares short across one execution.

ff. Hunter Snyder ([redacted]080): 1,000 shares short across three executions.

gg. Carl Eguez ([redacted]114): 550 shares short across four executions.

hh. Samuel Oh ([redacted]097): 91 shares short across five executions.

### G. The Shares Actually Available to Be Traded, and the Dilution

379. The number of shares outstanding is not the number of shares that can be bought and sold. Shares held in book entry form on the register of the Company's transfer agent are not available for lending or for ordinary market settlement; only shares held electronically through the facilities of the Depository Trust Company, in the name of its nominee Cede & Co. are eligible for trading. The distinction is decisive in a security in which the short selling exceeded the entire share count.

380. As recorded on the share register at the reverse split of May 22, 2026, Lunai had 4,534,025 shares outstanding. Of those, 3,145,130 shares were held electronically through Cede & Co. and 1,388,895 shares were held in book entry form and were held exclusively by insiders. One block of 155,482 book entry shares is the subject of a court-ordered freeze and is represented by a physical certificate held by a judge.

381. Shareholders holding 1,128,906 of the electronic shares have confirmed that their holdings were not made available for lending at any time during the relevant period. The maximum quantity of Lunai common stock capable of being borrowed and delivered was therefore 2,016,224 shares, and that figure is itself conservative because it does not subtract further long-standing holders who have not been asked.

382. Measured against that figure, the short selling pleaded in this Second Amended Complaint is 41,931,539 shares as traded, being 35,885,799 shares recorded in the clearing firm's correspondent records, 2,676,278 shares recorded in the trade blotter of a second clearing broker-dealer, and 3,369,462 shares cleared through a third. The three are separate clearing relationships and no share is counted twice. Expressed in the denomination that followed the reverse split the total is 5,241,442 shares, which is approximately 116 percent of every share outstanding,

approximately 167 percent of every share held electronically, and approximately 260 percent of the shares actually capable of being borrowed and delivered. The figure is confined to the productions received in this action and excludes short selling recorded in the productions of executing firms.

383. The share count did not remain constant. The covers of the Company's quarterly reports record 23,432,391 shares outstanding as of November 10, 2025, 24,187,356 as of February 11, 2026 and 36,271,119 as of May 15, 2026. The increase between the first two dates was 754,965 shares, approximately three percent. The increase between the second and third was 12,083,763 shares, approximately 50 percent, and it falls within the months of the heaviest short selling alleged in this Second Amended Complaint.

384. Those shares were issued electronically and not into book entry. Expressed in the denomination that followed the reverse split, the increase is approximately 1,510,470 shares, which is approximately 48 percent of the electronic holding recorded at the split and approximately 75 percent of the shares capable of being borrowed and delivered. The dilution fell on the tradeable portion of the Company's equity and not on the locked holdings of its insiders.

385. On February 27, 2026, between the second and third of the share counts set out above, the Company furloughed its employees in the United States and Canada without compensation, and its Chief Executive Officer and Chief Financial Officer deferred their salaries, in each case to preserve liquidity while the Company continued to seek financing. The Company reported those measures to the Securities and Exchange Commission on March 5, 2026.

386. The Company raised that capital through an at-the-market offering programme and through exchanges of secured indebtedness for equity. In each, the number of shares issued is a function of the market price: the lower the price, the greater the number of shares required to raise

the same sum or to discharge the same debt. On March 24, 2026, one week after the session of March 17 on which the lending market recorded no available inventory, the Company exchanged $828,770 of secured promissory notes and accrued interest for 3,909,293 shares and 1,433,621 warrants at a price of $0.21 per share, the warrants expiring on March 24, 2036.

## V. LIGHTSPEED FINANCIAL SERVICES GROUP LLC AND LEO TANNER

387. A holding company under common ownership with the clearing firm that carries Lightspeed's customer accounts is recorded on Lightspeed's Form BD as a direct owner of Lightspeed, alongside Lightspeed Holdings LLC, which holds 75 percent or more and has directed the management or policies of the firm since May 2018. The same holding company is recorded on that clearing firm's own Form BD as its direct owner.

388. One holding company therefore sits over both the introducing broker that issued the locates through its own Short Request Window and the clearing broker whose securities lending desk supplied it with 191,273 shares against requests for 15,517,500 and refused it outright on the sessions at issue. The account-opening files described below are Lightspeed's own records, maintained by that clearing firm, which is under common ownership with Lightspeed.

389. Lightspeed is the introducing broker-dealer through which the short selling alleged in this Second Amended Complaint was solicited, approved, accepted and introduced for clearing. 83 Lightspeed customer accounts sold 2,208,224 shares of LNAI short across 6,014 executions on 17 trading dates between November 5, 2025 and May 5, 2026.

390. The obligation under Rule 203(b)(1) not to accept a short sale order without reasonable grounds to believe the security could be borrowed and delivered, and to document that determination, attached to Lightspeed at the point of acceptance, before any order reached the

clearing firm. Lightspeed's own margin agreement provides that the customer remains Lightspeed's customer and does not become the customer of the clearing agent.

391. Lightspeed did not leave that obligation to its clearing firm. It operated the locate function itself. Item 15 of every Lightspeed account application states that a locate is accepted through the Lightspeed "Short Request Window," that the displayed fee is payable whether or not the locate is used, that unused shares cannot be returned, that the locate is good for one day and covers the intraday locate only, that an overnight position incurs overnight short fees, and that it remains subject to buy-in in compliance with Reg SHO.

392. Lightspeed thereby stated the requirement to every customer it approved, in writing, at account opening; charged each customer a fee for the mechanism by which the requirement was to be satisfied; and retained control of that mechanism. The acknowledgement establishes that Lightspeed knew the rule. It is not evidence that Lightspeed obeyed it.

393. The log of the Short Request Window is the contemporaneous record of what locate Lightspeed granted, to which account, in what quantity, at what time and on what basis. It is the documentation Rule 203(b)(1) requires. That log does not exist in Records obtained by Lunai, and it appears in no other party's records either.

394. Because the fee is charged on every request whether or not the locate is used, Lightspeed's own billing records for the Short Request Window would show the same thing from the other side: which account asked for what, on which day, and what was charged. Those records do not exist either.

395. No locate obtained for any of the 83 customer accounts appears in records obtained by Lunai. The clearing broker's locate request file records 812 requests in LNAI over the period, and the only requests in it from the Lightspeed channel come from two Lightspeed house accounts,

[redacted]130 and [redacted]302. Not one of the 83 customer accounts appears in that file. What Lightspeed requested through those two house accounts, and what it requested from a second clearing firm, is set out below.

396. Lightspeed did not confine its search for borrow to the clearing broker that carried its accounts. The locate records of a second clearing firm record locate requests in LNAI under a correspondent group code identifying the Lightspeed channel.

397. Under that group code, 4,567 requests were made for a total of 13,024,998 shares of LNAI across 16 trading dates between November 5, 2025 and May 5, 2026. Not one share was granted on any of them. Across the same file as a whole, that clearing firm granted 763 of 29,996 requests, so the outcome under the Lightspeed group code is not the ordinary outcome in the file.

398. 15 of the 16 dates on which those requests were made are dates on which Lightspeed customer accounts sold LNAI short, and on several the quantity requested and the quantity sold correspond closely: on March 27, 2026 a locate for 32 shares was requested and 31 shares were sold short; on May 5, 2026 a locate for 331 shares was requested and 330 shares were sold short; on May 1, 2026 a locate for 36,223 shares was requested and 37,940 shares were sold short. On March 17, 2026, 3,529 separate requests were made for 9,486,417 shares and none was granted; Lightspeed customer accounts sold 193,593 shares short that day.

399. The position for Lightspeed is therefore not merely that no locate appears in the clearing broker's records. Lightspeed sought borrow from a second clearing firm, in thousands of separate requests, on the same days on which its customers were selling, and was granted nothing. It accepted and introduced the orders regardless.

400. The identification of the group code with Lightspeed rests on the code itself as that clearing firm records it and on the correspondence of dates and quantities set out above. That

clearing firm's own records state that locates are recorded at correspondent level and that a single locate may cover more than one customer order.

401. Lightspeed also requested locates in LNAI from the clearing broker that carried its accounts, through two house accounts, [redacted]130 and [redacted]302. Those two accounts made 156 requests for 15,517,500 shares of LNAI in total, and 191,273 shares were allocated against them, being approximately 1.2 percent of the quantity requested.

402. The allocations were made on five dates: November 5 and 25 and December 9, 2025, and March 12 and April 15, 2026. Four requests were refused outright, each against nil recorded inventory, on March 17, April 24 and May 4, 2026, each of them a date on which Lightspeed customer accounts sold LNAI short in quantity.

403. Taken with the records of the second clearing firm, Lightspeed made 4,723 requests for a locate in LNAI across the period, for a combined 28,542,498 shares, and obtained 191,273 shares. It sought borrow through both of its clearing channels, was supplied with less than one percent of what it asked for, and accepted and introduced its customers' short sale orders in the quantities pleaded above.

404. Lightspeed's position differs from that of the other two correspondent broker-dealers, and the Complaint states the difference.

405. Lightspeed did request locates, and on almost every session on which its customers sold. Of the 17 sessions on which Lightspeed accounts sold LNAI short, requests were made through one or both of its channels on 15. On the remaining two, November 6, 2025 and March 16, 2026, no request appears in either record; Lightspeed accounts sold 22,657 shares between them on those two days.

406. What the record shows is not that Lightspeed failed to ask. It is that Lightspeed asked, was given almost nothing, and accepted and introduced the orders regardless. Across both channels it requested 28,542,498 shares and obtained 191,273, being approximately 0.67 percent.

407. The shortfall was not marginal on any occasion on which it obtained anything. On November 5, 2025 it requested 4,000,000 shares and received 64,307. On November 25, 4,617,500 and received 89,796. On December 9, 1,500,000 and received 18,638. On March 12, 2026, 3,000,000 and received 3,422. On April 15, 2,000,000 and received 15,110. On every other session on which it asked, it received nothing at all.

408. On three of those sessions the securities lending desk granted locates in the same security to other correspondent broker-dealers while Lightspeed received a fraction of what it had asked for: 83,107 shares to others on November 5, 2025 against 64,307 to Lightspeed; 89,890 against 89,796 on November 25; and 732,876 against 15,110 on April 15, 2026.

409. The clearing firm's securities lending file records a locate or pre-borrow requirement in LNAI on all 139 trading days from November 3, 2025 to May 22, 2026 and not one day on which the security was easy to borrow. From March 17 to May 18, 2026 the recorded status was pre-borrow required, under which shares must be borrowed before the sale rather than merely located. The clearing firm held none of its own inventory in LNAI on any day of the period.

410. On eight of the 17 sessions on which Lightspeed accounts sold LNAI short, every locate request recorded at the clearing firm's desk in that security was refused and the inventory recorded against each refusal was nil. Lightspeed accounts sold 1,369,554 shares of LNAI short on those eight sessions, approximately 62 percent of all their short selling in the security: March 17, 2026, 193,593 shares; March 26, 2026, 210,566; March 27, 2026, 31; April 7, 2026, 283,056; April 24, 2026, 221,566; May 1, 2026, 37,940; May 4, 2026, 422,472; and May 5, 2026, 330.

411. On March 17, 2026 Lightspeed's own house account [redacted] 130 requested a locate of 100,000 shares of LNAI from the clearing firm's lending desk. The inventory recorded against that request was nil, the quantity allocated was nil, and the request was refused. Lightspeed customer accounts sold 193,593 shares of LNAI short that day. The same house account requested and was refused again on April 24 and May 4, 2026, on which days Lightspeed customer accounts sold 221,566 and 422,472 shares short respectively.

412. On March 26, March 27, April 7, May 1 and May 5, 2026, Lightspeed customer accounts sold LNAI short and no request for a locate in LNAI was recorded at the clearing firm's desk from any Lightspeed account, house or customer.

413. The largest single Lightspeed session of the period is May 4, 2026 at 422,472 shares. The second largest is March 12, 2026 at 284,768 shares, a session on which's lendable inventory in LNAI stood at 27,561 shares.

414. Of Lightspeed's short selling in LNAI, 1,805,961 shares, approximately 81.8 percent, were executed before the market opened at 9:30 a.m. Eastern Time; 351,798 shares, approximately 15.9 percent, during regular trading hours; and 50,465 shares, approximately 2.3 percent, after the close. 1,188,433 shares, approximately 53.8 percent, were executed before 9:00 a.m. The earliest execution recorded is timed at 4:00:15 a.m. and the 4:00 a.m. hour alone carries 312,052 shares.

415. That is the highest pre-market concentration of any correspondent broker-dealer in the clearing firm's records. The comparable figure for the correspondent with the largest book is 54.2 percent and for the correspondent with the second largest is 37.7 percent.

416. The single largest half hour of the entire period is 9:00 a.m. to 9:30 a.m., the 30 minutes before the market opens, at 617,528 shares.

417. The locate requirement applies to every short sale and admits no exception for extended trading hours. It attaches to the order and not to the session, and the locate must be in place before the order is accepted. The locate requests recorded at the clearing firm's own desk are timestamped between 6:14 a.m. and 6:25 a.m., and no securities lending desk is open at four o'clock in the morning. What the Short Request Window did at that hour, and on what basis it issued a locate then, is answerable only from its log.

418. Trading at four in the morning requires a venue that is open at four in the morning. Of the pre-market volume, 896,656 shares were executed through Coda Markets, Inc., the alternative trading systems of which operate around the clock. Across the whole period the alternative trading systems venue split is Coda Markets 1,087,573 shares, approximately 49.3 percent; Instinet 661,570 shares, approximately 30.0 percent; a destination recorded as LAMP 281,257 shares; Valor 100,535 shares; and Clearpool 77,289 shares. The hour and the venue are a single decision, not two.

419. The account applications in Records obtained by Lunai show, on their face, that it approved accounts on records it had itself flagged and on financial statements that cannot be true as written.

420. Three applications failed Lightspeed's own automated identity and background screening and were approved with no remediation recorded. Accounts [redacted]995 and [redacted]859 failed on the same screening code, a sanctioned-country input flag. On [redacted]859 the reviewing officer moved the application from failed to approved in a single step, recording the word "approved" and nothing else.

421. Those two applications are not independent of one another. Both give the same previous broker, the same answer in the referral field, the same Lightspeed salesperson, the same

promotional code and a non-United States address; both failed on the same screening code; and both were approved. They are the two largest of the Lightspeed accounts for which an application exists, at 116,986 and 99,552 shares, and both sold short overwhelmingly before the market opened.

422. Lightspeed account [redacted]298 failed on different flags: an automated fraud score of 0.897 against identity elements scoring 0.99, an input address more than five years stale with a more recent address found for the matched identity, and a national identity number associated with multiple addresses. Nevertheless, Account [redacted]298 was approved three days after submission, the fastest approval in the set.

423. The same application records the account holder's employment status as unemployed, records the source of income as employment, and gives an annual income of $125,000 to $149,999. Lightspeed approved the account as submitted, for a day-trading margin account, with a stated investment objective including speculation and a stated risk tolerance of high.

424. On Lightspeed account [redacted]200, the applicant's stated liquid net worth of $225,000 to $249,000 exceeds her stated total net worth of $200,000 to $224,999. Liquid net worth is a component of total net worth and cannot exceed it. The same application gives an annual income of $15,000 to $24,999 against initial funding of $50,000. Lightspeed approved it as submitted.

425. The officer who reviewed that application amended and resubmitted it three times before approving it, and recorded in the compliance notes the words "We know her." The same officer's notes record an existing account for the same applicant, [redacted]843, for which no file exists in Records obtained by Lunai and which appears nowhere else in the record.

426. On account [redacted]703, the applicant represented annual income, total net worth and liquid net worth as three identical bands and answered "Less than 5 years" of investment experience in all seven asset classes, including annuities and limited partnerships. Lightspeed approved the account for margin under Regulation T, with a recorded risk tolerance of medium and a stated investment objective of income. The account went on to sell LNAI short, entirely before the market opened.

427. A fourth application also carries an automated screening failure.

428. On several applications, Lightspeed compliance staff enabled resubmission and submitted the application themselves. Fields on those applications carry the timestamp of the officer's intervention rather than of the applicant's own session. On account [redacted]703, the salesperson's name, the applicant's address line and the postal code carry timestamps matching the exact minutes at which the reviewing officer resubmitted the form, 12 days after the applicant had last touched it. The customer's attestation on that application covers answers the customer did not provide.

429. Every Lightspeed application records a principal-approval step separately from the compliance review and ends with a single line reading "Principal Approval" followed by a name. On every application examined that name is the same person who conducted the compliance review of the same application. Four Lightspeed officers appear in that role across the set. No second signature appears anywhere in it, and no principal above those four is identified in any of Lightspeed's account documents.

430. The defects set out above were therefore approved by the same officer who had just reviewed them.

431. Across the three correspondent broker-dealers whose account-opening documents are described in this Second Amended Complaint, Lightspeed is the only one in which no individual stands behind the approval of an account. One identifies its president, who executes the correspondent broker signature guarantee on every account file. Another identifies its Chief Executive Officer, who approved each of its customer accounts in his own hand and who is recorded in that firm's Form BD as holding 75 percent or more of it and as directing its management and policies. Lightspeed names four compliance officers, each of whom approves the file he or she has just reviewed.

432. The applications record three matters that appear in no other document in this action: how the applicant came to hear of the firm, who the applicant's previous broker was, and whether a named Lightspeed salesperson assisted the applicant in opening the account or in learning the trading platform.

433. Across the applications read in full, every one names the same trading platform. Four name as the applicant's previous broker the correspondent broker-dealer through which the largest number of accounts in the related action traded. The referral field is dominated by answers naming a private messaging platform and by "Friend/Colleague"; advertising and internet search account for a small minority. A named Lightspeed salesperson is recorded as having assisted the applicant on eight of them.

434. The clearing firm's own file names the Lightspeed representative of record for each of the 83 accounts. Two representatives carry 66 of the 83 accounts and 1,931,050 shares, approximately 87 percent of the short selling: one on 35 accounts carrying 1,398,302 shares, the other on 31 carrying 532,748 shares.

435. On one application the person recorded as the customer's trusted contact is one of the four holders of the limited powers of attorney set out below, who holds one of them jointly with Defendant Tanner. He is given at the applicant's own street address and the relationship is declared as "friend."

436. Defendant Jacob Chupick, the Lightspeed salesperson recorded on four applications as having assisted the applicant, holds account [redacted]674 in his own name, which sold 2,378 shares of LNAI short and which carries a limited power of attorney in favor of Defendant Tanner. A further account, Defendant Mearas Capital LLC (account [redacted]947), stands in the name of a limited liability company at the same street address and is marked to that salesperson's attention; it traded 17,701 shares of LNAI in each direction between March 26 and May 4, 2026. Records obtained by Lunai contain no account-opening file for either account.

437. 20 of the 83 accounts record a limited power of attorney in the account name field of the clearing firm's own records, covering 287,263 shares. Four individuals hold those 20 limited powers of attorney: Defendant Tanner, Defendant Igor Korzha, Alex Korzha, and a pair holding jointly of whom Defendant Tanner is one. 17 of the 20 run to Defendant Tanner, 16 alone and one jointly.

438. The powers of attorney are not distributed across the book. 14 of the 20 sit with a single Lightspeed representative of record, being 14 of his 31 short-selling accounts, against one of 38 for the representative with the larger book and one of two for a third. Nearly half of that representative's book is traded by someone other than the account holder.

439. Defendant Tanner holds seven accounts in his own name, all recorded at 189 Boardwalk Place, London E14 5SQ, four of them styled by Lightspeed itself as numbered sub-accounts. Those seven accounts sold 292,397 shares of LNAI short across 1,154 executions. The

17 accounts held under his power of attorney, standing in 16 other names, sold a further 262,170 shares. 24 accounts carrying 554,567 shares, approximately 25 percent of all Lightspeed short selling in LNAI, therefore stand in his name or under his trading authority.

440. On May 4, 2026, the largest Lightspeed session of the period, five of the accounts in Defendant Tanner's own name sold LNAI short: [redacted]363, 52,449 shares; [redacted]362, 44,384; [redacted]850, 11,796; [redacted]361, 8,325; and [redacted]425, 3,922.

441. Fragmenting a single trading position across many nominally independent accounts is not administrative convenience. On the record pleaded above it is itself a mechanism of manipulation, and it operates here in at least four distinct ways to enable and disguise the conduct alleged against Defendant Tanner.

442. First, distributing an aggregate position across two dozen accounts defeats surveillance and threshold mechanisms that operate at the account level rather than at the level of the person who controls the account. 24 separate accounts, each selling only a fraction of the 554,567 shares, present to any system that reviews trading account by account 24 unremarkable trading records; no single account discloses that more than half of one percent of LNAI's pre-split float, and approximately 25 percent of all Lightspeed short selling in the security, traces to one person's decision. The fragmentation is therefore not incidental to the scale of the position. It is the means by which a position of that scale was executed without any single account ever presenting the profile that scale would otherwise create.

443. Second, 17 of Tanner's 24 accounts stand in the names of 16 other people, such that any review of the trading data by name, rather than by the power-of-attorney field the clearing firm happens to record, sees 16 apparently unrelated sellers rather than one. That structure creates a false impression of the breadth and independence of selling interest in LNAI in substantially the

same way that wash trading and matched orders create a false impression of trading volume and demand: the market, and any observer without access to the clearing firm's power-of-attorney field specifically, cannot distinguish 16 independent decisions to sell from the exercise of one person's trading authority 16 times.

444. Third, centralized control over the timing of execution across many accounts allows a single actor to concentrate selling pressure into a narrower window than any one account's activity would suggest, amplifying price impact beyond what the same aggregate volume would produce if genuinely dispersed among independent sellers acting on their own schedules. On May 4, 2026, the largest Lightspeed trading session of the period, five of Tanner's own accounts sold LNAI short within that single session, as pleaded above. The same coordinating authority that produced that result in accounts standing in his own name was, on this record, available to him across the 17 further accounts he controlled by power of attorney.

445. Fourth, the maintenance of 16 power-of-attorney relationships, standing in other individuals' names and concentrated within a single Lightspeed representative's book, required 16 separate account-opening approvals, for which, as pleaded below, no compliance review or documentation exists in Records obtained by Lunai. A person trading only his own view of a security requires one account. The multiplication of accounts standing in other people's names, each requiring its own account-opening process and each of which escaped documentation, is itself circumstantial evidence that concealment of the concentration, rather than administrative convenience, was a purpose of the structure. This demonstrates that Tanner's24-account footprint functioned as an enterprise-style trading operation coordinated by a single, controlling hand, rather than as the parallel conduct of 24 independent traders who happened to reach the same view of LNAI at the same time.

446. Neither the powers of attorney themselves nor any compliance review under which one individual was granted trading authority over 17 accounts held in 16 other names appears anywhere in Records obtained by Lunai.

447. Nine parties hold more than one of the 83 accounts. Between them they hold 25 accounts carrying 927,288 shares, approximately 42 percent of all Lightspeed short selling in LNAI: Defendant Tanner, seven accounts and 292,397 shares; Defendant Alveria Capital Ltd, four accounts and 210,020 shares; Suhua Guo, two and 122,777; Shuk Yee Ho, two and 120,825; Alexander Korzha, two and 68,061; George Huckstepp, two and 43,846; Defendant Calystrum FZCO, two and 36,235; Vijnish Treohan, two and 31,554; and Bearish Ventures LLC, two and 1,573.

448. One holder of a Lightspeed account, Tyler Wasserman, holds a further short-selling account at another correspondent broker-dealer in the related action at the same recorded street address. Across the two correspondents, that party sold 700,102 shares of LNAI short, of which 81,001 through Lightspeed.

449. Records obtained by Lunai include account-opening files for 28 of the 83 accounts that sold LNAI short, covering 730,817 of the 2,208,224 shares, approximately 33 percent. For 55 accounts, carrying 1,477,407 shares or approximately 67 percent of the short selling, no account-opening file of any kind exists in Records obtained by Lunai.

450. Records obtained by Lunai include 155 account files in all. 127 of them belong to accounts that did no short selling in LNAI during the period. Every one of the 155 matches a real account in the clearing firm's blotter, so the numbering is sound. It is the pattern of which files exist, not the trading activity, that determines which accounts are documented.

451. The gap is a contiguous band of account numbers, and in this series a number band is a date band. Among the short-selling accounts, the account-opening files that exist run from [redacted]867 to [redacted]707 and from [redacted]671 to [redacted]026, while the accounts for which no file exists begin at [redacted]277 and [redacted]141. On its face, Records obtained by Lunai document its newer account openings and not its older ones.

452. The older band is where the material sits. 13 of the 20 accounts carrying a limited power of attorney lie in it, carrying 187,245 shares. Six of Defendant Tanner's seven accounts in his own name lie in it, so the party holding the widest trading authority in the book has a documented file for one account out of seven.

453. Twelve of the accounts for which no file appears to exist stand in the names of entities, and, therefore, there appears to be no know-your-customer file and no record of a beneficial owner for any of them. They include all four accounts of Defendant Alveria Capital Ltd, carrying 210,020 shares every one of which was executed before the market opened; both accounts of Defendant Calystrum FZCO, a United Arab Emirates free-zone company; and single accounts in the names of Lakeside Algo Fund LP, Varsity Tech Ltd, Trading in Securities Oporto Delta, Arcadia Analytics LLC, Hudson Trades LLC and Mearas Capital LLC.

454. The accounts for which no files appear to exist traded more heavily before the open than those with a file, 87.0 percent against 71.2 percent, while the average volume per account is materially the same in both groups, approximately 26,861 shares against 26,100. The accounts missing a file are not the largest. They are the earliest.

455. Four accounts fall outside that explanation. Three of them, Defendant Arcadia Analytics LLC (account [redacted]782), Defendant Hudson Trades LLC (account [redacted]850) and Defendant Mearas Capital LLC (account [redacted]947), sit immediately above the top of the

documented range of older-format accounts, at the point at which the account series and the document format change; all three are limited liability companies, and one is the company registered at the street address of a Lightspeed salesperson and marked to his attention. The fourth, [redacted]117, one account of Defendant Suhua Guo, sits inside the documented range itself.

456. Defendant Suhua Guo's account [redacted]117 has no mechanical explanation at all. Defendant Suhua Guo's second account, [redacted]995, has a complete application on file. In short, Defendant Suhua Guo holds two accounts; a file exists for one and not the other.

457. The format of the missing files is not incidental. The applications that exist for Lightspeed's newer accounts run to between 33 and 42 pages each and record identity, employment and source of income, financial position, investment experience, a trusted contact, the government identification supplied, every agreement accepted with a per-item timestamp, the automated background-check result, and the compliance and approval history with each officer named. The older summary format records materially less, and records none of the three intake fields set out above.

458. Every one of the 83 Lightspeed accounts closed the period at exactly nil. On each account, purchases less long sales less short sales comes to zero, to the share. The positions were opened and closed within the period and no economic exposure remained at the end of it.

459. Lightspeed was not a bystander to the conduct of its customers. It solicited them, recorded the salesperson who introduced each of them, approved their accounts over its own screening failures and over financial statements that contradict themselves, accepted their short sale orders, operated and charged for the locate mechanism those orders required, and entered the orders for clearing. On the sessions at issue its own clearing firm had told it, in answer to its own request, that there was nothing to lend.

460. Lightspeed's conduct in this action did not occur in a vacuum, and its own public disciplinary record, maintained by FINRA and available through BrokerCheck (CRD# 104369), placed it on repeated notice of precisely the categories of failure alleged above — deficient books and records, deficient supervision of potentially manipulative trading, and deficient response to red flags generated by its own surveillance — well before the conduct alleged in this Second Amended Complaint.

461. On July 23, 2019, acting under its then name, Lime Brokerage LLC, Lightspeed consented to findings by multiple national securities exchanges, including Nasdaq BX, Nasdaq PHLX, Cboe BZX, Cboe BYX, Cboe EDGA and Cboe EDGX, that it failed to establish and maintain a supervisory system and written supervisory procedures reasonably designed to achieve compliance with rules prohibiting layering, spoofing, ramping, marking the open or close, and other potentially manipulative trading, and that it failed to reasonably respond to red flags of potentially manipulative trading generated by its own surveillance system with respect to its direct market access customers, including thousands of surveillance alerts generated by two such customers. Lightspeed was censured and fined a combined total in excess of $625,000 across those proceedings. On August 15, 2019, FINRA itself entered a related, materially identical finding.[25]

462. On June 20, 2023, Lightspeed again consented to findings, this time by NYSE Arca, that it failed to establish, document and maintain a system of risk management controls and supervisory procedures reasonably designed to manage the financial and regulatory risks of its business activities, that it failed to implement a reasonable supervisory system for the prevention

---

[25] *See Lime Brokerage LLC*, FINRA Letter of Acceptance, Waiver, and Consent No. 2013037572601 (Aug. 15, 2019), *available at* https://data-portal.finra.org/fda_documents/2013037572601%20Lime%20Brokerage%20LLC%20CRD%20104369%20AWC%20%20jm%20%282019-1568506780149%29.pdf.

and detection of potentially manipulative activity, and that although its own surveillance system generated alerts for potentially manipulative trading activity by certain of its customers, it failed to reasonably investigate that activity.[26] Lightspeed was censured and fined $290,000.

463. On November 22, 2024, the United States Securities and Exchange Commission instituted cease-and-desist proceedings against Lightspeed and found that, from May 2018 through December 2022, Lightspeed willfully violated Section 17(a) of the Exchange Act and Rule 17a-8 thereunder by filing deficient Suspicious Activity Reports with the Department of the Treasury's Financial Crimes Enforcement Network, omitting details of suspicious transactions that Lightspeed knew or should have known.[27] Lightspeed was ordered to cease and desist, was censured, and paid a civil penalty of $75,000. Separately, on September 30, 2022, FINRA found that Lightspeed submitted options orders with inaccurate origin codes caused by a defect in its own order-routing system, and that its supervisory system was not reasonably designed to catch the defect; Lightspeed was censured and fined $25,000.

464. Each of those proceedings, resolved without Lightspeed admitting or denying the underlying findings, nonetheless placed Lightspeed on express, repeated and recent notice of the specific type of institutional failure pleaded against it in this Second Amended Complaint: a surveillance and supervisory function that generates red flags of potentially manipulative trading by its own customers and that Lightspeed does not reasonably investigate; and an order-handling and recordkeeping function whose defects Lightspeed does not catch until a regulator catches them

[26] *See Lightspeed Fin. Servs. Group LLC*, NYSE Arca, Inc. Letter of Acceptance, Waiver, and Consent No. 2021-04-06-00002 (June 21, 2023), *available at* https://www.nyse.com/publicdocs/nyse/markets/nyse-arca/disciplinary-actions/2023/Lightspeed_AWC_(Fully_Executed_2023.06.21).pdf.
[27] *See In re Lightspeed Fin. Servs. Group LLC*, Release No. 34-101705, 2024 WL 4869658 (S.E.C. Nov. 22, 2024).

first. The conduct pleaded in this Second Amended Complaint — accepting and introducing 2,208,224 shares of LNAI sold short by 83 customer accounts on a security for which Lightspeed's own two-channel locate requests were satisfied at a rate of well under one percent — is not a first or isolated failure of that function. It is the continuation, in a new security, of a pattern for which Lightspeed had already been sanctioned six times in the five years preceding the conduct alleged herein.

## VI. COBRA TRADING, INC. AND CHADD THOMAS HESSING

465. Cobra Trading, Inc. is the introducing broker-dealer through which the short selling alleged in this Second Amended Complaint was accepted and introduced for clearing. Between November 5, 2025 and May 20, 2026, 438 Cobra customer accounts sold 12,103,970 shares of LNAI short across 17,778 executions on 27 trading dates.

466. The obligation under Rule 203(b)(1) not to accept a short sale order without reasonable grounds to believe the security could be borrowed and delivered, and to document that determination, attached to Cobra at the point of acceptance, before any order reached the clearing firm.

467. Cobra's largest single session is November 5, 2025 at 3,204,387 shares, the first day of the period. The next largest are March 26, 2026 at 2,563,675 shares, March 17, 2026 at 2,278,094 and April 7, 2026 at 1,497,782.

468. Execution was concentrated in Instinet, which carried 9,321,309 shares, approximately 77 percent, with 1,078,539 shares through a destination recorded as LAMP, 796,324 through Stox, 788,135 through Valor and 109,163 through MLCO.

469. Of Cobra's short selling in LNAI, 37.7 percent was executed before the market opened. Plaintiff does not allege that the timing of Cobra's selling is itself remarkable. The

allegation against Cobra rests on what Cobra was told about the availability of the security and on what it did afterwards.

470. Cobra maintained two securities lending desk accounts with its clearing firm, [redacted]002 and [redacted]999. Those two accounts are the mechanism through which Cobra requested locates in LNAI for its customer accounts.

471. The clearing firm's locate request file records 812 requests in LNAI over the period. 376 of them, approximately 46 percent of every locate request made in the security by any firm, came from Cobra's two desk accounts. Cobra asked for 108,418,048 shares in total and was allocated 10,065,221.

472. The file records three dispositions. A request marked as granted in full carries an allocation equal to the quantity requested. A request marked as partly granted carries an allocation below the quantity requested and a positive recorded inventory. A request marked as refused carries an allocation of nil, and in every instance in the file it also carries a recorded inventory of nil.

473. 127 of Cobra's 376 requests were refused. On every one of the 127 the quantity allocated was nil and the inventory recorded against the request was nil. Cobra was therefore not left to infer that the security could not be borrowed. It asked, and it was told, in the clearing firm's own contemporaneous record, 127 times.

474. In 31 trading days every request Cobra made was refused against nil inventory. Those days are March 18, 19, 23, 24, 25, 26, 27, 30 and 31; April 1, 2, 6, 7, 8, 9, 27, 28, 29 and 30; and May 1, 4, 5, 6, 7, 8, 11, 13, 14, 15, 18 and 21, 2026. Cobra was refused again on May 22, 2026.

475. The requests on those days form a standing pattern rather than a response to particular orders: three requests for 900,000 shares on almost every day in the sequence. The pattern intensifies at the points at which Cobra's customers sold most heavily. On May 1, 2026 Cobra made six requests for 1,800,000 shares and every one was refused. On May 4, 2026, the date this Court identified in granting expedited discovery in the related action as evidence of ongoing harm, Cobra made nine requests for 2,700,000 shares and every one was refused. On May 21, 2026 it made ten requests, all refused.

476. On the 31 days on which every Cobra request was refused, Cobra customer accounts sold 4,800,399 shares of LNAI short, approximately 40 percent of all Cobra short selling in the security. The largest of those sessions are March 26, 2026 at 2,563,675 shares, April 7, 2026 at 1,497,782, May 4, 2026 at 417,144 and May 1, 2026 at 285,218.

477. Cobra made no request for a locate in LNAI from the clearing broker's securities lending desk on March 17, 2026, on which day its customer accounts sold 2,278,094 shares short. Plaintiff does not allege that Cobra was refused at that desk on that day. The requests Cobra made in LNAI on that date were made to the second lender identified below, and were granted in no part.

478. The clearing firm's securities lending file records a locate or pre-borrow requirement in LNAI on all 139 trading days from November 3, 2025 to May 22, 2026; and the file reflects not one day on which the security was easy to borrow. From March 17 to May 18, 2026, the recorded status was pre-borrow required, under which shares must be borrowed before the sale rather than merely located.

479. The clearing firm's securities lending file for each trading day record the inventory available to lend, the quantity of shares lent, the proportion of available inventory in use, and the

average rate at which the security was lent. Those four figures state the borrowing conditions in the security on the clearing firm's own records, without reference to any outside data source.

480. Across the 139 trading days the security was lent at a negative average rate on 135 of them, meaning that a borrower paid to borrow rather than receiving a rebate. The mean rate over the period was negative 80.9 percent per annum. On 90 days, the rate was more negative than 50 percent, and on 21 days more negative than 100 percent.

481. The most expensive days fall inside the period in which the security stood on the Nasdaq Threshold Securities List. On March 24, 2026 the recorded rate was negative 553.6 percent against inventory of 86,978 shares and 5,616,329 shares out on loan; on March 23, negative 519.7 percent against nil inventory and 5,574,773 shares on loan; on March 25, negative 452.7 percent; and on March 26, 27, 30 and 31, rates between negative 338 and negative 362 percent.

482. Utilization, being the proportion of available inventory actually lent, averaged 52.9 percent across the period, exceeded 75 percent on 29 days and 90 percent on nine. On March 18, 2026 it stood at 100 percent, with nil inventory remaining and 3,191,740 shares out on loan.

483. The clearing firm held no inventory of its own in LNAI on any day of the period. Every share lent was lent from external sources.

484. Cobra's records include no evidence of what it did after each refusal: no record of any alternative source of borrow approached, no record of what was relied on in accepting the customer orders that followed, and no exception report or supervisory record addressing a sequence of 127 refusals over two months.

485. Cobra did not confine its search for borrow to the clearing broker that carried its accounts. The locate records of a second lender, Apex Clearing Corporation, record locate requests in LNAI under a correspondent group code identifying the Cobra channel: 14,755 requests for

124,165,105 shares, of which 255,048 shares were granted, being approximately one fifth of one percent of the quantity requested and a grant on 101 of the 14,755 requests.

486. 24 of the 27 trading dates on which Cobra customer accounts sold LNAI short are dates on which requests were made under that code, and the largest requests fall on the largest selling days: 93,798,705 shares requested on March 17, 2026; 9,468,427 on March 26; 4,412,547 on March 12; 4,034,391 on March 20; 3,508,220 on April 7; and 3,498,412 on November 5, 2025.

487. Taken with the requests made through its own desk accounts, Cobra made 15,131 requests for a locate in LNAI across two lenders, for 232,583,153 shares in total, and obtained 10,320,269, being approximately 4.4 percent of what it asked for. It introduced its customers' short sale orders regardless.

488. The identification of the group code with Cobra rests on the code itself as that lender records it and on the correspondence of dates and quantities set out above. That lender's own records state that locates are recorded at correspondent level and that a single locate may cover more than one customer order.

489. Cobra's records include account-opening files for 179 of the 438 accounts that sold LNAI short, covering 5,755,921 shares, approximately 48 percent. For 259 accounts, carrying 6,348,049 shares or approximately 52 percent of the short selling, no account-opening file of any kind exists in Cobra's records. The files that do exist comprise, per account, a customer agreement styled Letter A, a margin loan agreement, and in some cases identification documents, a trusted-contact form, or an operating agreement where the account stands in the name of an entity.

490. Every one of those files carries the correspondent broker signature guarantee executed in the name of Chadd Thomas Hessing, over the office he then held at the firm. There is

no other approving signatory anywhere in the set, and the approval of each Cobra account is therefore attributable to one named individual rather than to a system.

491. Defendant Hessing is recorded on Cobra's Form BD as holding 75 percent or more of the firm since March 2004 and as directing its management and policies. He holds the office of Chief Executive Officer and the office of Chief Compliance Officer at the same time. The compliance function of the firm is therefore not independent of its owner, and the person who guaranteed every account signature is the person responsible for supervising the account-opening process that generated them.

492. The representative-of-record field in the clearing firm's file carries the same value on 435 of the 438 accounts, "Domestic Accounts," and "Closed Accounts" on the remaining three. Cobra's records identify no individual as the representative responsible for any customer account.

493. No account in the Cobra channel carries a power of attorney in the clearing firm's records.

494. The 259 undocumented accounts carry 6,348,049 shares, approximately 52 percent of the channel, and 2,639,198 of those shares were sold on the 31 days on which every locate request Cobra made was refused.

495. Documentation stops at a single point in the account-number series and is incomplete below it. Every documented Cobra account falls at or below number [redacted]041. Not one of the 208 accounts numbered above [redacted]041 has a file of any kind. Below that number, the coverage is partial: a further 51 accounts carrying 1,247,069 shares also have no file. The cut-off therefore operates as a ceiling rather than as a clean division.

496. The account-opening files that exist for Cobra record openings from 2017 to 2019. In this series the account number follows the date of opening, so the ceiling at [redacted]041 is a date

as well as a number: Cobra's records document its older openings and nothing opened after that point. The accounts opened closer in time to the trading at issue are the accounts for which no file exists.

497. Six of the ten largest short-selling accounts in the entire Cobra channel fall above the cut-off and none of them has a file: [redacted]446, 619,101 shares; [redacted]806, 443,105 shares, of which approximately 84 percent was executed before the market opened; [redacted]079, 388,848 shares; [redacted]239, 376,103 shares over six sessions; [redacted]740, 301,885 shares over seven sessions; and [redacted]412, 160,290 shares. The first of these is the second largest short-selling account in the channel.

498. Two individuals already named as defendants in the related action hold Cobra accounts above the cut-off and neither has an account-opening file: account [redacted]740, 301,885 shares over seven sessions, and account [redacted]334, 154,574 shares over four sessions of which 99 percent was executed before the market opened. The clearing firm's records give both accounts an address at the same villa.

499. 62 of the 438 accounts stand in the names of entities and hold 2,029,728 shares. 21 entities, holding 35 accounts and 1,083,741 shares between them, have no document of any kind in Cobra's records, and 508,289 of those shares were sold on the 31 days on which every locate request Cobra made was refused. For those entities there is no record anywhere identifying who owns them.

500. Where an operating agreement does exist for a Cobra account, the document identifies natural persons and their percentages, and those persons appear nowhere in the trading data. Account [redacted]844 stands in the name of an Estonian limited partnership formed in December 2021 whose general partner is an Estonian management company and whose two

management board members hold 66.68 percent, at an address in Latvia, and 33.32 percent, at an address in Cyprus. Account [redacted]501 is a Wyoming limited liability company whose members are an individual at 90 percent and a second limited liability company at 10 percent. Account [redacted]021 is a Wyoming limited liability company whose members are an individual at 80 percent and a second limited liability company at 20 percent. Account [redacted]168 is a Hawaii limited liability company with a single member. Account [redacted]840 is a Florida limited liability company whose sole member holds 100 percent.

501. 25 of the Cobra accounts carry a limited liability company agreement or articles of organization. Those documents are the only records that name the natural persons behind an entity account. Nine have been read in full.

502. Account [redacted]990 is a Delaware limited liability company whose two members are described by role as trading manager and as coding and trading manager. Their percentages are not stated in the agreement; each member's share is recorded as being held in a "Master Ledger" that does not appear in Cobra's records. Account [redacted]319 defers the identity of its members to an "Exhibit 2" which the agreement incorporates and which likewise does not appear in Cobra's records.

503. Account [redacted]788, which sold 295,154 shares of LNAI short and is the largest entity account in the set, stands in the name of a Massachusetts limited liability company. The members' resolution authorizing the account is signed by Pradeep Vallandas as managing member. Mr. Vallandas holds two further Cobra accounts in his own name, [redacted]629 and [redacted]838, which sold 410,118 shares of LNAI short between them. Three accounts and 705,272 shares therefore stand under one person.

504. That connection is not visible in the trading data. The entity account stands in a different name and at a different street address from the accounts held by Mr Vallandas personally, so no match on name or on address in the clearing firm's records connects them. It exists only in the account-opening document. It is the reason the 259 undocumented accounts matter: what an operating agreement discloses cannot be reconstructed from a blotter.

505. Mr. Vallandas's three-account, 705,272-share footprint at Cobra exhibits the same enterprise-style structure pleaded against Defendant Tanner at Lightspeed, and for the same reason: distributing one person's position across accounts that present, on the face of the trading blotter, as unrelated defeats account-level surveillance and lets a single trading decision masquerade as three independent ones. Connecting Mr. Vallandas's entity account to his two personal accounts is a members' resolution buried in an operating agreement that Cobra maintained for only 179 of its 438 accounts; had that agreement not existed, or not been retained, then the connection would not appear anywhere in Cobra's records.

506. 13 accounts standing in the name of TakeChip 2 LLC, all sharing one street address and none accompanied by an account-opening file, exhibit a related but distinct version of the same structure: a single entity, rather than a single natural person exercising power of attorney, dividing its trading across a bank of numbered sub-accounts. Whether the controlling hand is a natural person acting through powers of attorney, as with Tanner, or a single entity opening accounts in a numbered series, as with TakeChip 2 LLC, the mechanism and its effect are the same: the true scale and unity of the trading decision is invisible to anyone reviewing the accounts individually, and becomes visible only when the accounts are examined together, as they are in this Second Amended Complaint.

507. Two of the operating agreements that do exist carry a stamp reading "C.S.D. New Accts. Received," dated June 1, 2021 and June 18, 2022. The clearing firm's own new-accounts department therefore received and date-stamped operating agreements naming foreign beneficial owners and their percentages.

508. 13 of the 438 accounts stand in the name of a single entity, TakeChip 2 LLC, and hold 284,566 shares between them. All 13 give the same street address.

509. Cobra numbered them itself. Twelve of the 13 carry, on the first address line of the clearing firm's record, the words "Sub Account" followed by a number, and the thirteenth carries the street address alone as the master account. The series runs to 16 and only 13 appear: sub-accounts 4, 6, 12 and 15 are absent from Cobra's records. The numbering is the broker's own field, so the gaps are visible on the face of the record.

510. Not one of the 13 appears to have an account-opening file. The largest multi-account holder in the Cobra channel by number of accounts is therefore entirely undocumented, and the members of the limited liability company in whose name all 13 stand cannot be identified from anything in the record.

511. Two further entity accounts, [redacted]059 and [redacted]100, holding 163,309 and 77,169 shares, give the same street address as one another. Neither has a file. The entity in whose name the first stands also holds an account at a third correspondent broker-dealer in the related action.

512. Three accounts stand in the name of HQS Ltd and hold 221,700 shares. None has a file.

513. Eight parties hold more than one Cobra account. Between them they hold 29 accounts carrying 2,000,315 shares, approximately 17 percent of the channel: Ezra Grothe, two

accounts and 932,718 shares; Pradeep K. Vallandas, two accounts and 410,118 shares in his own name; TakeChip 2 LLC, 13 accounts and 284,566; HQS Ltd, three and 221,700; Evelyn Ow, two and 99,633; Jaime Antonio Velasco Desdentado, two and 24,593; Giulio Sartori, two and 16,125; and Tan Yi Hao, three and 10,862.

514. Six Defendants sold short LNAI through accounts at both Cobra and Lightspeed, the other introducing broker-dealer in this action, at the same recorded address in each case. Together with a seventh Defendant who also holds accounts at both, these seven Defendants sold 1,108,420 shares of LNAI short across 16 accounts and two correspondents.

515. The largest of them, Tyler J. Wasserman, sold 619,101 shares through Cobra account [redacted]446 and 81,001 shares through a Lightspeed account, 700,102 shares in all, at the same recorded street address. Cobra's records contain no account-opening file for its account.

516. Evelyn Ow holds two Cobra accounts and one Lightspeed account at one address in Singapore, and sold 126,811 shares of LNAI short across the three. Her Lightspeed account application states annual income, total net worth, and liquid net worth as three identical bands and answers "Less than 5 years" of investment experience in all seven asset classes. It was approved for margin. No application of any kind exists in Cobra's records for either of her Cobra accounts.

517. Four of Lightspeed's account applications name Cobra as the applicant's previous broker.

518. Cobra maintains clearing arrangements with three separate clearing broker-dealers, each recorded on its Form BD: one which became effective October 13, 2011, a second which became effective August 20, 2012; and a third which became effective February 14, 2023. Under each arrangement the clearing firm provides execution services, maintains certain customer accounts, acts as Cobra's back office and maintains certain books and records required by SEC

Rules 17a-3 and 17a-4. The trading pleaded in this Second Amended Complaint is the trading Cobra introduced through that second clearing firm — the same common clearing firm through which Lightspeed's and Opal's customer accounts were also carried, as alleged above. Two of the individuals whose Cobra accounts are described above also hold accounts at another broker-dealer, which is one of Cobra's three clearing firms.

519. Cobra's regulatory record, as disclosed on its own Form BD, contains six regulatory events. Three of them bear directly on the conduct alleged in this Second Amended Complaint.

520. First, and most directly, Cobra has already been sanctioned for relying on its clearing firm instead of exercising its own controls. In a proceeding brought under Rule 15c3-5 of the Exchange Act, the market access rule, and NYSE Arca Rule 11.18, the regulator's statement of the matter records that the violations "arose out of Cobra Trading's failure to exercise reasonable control over its risk management controls; rather, the Firm relied on third parties for the implementation of those controls, including order management system ("OMS") providers and its clearing firm."[28] Cobra was censured, fined $20,000 and required to undertake to address the remaining market access deficiencies and to implement controls and procedures reasonably designed to achieve compliance. The specific findings were a failure to have controls and supervisory procedures reasonably designed to prevent the entry of orders exceeding pre-set credit thresholds, contrary to Rule 15c3-5(c)(1)(i); a failure to have controls preventing the entry of erroneous orders exceeding appropriate price parameters on an order-by-order basis or over a short period, contrary to Rule 15c3-5(c)(1)(ii); and a failure to establish and maintain adequate

---

[28] *See* NYSE ARCA, Inc., *NYSE Regulation v. Cobra Trading, Inc.*, Proc. No. 2017-10-00061 (Nov. 1, 2018), *available at* https://www.nyse.com/publicdocs/nyse/markets/nyse-arca/disciplinary-actions/2018/2017-10-00061-Hearing%20Decision-20181105.pdf.

supervisory systems and written supervisory procedures reasonably designed to ensure compliance with Rule 15c3-5.

521. That disposition places Cobra on notice, before the period at issue, that the obligation to control the orders it accepts is its own and is not discharged by leaving the matter to its clearing firm. The conduct alleged in this Second Amended Complaint is Cobra accepting and introducing short sale orders on days on which its own requests to that same clearing firm had been refused against nil inventory.

522. Second, on April 3, 2024, Cobra consented to findings and to censure, a fine of $200,000 and undertakings in respect of its customer acquisition practices.[29] The findings recorded that Cobra paid social media influencers a flat fee for every new account opened and funded by a customer using a unique link the firm provided, and did not limit the compensation an influencer could earn; that Cobra supplied those influencers with "selling points" to use in their social media communications; that the majority of the influencers' posts promoting the firm failed to disclose that they were advertisements; that Cobra failed to approve the influencers' videos before they were used and failed to preserve records of them; that no appropriately qualified registered principal of the firm reviewed the videos before publication; and that Cobra failed to establish, maintain and enforce written supervisory procedures reasonably designed to supervise its influencers' retail communications. Cobra was required to certify that it had remediated the matters identified and implemented a supervisory system, and it revised its procedures to require principal review and approval of influencer posts before use.

---

[29] *See Cobra Trading, Inc.*, FINRA Letter of Acceptance, Waiver, and Consent No. 2021072501001 (Apr. 3, 2024), *available at* 2021072501001 Cobra Trading, Inc. CRD 132078 AWC gg (2024-1714782000987).pdf.

523. That disposition concerns how the customers whose accounts are described in this Second Amended Complaint were recruited: through paid promotional channels, on a fee-per-funded-account basis, with the promotional material neither disclosed as advertising nor reviewed by a principal of the firm.

524. Third, in a matter initiated by NYSE Arca, Inc. on February 26, 2019, it was found that between September 30, 2005 and April 2, 2018 Cobra failed to register its Chief Compliance Officer as a general securities principal with the exchange. Cobra was censured and fined $3,500, and the matter became final on March 5, 2019.[30] Throughout that period the office of Chief Compliance Officer was held by Defendant Hessing, who also held the offices of Chief Executive Officer, Chief Financial Officer, Financial and Operations Principal, Treasurer and Secretary, and who owned 75 percent or more of the firm.

525. Taken together, the regulatory record establishes that before the period at issue Cobra had been told that it could not delegate control of the orders it accepts to its clearing firm; that its supervisory procedures over the material by which it recruited customers were inadequate and that no qualified principal was reviewing that material; and that for twelve and a half years the person holding its compliance office was not registered in the capacity the exchange required.

526. On May 21, 2026, in shares as then constituted, six customers of Instinet sold 23,055 shares short: Clear Street LLC (Fox River), 12,510 shares; CIBC World Markets Inc., 9,946; Velocity Clearing, LLC, 300; Jane Street Capital, LLC, 200; BestEx Research Securities, LLC, 94; and Virtu Americas LLC, 5. The reverse stock split took effect on May 22, 2026. On that date and on May 26, 2026, in the new denomination, five customers sold a further 2,685 shares

[30] *BrokerCheck Report: Cobra Trading, Inc.*, BrokerCheck, *available at* https://files.brokercheck.finra.org/firm/firm_132078.pdf (last visited Aug. 26, 2026).

short, equivalent to 21,480 shares in the denomination of the preceding session: CIBC World Markets Inc., 1,535 shares; Jane Street Capital, LLC, 477; Velocity Clearing, LLC, 373; Virtu Americas LLC, 200; and PNT Financial LLC, 100. Seven customers of that broker sold LNAI short across the three sessions.

527. On the settlement date of June 17, 2026, 359,775 shares of LNAI failed to deliver, approximately 7.9 percent of the Company's outstanding shares; on June 18, 2026, 309,545 shares; and on June 22, 2026, 87,898 shares. Failures to deliver continued in smaller quantities on nearly every settlement date through July 27, 2026. Those figures are published in aggregate and identify no participant. Which accounts stood behind them, and whether the shares sold had been located or borrowed, can be established only from records outside those reviewed for this Second Amended Complaint.

528. The Company had 4,534,025 shares outstanding as of May 21, 2026. Of those, 1,388,895 shares were held in book entry, held exclusively by insiders, and were not available to settle an ordinary market transaction. The remaining 3,145,130 shares were held electronically at Cede & Co. Of those, 1,128,906 shares are held by shareholders who have confirmed that their shares are not lent. At most 2,016,224 shares were therefore available to settle a trade in LNAI. The 359,775 shares that failed to deliver on the settlement date of June 17, 2026 are approximately 17.8 percent of that number, and the failures of June 17, June 18 and June 22, 2026 together are approximately 37.6 percent of it. That calculation subtracts only those holdings which have been confirmed; the shares held by other long-standing holders who have made no such confirmation are not subtracted, and the figure is to that extent conservative.

529. Cobra was not a bystander to the conduct of its customers. It approved their accounts, guaranteed their signatures through one man who owns the firm and supervises its

compliance, requested locates for them through its own desk accounts, and received 127 refusals against nil inventory over two months. It introduced 4,800,399 shares of short selling on the days those refusals were given.

530. Cobra's own public disciplinary record, maintained by FINRA and available through BrokerCheck (CRD# 132078), independently placed it on notice of its obligations under Reg SHO's locate requirement, and did so twice, in terms directly on point to the conduct alleged in this Second Amended Complaint, before the events pleaded herein.

531. On October 17, 2011, Cobra consented to FINRA findings that it had, on numerous occasions, accepted a short sale order in an equity security, or effected a short sale for its own account, without borrowing the security, entering a bona fide arrangement to borrow it, or having reasonable grounds to believe the security could be borrowed and delivered by settlement date, and without documenting compliance with Rule 203(b)(1) of Reg SHO.[31] Cobra was censured and fined $8,500. By its own account in that proceeding, Cobra had been relying on locate confirmations obtained through a third-party locate service without verifying, or maintaining any means of verifying, that the arrangement through which it obtained them remained in effect.

532. On June 22, 2015, Cobra again consented to FINRA findings covering conduct in 2011 and 2013, that on 2,137 separate occasions it accepted or effected short sale orders without borrowing the relevant security, without a bona fide arrangement to borrow it, without reasonable grounds to believe it could be borrowed and delivered, and without documenting compliance with Rule 203(b)(1) of Reg SHO, and that it separately violated Rule 200(g)'s order-marking

---

[31] *Id.* at 32-34.

requirement on 2,139 occasions.[32] FINRA found in the same proceeding that Cobra's supervisory system did not provide for supervision reasonably designed to achieve compliance with Rules 200(g) and 203(b)(1), because Cobra's written supervisory procedures failed to identify who was responsible for that supervision, what steps that person was to take, how often, or how completion was to be documented. Cobra was censured and fined $32,500 and undertook to revise its written supervisory procedures.

533. Cobra's regulatory record also includes a February 17, 2015 FINRA finding[33] that from January 2009 through September 2013, Cobra failed (i) to adequately implement anti-money laundering policies and procedures reasonably expected to detect and cause the reporting of suspicious transactions, and (ii) to implement an adequate customer identification program, resulting in a censure and a $150,000 fine.

534. Each of those matters was resolved without Cobra admitting or denying the underlying findings. Each nonetheless placed Cobra on actual, repeated, and specific notice — twice, in terms addressed to Rule 203(b)(1) itself — that accepting a customer's short sale order without a documented, verified basis to believe the security could be borrowed and delivered is a violation for which Cobra had already been sanctioned, and that its written supervisory procedures for that exact function had already been found deficient once and required by FINRA to be revised. The conduct pleaded in this Second Amended Complaint, in which Cobra introduced 4,800,399

---

[32] *Cobra Trading, Inc.*, FINRA Letter of Acceptance, Waiver and Consent No. 20110288105-01 (June 22, 2015), *available at* https://data-portal.finra.org/fda_documents/2011028810501_FDA_JMX1590%20%282019-1563056366301%29.pdf.

[33] *Cobra Trading, Inc.*, FINRA Letter of Acceptance, Waiver and Consent No. 2013035340001 (Feb. 17, 2015), *available at* https://data-portal.finra.org/fda_documents/2013035340001_FDA_JS305683%20%282019-1563031156112%29.pdf.

shares of LNAI sold short by its customers on days on which its own securities lending desk accounts had been refused locates 127 times against nil recorded inventory, is not a first encounter with that requirement. It is a recurrence, in a new security, of the identical failure for which Cobra was twice sanctioned by name.

## VII. SAGETRADER, LLC

535. SageTrader is a registered broker-dealer that accepted, entered and executed 5,014,261 shares of LNAI sold short across 15 trading dates during the period, as alleged in Section IV above. SageTrader is named as a Defendant based on its own conduct as the broker-dealer that accepted and entered those orders under its own market participant identifiers and selected the execution venue for each, and not merely as a conduit through which some other named Defendant traded.

536. SageTrader describes itself as an introducing, agency-only broker-dealer that conducts no proprietary trading for its own account. Even if that description of SageTrader's current business is accurate, then that characterization is not a defense to the claims pleaded against SageTrader in this Second Amended Complaint. The obligation imposed by Rule 203(b)(1) of Reg SHO attaches to the broker-dealer that accepts a short sale order, not to the customer on whose behalf the order is placed, and applies without regard to whether the broker-dealer is acting as principal or as agent: "A broker or dealer may not accept a short sale order in an equity security from another person, or effect a short sale in an equity security for its own account, unless the broker or dealer has" borrowed the security, entered a bona fide arrangement to borrow it, or has reasonable grounds to believe it can be borrowed and delivered. 17 C.F.R. § 242.203(b)(1). An agency broker-dealer that accepts a customer's short sale order without a documented, reasonable basis to believe the security can be borrowed and delivered violates Rule 203(b)(1) directly and

independently of whatever liability its customer separately bears. The distinction SageTrader draws between agency and proprietary trading does not bear on the locate obligation on which the claims against it rest.

537. SageTrader's own regulatory history is, in any event, inconsistent with any potential unqualified claim that it has never traded as principal. FINRA has found, in the proceeding described at Paragraph 544 below, that SageTrader failed to locate shares available for borrowing for approximately 490,000 principal short sales between July 2017 and February 2018, in violation of Rule 203(b)(1) of Reg SHO, and that SageTrader mismarked its own principal short sales as long in connection with its handling of customer orders on a net basis.[34] The clearing firm's own records in this action likewise show two SageTrader accounts, numbered [redacted]690 and [redacted]914, through which activity attributed to SageTrader itself, whether principal or aggregated agency flow, included the purchase of 1,473,992 shares, long sales of 722,855 shares, and short sales of 5,014,261 shares during the period at issue in this Second Amended Complaint.

538. The timing of SageTrader's 2022 to 2023 change in ownership, established by SageTrader's own regulatory filings, bears directly on the notice and scienter alleged against SageTrader in this Second Amended Complaint. On March 31, 2022, Sage Brokerage Holdings, LLC, then the sole owner of SageTrader, entered into an agreement under which Bogert Investments, LLC acquired a 20 percent interest in SageTrader, with the remaining 80 percent to transfer only once FINRA approved the change of control through its Continuing Membership

[34] *See SageTrader, LLC*, FINRA Letter of Acceptance, Waiver, and Consent No. 2018057956001 (Mar. 9, 2023), *available at* https://data-portal.finra.org/fda_documents/2018057956001%20SageTrader%2C%20LLC%20CRD%20137862%20AWC%20gg%20%282023-1681086005184%29.pdf.

Application process. That approval was not granted until December 5, 2022, and the remaining 80 percent interest did not transfer to Bogert Investments until January 2023.

539. Measured against that timeline, SageTrader's regulatory record since March 2022 is as follows.

540. On July 20, 2022, four months after Bogert Investments' initial 20 percent acquisition and five months before FINRA approved the balance of the transaction, FINRA censured SageTrader and fined it $775,000 for failing to reasonably supervise potentially manipulative trading, including layering, spoofing, wash trades and marking the close, on its own platforms between 2013 and 2019.[35] NYSE Arca and Nasdaq BX entered parallel findings on substantially the same underlying conduct at approximately the same time, imposing further fines exceeding $170,000 in the aggregate and finding, in addition, that SageTrader failed to properly register at least ten and 18 individual employees, respectively, with those exchanges.

541. On or about February 6, 2023, after FINRA approved the full change of control and after the remaining 80 percent interest had transferred to Bogert Investments, FINRA censured SageTrader and fined it $100,000 for failing to tailor its anti-money-laundering programme to its business and to reasonably monitor for and report suspicious activity between April 2016 and June 2018, including through a policy under which SageTrader would not consider filing a Suspicious Activity Report against a trader until that trader had already been warned once and suspended once.[36]

---

[35] *See SageTrader, LLC*, FINRA Letter of Acceptance, Waiver, and Consent No. 2017053210201 (July 20, 2022), *available at* https://data-portal.finra.org/fda_documents/2022073705601%20SageTrader%2C%20LLC.%20CRD%20137862%20AWC%20lp%20%282023-1678407615397%29.pdf.

[36] *See SageTrader, LLC*, FINRA Letter of Acceptance, Waiver, and Consent No. 2022073705601 (Feb. 7, 2023) *available at* https://data-

542. On March 21, 2023, under the same new ownership, FINRA censured SageTrader and fined it $175,000 for three further violations: first, that SageTrader mismarked approximately 9.7 million order events, resulting in approximately 390,000 executions marked long that should have been marked short, because SageTrader mismarked its own principal short sales in connection with its handling of customer orders on a net basis; second, that between July 2017 and February 2018 SageTrader failed to locate shares available for borrowing for approximately 490,000 principal short sales, in violation of Rule 203(b)(1) of Reg SHO; and third, that from July 2017 through August 2022, a date eight months after Bogert Investments' initial acquisition and four months before FINRA's approval of the balance of the transaction, SageTrader failed to establish, maintain and enforce a supervisory system reasonably designed to achieve compliance with Reg SHO and related FINRA rules.[37]

543. On September 20, 2023, eight months after the new ownership took full control, NYSE Arca censured SageTrader and fined it $15,000 for violating the Market Access Rule, Rule 15c3-5 of the Exchange Act, and NYSE Arca's parallel supervisory rule, for a relevant period NYSE Arca's own order defines as running from January 2021 "through the present," meaning through the date of that order in September 2023.[38]

544. This timeline establishes that SageTrader's supervisory failures continued for at least eight months after new ownership first acquired an interest in the firm, that additional

---

portal.finra.org/fda_documents/2022073705601%20SageTrader%2C%20LLC.%20CRD%20137862%20AWC%20lp%20%282023-1678407615397%29.pdf.

[37] *See supra* n. 10.

[38] *See SageTrader, LLC*, NYSE Arca, Inc. Letter of Acceptance, Waiver, and Consent No. 2022-03-23-00030 (Sept. 20, 2023), *available at* https://www.nyse.com/publicdocs/nyse/markets/nyse-arca/disciplinary-actions/2023/2023-09-20_--_SageTrader,_LLC._-_AWC_--_No._2022-03-23-00030.pdf.

regulatory findings were entered against SageTrader nine and 11 months after that ownership acquired full control, and that the relevant period defined by at least one violation extended more than eight months beyond the completion of the change of control. A change in ownership does not, by itself, extinguish notice of obligations a firm's own regulatory history shows it already possessed, and SageTrader's record shows that whatever compliance measures accompanied its change of ownership did not eliminate the deficiencies addressed in the findings that followed.

545. The conduct particularized against SageTrader in Section IV above identifies 15 specific trading dates, the approximate number of shares SageTrader sold short on each, and the absence of any corresponding locate in the clearing firm's records for each date, supplying the who, what, when and how of the claims against SageTrader without regard to whether the underlying customer orders SageTrader accepted and entered came from an already-named Defendant or from a customer whose identity Plaintiff's continuing investigation will establish. SageTrader accepted and entered those orders under its own market participant identifiers by its own choice, on its own trading systems, applying its own locate practices, and its liability under Rule 203(b)(1) of Reg SHO and the claims for relief below does not depend on the identity of the customer whose order it accepted.

## VIII. <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I - Securities Fraud (Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)</u> (Against All Defendants)

546. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

547. Lunai's common stock is a "security" within the meaning of Section 3(a)(10) of the Exchange Act (15 U.S.C. § 78c(a)(10)) and is an "equity security" within the meaning of Section 3(a)(11) of the Exchange Act (15 U.S.C. § 78c(a)(11)).

548. Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others, including, but not limited to engaging in the fraudulent schemes described herein, and making materially false and misleading statements.

549. Particularized fraudulent conduct included executing short sales without valid locates or reasonable grounds to borrow; generating persistent FTDs; using sham reset transactions to evade close-outs; marking the close; painting the tape; wash trades; and spoofing/layering, each creating false market signals regarding supply, demand, and settlement integrity.

550. Defendants' scienter is established by Defendants' repeated zero-locate trading on known zero-borrow days, coordinated timing across multiple accounts and entities on peak dates, exploitation of Threshold list mechanics to evade buy-ins, and trading patterns that neutralized positive corporate news.

551. Scienter is separately and independently established as to each category of Defendant. As to the broker-dealer Defendants Lightspeed and Cobra, scienter is established by their own recent and repeated regulatory sanctions, described in Sections V and VI above, placing each on actual notice of the precise obligation — not to accept or introduce a short sale order without a documented, reasonable basis to believe the security could be borrowed — that each is alleged to have violated again here; by Lightspeed's operation, for a fee, of its own locate

mechanism whose log and billing records do not exist in its records; and by Cobra's receipt of 127 locate refusals against nil recorded inventory on the very sessions on which it introduced its customers' short sales. As to Opal, scienter is established by its own conduct: Opal requested no locate whatsoever, from any of its 41 customer accounts, at any time during the period, a complete absence of effort from which knowledge or recklessness may be inferred without resort to any prior sanction. As to the Customer Defendants, scienter is established by the trading patterns pleaded as to each: pre-market execution concentrations far above ordinary market activity, positions opened and closed at exactly nil within the trading day on a recurring basis, and, for those Customer Defendants who held accounts at more than one of the broker-dealer Defendants simultaneously, the distribution of trading activity across multiple nominally independent correspondents.

552. Plaintiff's reliance on the integrity of the market for LNAI, and on the settlement and locate representations inherent in the reported and cleared trading of its own stock, was reasonable and is independently supported by the fraud-on-the-market presumption applicable to securities traded in an efficient market such as Nasdaq, under which Plaintiff and the market are presumed to have relied on the integrity of the market price absent the concealed fraud pleaded herein.

553. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] ("Section 10(b)") and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] ("Rule 10b-5").

554. Section 10(b) and Rule 10b-5 allow private rights of action against primary violators of those provisions. *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).

555. As a direct and proximate result of Defendants' securities fraud and manipulative trading of the common stock of Lunai, Lunai suffered economic loss and damages including price suppression diminishing market capitalization, loss of access to capital on reasonable terms, increased cost of capital, index removal harm, reputational injury, and expenses associated with Nasdaq proceedings, with damages to be proven at trial.

**COUNT II - Market Manipulation (Section 9(a) of the Exchange Act)**
**(Against All Defendants)**

556. Plaintiff *realleges* and incorporates the foregoing paragraphs herein by reference.

557. Lunai's common stock is a "security" within the meaning of Section 3(a)(10) of the Exchange Act (15 U.S.C. § 78c(a)(10)).

558. Section 9(a) of the Exchange Act allows "any person who shall purchase or sell any security at a price which was affected by such act or transaction" to "sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction." 15 U.S.C. § 78i(f).

559. Section 9(a)(2) of the Exchange Act separately makes it unlawful "[t]o effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange … creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). LNAI common stock is registered on the Nasdaq Capital Market, a national securities exchange, within the meaning of Section 9(a)(2).

560. Defendants effected a series of transactions in LNAI, including the naked short sales, sham reset transactions, wash trades, and spoofing and layering activity pleaded throughout this Second Amended Complaint, that created actual and apparent active trading in LNAI and that raised or depressed the price of LNAI, within the meaning of Section 9(a)(2).

561. Defendants effected that series of transactions for the purpose of inducing the purchase or sale of LNAI common stock by others. That purpose is properly inferred from the pattern of conduct pleaded throughout this Second Amended Complaint: Defendants' trading was concentrated in pre-market and other thin-liquidity windows calculated to maximize price impact per share traded; Defendants' locate failures and sham resets were designed to create a false appearance of settled, bona fide supply that would influence other market participants' trading decisions; and Defendants' coordinated timing across nominally unrelated broker-dealers and customer accounts, described in Sections III through VII above, reflects a purpose beyond simply profiting from an independently formed view of LNAI's value — a purpose to move the market itself and to induce other holders and prospective purchasers of LNAI to sell, decline to buy, or otherwise trade at the artificial prices Defendants' own transactions created.

562. Lunai is an entity engaged in the purchase or sale of its common stocks, which terms include "the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance." 15 U.S.C. § 78c-2(b).

563. Lunai is an entity that purchased or sold securities at prices affected by Defendants' manipulative acts and transactions, and accordingly has statutory standing to sue under Section 9 independent of its status as issuer. During the period of manipulative trading alleged in this Second Amended Complaint, Lunai itself sold shares of its own common stock into the market at then-prevailing prices, including through an at-the-market offering programme under which the number of shares issued was a direct function of the market price, and through an exchange, on March 24, 2026, of $828,770 in secured indebtedness for 3,909,293 shares and 1,433,621 warrants priced at $0.21 per share — a transaction executed one week after the March 17, 2026 session on which the securities lending market recorded no LNAI inventory available to borrow. Each such sale

occurred at a price depressed by the manipulative trading pleaded herein, and each such sale required Lunai to issue a greater number of shares, at greater dilution to its existing stockholders, than it would have been required to issue absent Defendants' manipulation.

564. Defendants executed transactions that were manipulative by intent and design, including executing naked short sales without valid locates or reasonable grounds to borrow; generating persistent FTDs; using sham reset transactions to evade close-outs; marking the close; painting the tape; wash trades; and spoofing/layering, each creating false market signals regarding supply, demand, and settlement integrity. These manipulative trades were designed to and did create a false and misleading appearance of active trading, market depth, and price for LNAI, artificially depressed the company's stock price and misled market participants, including with respect to the market's assessment of the stock's value.

565. Defendants' FTD-generating sales involved no bona fide change in beneficial ownership and were effected to create artificial supply and manipulate price.

566. Lunai's price was affected by such acts and transactions, and Lunai sustained damages as a direct and proximate result, including capital market harms and listing-related injuries.

567. As a direct and proximate result of Defendants' manipulation of the price of Lunai's securities on the Nasdaq, Plaintiff has suffered damages in connection with and as a result of the manipulative trading of the common stock of Lunai.

**COUNT III - Racketeering Activity (18 U.S.C. §§ 1962, 1964(c))**
**(Against All Defendants)**

568. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

569. Title 18 United States Code section 1962, the federal Racketeering Influenced and Corrupt Organizations (RICO) statute, prohibits association with any enterprise "in the conduct of

such enterprise's affairs through a pattern of racketeering activity" and prohibits any conspiracy to so associate.

570. "Racketeering activity" includes "fraud in the sale of securities" and any act which is indictable under 18 U.S.C. § 1343.

571. Pursuant to 18 U.S.C. § 1964(c), a civil RICO plaintiff may not rely on conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962, unless the person against whom such claim is asserted has been criminally convicted in connection with the fraud, in which case the amendment does not bar the claim. To the extent this Count relies on securities fraud as a predicate act against any Defendant not so convicted, Plaintiff's civil RICO claim rests instead, and independently, on the predicate acts of wire fraud pleaded in Count III and re-alleged herein, which are separately indictable under 18 U.S.C. § 1343 without regard to whether the same conduct is also actionable as securities fraud.

572. Lightspeed, Cobra, Opal, the other broker-dealer Defendants, and the Customer Defendants who traded through them constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4): a group of persons associated together, in fact if not in form, for the common purpose of generating trading profit through the sale of LNAI shares that had not been borrowed or located, joined by the ongoing relationships pleaded above among broker-dealers sharing a common clearing infrastructure and among Customer Defendants who traded simultaneously through more than one of the broker-dealer Defendants, and possessing sufficient longevity to pursue that purpose across the six-month coordinated trading period alleged herein, from November 5, 2025 through May 4, 2026.

573. That enterprise satisfies the structural requirements articulated in *Boyle v. United States*, 556 U.S. 938, 946 (2009): it has a common purpose, in that its members share the object of

generating trading profit from short sales of LNAI shares that had not been borrowed or located; relationships among those associated with the enterprise, in that the broker-dealer Defendants share a common clearing infrastructure and the Customer Defendants who traded through more than one broker-dealer Defendant are connected through that shared infrastructure; and sufficient longevity to permit those associates to pursue the enterprise's purpose, in that the pattern pleaded above persisted across a six-month period and at least 17 coordinated trading dates.

574. Each Defendant conducted or participated in the conduct of the enterprise's affairs, within the meaning of 18 U.S.C. § 1962(c), through the operation or management of the enterprise's core function, and not merely through the provision of routine, ministerial services incidental to a legitimate business unrelated to the pattern of racketeering activity. Lightspeed operated and controlled the Short Request Window, the locate mechanism through which its own customers' short sale orders were purportedly, and in the overwhelming majority of instances were not, verified for borrow before acceptance. Cobra operated its own securities lending desk accounts and made the decision, on each occasion, to introduce a customer's short sale despite the refusals its own desk had received. Opal made the decision to introduce 41 customer accounts' short sale orders while making no locate request of any kind. Each such decision was a decision over the core locate-and-introduction function without which no Customer Defendant's short sale could reach the market, and each broker-dealer Defendant thereby directed the affairs of the enterprise rather than merely facilitating them.

575. Each broker-dealer Defendant's conduct, described above, satisfies the operation-or-management test of *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993), because each exercised control over the locate-and-introduction function that was indispensable to the enterprise's object,

rather than performing services that were merely ancillary to a legitimate business unconnected to the pattern of racketeering activity.

576. Defendants' predicate acts satisfy the pattern requirement of 18 U.S.C. § 1961(5). The predicate acts are related, sharing the common purpose of selling LNAI shares short without a borrow, the common participants identified throughout this Second Amended Complaint, the common methods of exploiting the locate process and pre-market execution windows, and the common victim, Lunai. The predicate acts also satisfy continuity: they were repeated on a coordinated basis across at least 17 trading dates over a period of six months, a closed period of sufficient duration and repetition to constitute continuity in its own right, and Plaintiff further alleges, upon information and belief, that Defendants' scheme was capable of continuing indefinitely but for its detection and the filing of this action, such that an open-ended threat of continuity independently exists.

577. The relatedness and continuity of Defendants' predicate acts, pleaded above, satisfy the pattern requirement articulated in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239–43 (1989), because the predicate acts are related to one another by common purpose, participants, methods and victim, and because they either extended over a substantial period sufficient to satisfy closed-ended continuity or, in the alternative, threatened repetition sufficient to satisfy open-ended continuity.

578. Pursuant to 18 U.S.C. § 1964, engaging in prohibited racketeering activity may give rise to civil liability for threefold damages sustained by the plaintiff and the cost of the suit to recover such damages.

579. Defendants associated together as an enterprise and conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.

580. From November 5, 2025 through and including May 4, 2026, Defendants engaged in repeated predicate acts on a common set of coordinated dates, across multiple accounts and entities, evidencing continuity and relationship, and concealed their activities via sham resets and evasion of Reg SHO close-out.

581. Defendants engaged in this coordinated pattern and practice of naked short selling knowingly, each with an intent to defraud and conceal their participation in the enterprise.

582. As a direct and proximate result of Defendants' racketeering activity, Lunai suffered injury to business and property, including depressed equity value, impaired ability to transact for shareholder benefit, elevated capital costs, and listing-related burdens and expenses.

583. As a direct and proximate result of Defendants' racketeering activity, Defendants harmed Plaintiff-Lunai's Delaware corporate interests, including impairment of corporate fundraising initiatives, strategic transactions, and shareholder value accretion.

584. As a direct and proximate result of Defendants' racketeering activity, Plaintiff has suffered damages in connection with and as a result of the manipulative trading of the common stock of Lunai.

585. Lunai seeks treble damages and costs as permitted by statute.

586. In the alternative, and independently of the substantive violation of 18 U.S.C. § 1962(c) pleaded above, each Defendant violated 18 U.S.C. § 1962(d) by agreeing to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. Each Defendant's knowing participation in the coordinated trading pattern

pleaded throughout this Second Amended Complaint, including the overlapping account relationships, common clearing infrastructure, and uniform pattern of execution and locate failure described in Sections III through VII above, supports a reasonable inference that each Defendant agreed that the enterprise's affairs would be conducted through such a pattern, even as to those Defendants whose own conduct might not independently satisfy the operation-or-management test for a substantive violation of Section 1962(c).

**COUNT IV - Common Law Fraud**
**(Against All Defendants)**

587. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

588. Common law fraud under Delaware law requires (1) a false representation, usually one of fact; (2) the defendant's knowledge or belief that the representation was false, or that it was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance on the representation; and (5) damage to the plaintiff as a result of that reliance. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005). Delaware recognizes that a plaintiff's justifiable reliance may rest on the integrity of a market price where, as pleaded here, the false representation was communicated to the market rather than directly to the plaintiff; the elements otherwise apply without modification.

589. Defendants made false representations of present fact and engaged in deceptive conduct, including representing that short sales were compliant and settled when Defendants had not borrowed or arranged to borrow shares and used sham resets to falsely signal close-outs and delivery.

590. Defendants knew or were recklessly indifferent to the falsity of these representations and deceptive practices, acting with intent to defraud, depress Lunai's stock, and profit from the artificial price decline.

591. Defendants intended that market participants, intermediaries, regulators, and Lunai rely on the false appearance of lawful settlement, genuine market supply, and compliant trading in LNAI, including through reported consolidated tape data and clearing records.

592. Lunai reasonably and justifiably relied on the integrity of the market, the apparent settlement of trades, and compliance with Reg SHO when making corporate decisions regarding capital raising, investor relations, disclosures, and strategic transactions; to the extent additional particulars of reliance are required, Lunai alleges reliance on the fraud-on-the-market presumption for price integrity.

593. Defendants knew that the representations they made were false or with reckless indifference to the truth.

594. As a direct and proximate result, Lunai suffered damages including price suppression, increased cost of capital, index removal harm, reputational injury, and listing-related expenses, all to be proven at trial.

595. Defendants' false representations and deceptive conduct, Defendants' scienter, Defendants' intent, Plaintiff's reasonable reliance, and resulting damages to Plaintiff satisfy the elements of common law fraud.

**COUNT V - Tortious Interference with Contract**
**(Against All Defendants)**

596. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

597. As an issuer with securities listed on the Nasdaq Capital Market, Plaintiff is a party to a contract with the Nasdaq in the form of a Listing Agreement.

598. Each Nasdaq-listed issuer is party to a Listing Agreement as a pre-condition to listing. That Listing Agreement with Nasdaq requires, *inter alia*, that companies comply with Nasdaq rules, including sustaining the $1.00 minimum bid price and maintaining minimum stockholders' equity.

599. As parties sophisticated in securities trading, each Defendant was aware that Plaintiff is a party to a Listing Agreement with Nasdaq.

600. Defendants, each of whom is a sophisticated securities market participant, knew or was substantially certain that Lunai had Listing Agreement obligations and that sustained price depression risked bid-price deficiency and related sanctions, each of which would have a further depressive effect on the price of Lunai stock.

601. Defendants intentionally engaged in manipulative trading practices, being naked short selling, FTD generation, close-out evasion, marking the close and painting the tape, designed to and that did depress Lunai's stock price, functioning as the primary factor causing Lunai's Bid Price Rule deficiency and triggering Nasdaq proceedings.

602. Defendants' manipulative trading was a significant factor in causing Lunai's actual non-compliance with the Bid Price Rule and the Stockholders' Equity Rule incorporated into its Listing Agreement, each an independent condition of continued listing, and thereby caused Lunai's breach of, or non-performance under, that agreement notwithstanding any compliance period Nasdaq rules afford before delisting follows; the availability of a cure period mitigates the ultimate sanction but does not cure the underlying non-compliance that Defendants' conduct caused. In the alternative, and without conceding that a formal breach is required, Defendants' conduct constitutes tortious interference with Lunai's prospective business and contractual relations, including its continued eligibility for listing on the Nasdaq Capital Market and its relationships

with existing and prospective investors and lenders, each disrupted by the price depression and dilution Defendants' manipulative trading caused.

603. Defendants lacked justification or privilege to interfere with Lunai's performance under its Listing Agreement, and their conduct directly and proximately caused Lunai to incur substantial harm, including costs to contest delisting, reputational damage, and market capitalization loss linked to contractual non-compliance exposure.

604. Defendants' manipulative trading scheme had no justification and caused Plaintiff substantial injury through the damage to Plaintiff's stock price and the material burden of contesting the Nasdaq's delisting determination.

605. Lunai suffered damages as a result of Defendants' interference, including legal and administrative costs, increased cost of capital, and further losses associated with bid-price and equity compliance remediation.

**COUNT VI – Civil Conspiracy**
**(Against All Defendants)**

606. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

607. Civil conspiracy under Delaware law requires (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of that confederation; and (3) damages to Plaintiff resulting from that act. *CMS Inv. Holdings, LLC v. Castle*, C.A. No. 9468-VCP, 2015 WL 3894021 (Del. Ch. June 23, 2015); *O'Gara v. Coleman*, C.A. No. 2018-0708-KSJM (Del. Ch. Feb. 14, 2020). Civil conspiracy is not itself an independent tort under Delaware law; it is a theory of liability that extends responsibility for an underlying wrong to every person who combined with another to accomplish it, regardless of which particular Defendant personally executed any given unlawful act. The underlying wrongs pleaded here are the securities fraud,

market manipulation, wire fraud, and tortious interference with contract alleged in Counts I, II, III and VI above, and the racketeering activity alleged in Count IV above.

608. Two or more Defendants combined for the object and course of action of selling LNAI common stock short without having borrowed, arranged to borrow, or having reasonable grounds to believe the shares sold could be borrowed and delivered, and of doing so through the coordinated use of the common clearing infrastructure and correspondent broker-dealer relationships described in Section III above, for the purpose of artificially depressing the trading price of LNAI common stock to Defendants' economic advantage and Plaintiff's detriment.

609. A meeting of the minds among the confederating Defendants is properly inferable at the pleading stage from the pattern of coordinated conduct alleged throughout this Second Amended Complaint: the customer accounts held simultaneously at more than one of the broker-dealer Defendants by the same person at the same recorded address, described in Sections III and V above; the fragmentation of individual trading positions across multiple nominally independent accounts under common control described in Section V above; the uniform pattern of pre-market execution concentration and locate failure replicated across broker-dealer Defendants that share no corporate relationship with one another, described in Sections III, V, VI and VII above; and the recurrence of coordinated selling by multiple Defendants on the same primary trading dates, described in Section IV above. Parallel conduct of that consistency and specificity, replicated across nominally unrelated broker-dealers and customer accounts on the same trading dates over a period of six months, supports a reasonable inference of agreement beyond mere coincidence.

610. Delaware law does not require direct evidence of an express agreement to plead civil conspiracy; a meeting of the minds may be, and regularly is, inferred at the pleading stage from circumstantial evidence of coordinated conduct. *O'Gara v. Coleman*, C.A. No. 2018-0708-

KSJM, at *8 (Del. Ch. Feb. 14, 2020). The parallel conduct pleaded above is accompanied by the additional, case-specific indicia of agreement Delaware courts require beyond mere parallelism: shared personnel and addresses among nominally independent accounts, shared clearing infrastructure among nominally independent broker-dealers, and a consistency of timing and technique that has no ready explanation other than coordination.

611. Each Defendant committed one or more unlawful, overt acts in furtherance of that combination, including the acceptance, introduction, execution and clearing of naked short sales of LNAI common stock without a valid locate, each such act separately constituting securities fraud, market manipulation, wire fraud or tortious interference as alleged in Counts I, II, III and VI above.

612. As a direct and proximate result of Defendants' conspiracy and the unlawful acts committed by its participants in furtherance of it, Plaintiff suffered damages including the artificial depression of its stock price, increased cost and difficulty of capital formation, dilution from capital raised at manipulated prices, and the costs of contesting Nasdaq's Bid Price Rule and Stockholders' Equity Rule deficiency determinations, each as alleged above.

**<u>COUNT VII – Fraudulent Misrepresentation</u>**
**(Against All Defendants)**

613. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

614. Common law fraud under Delaware law requires (1) a false representation, usually one of fact; (2) the defendant's knowledge or belief that the representation was false, or that it was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance on the representation; and (5) damage to the plaintiff as a result of that reliance. *Stephenson v. Capano Dev., Inc.*, 462

A.2d 1069, 1074 (Del. 1983); *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005).

615. Plaintiff does not allege that any Defendant made a representation directly to Plaintiff. The false representation pleaded in this Count is the representation each Defendant made, by the act of entering each short sale order pleaded in this Second Amended Complaint, to the market on which LNAI traded, to the counterparties who took the other side of each such order, and to the clearing and settlement system through which each such order was processed.

616. Every short sale order carries, by the structure of Reg SHO and the antifraud rule the Securities and Exchange Commission adopted specifically to address naked short selling, an implicit representation that the seller has borrowed the security, has entered a bona fide arrangement to borrow it, or has reasonable grounds to believe it can be borrowed and delivered by settlement date. 17 C.F.R. §§ 242.203(b)(1), 242.10b-21; Adoption of "Naked" Short Selling Antifraud Rule, 73 Fed. Reg. 61666 (Oct. 17, 2008) (adopting Rule 10b-21 to address deception, through the entry of a sale order, of a broker-dealer, participant of a registered clearing agency, or purchaser about the seller's intention or ability to deliver securities). Defendants' entry of each short sale order pleaded in this Second Amended Complaint, on a security for which records reflect no corresponding locate and no lendable inventory, was therefore a false representation of fact: a representation that the Defendant entering the order had satisfied a locate requirement that, on the record pleaded in this Second Amended Complaint, it had not satisfied.

617. Each Defendant knew, or was recklessly indifferent to whether, that representation was false. The broker-dealer Defendants' knowledge is independently established by the notice and scienter allegations pleaded in Count I and in Sections III, V, VI and VII above. Each Customer

Defendant's knowledge or reckless indifference is established by the trading-pattern allegations pleaded as to each such Defendant in Section IV above.

618. Each Defendant intended that its false representation be relied upon. A short sale order that did not carry a credible representation of a valid locate would not have been accepted for execution by the broker-dealer Defendants, would not have been executed by the counterparties on the other side of each trade, and would not have cleared and settled through the ordinary mechanisms of the market. Defendants' representations were therefore made for the purpose of, and were necessary to, inducing the market's acceptance and execution of the orders pleaded in this Second Amended Complaint.

619. Plaintiff and the market for LNAI common stock justifiably relied on the integrity of Defendants' representations. Plaintiff itself sold shares of its own common stock into the market at then-prevailing prices during the period, including through the at-the-market offering programme and the debt-for-equity exchange described in Count II above, and in doing so relied on the market price of LNAI as an accurate reflection of genuine supply and demand, undistorted by short sales that misrepresented the availability of a valid locate. That reliance was justified because Plaintiff, like any issuer or public investor, had no means of testing, order by order, whether a given short sale carried a valid locate; the representation implicit in each order's acceptance and execution was the assurance the market, and Plaintiff, received.

620. As a direct and proximate result of Plaintiff's justifiable reliance on the integrity of the market for LNAI common stock, and of the false representations that induced it, Plaintiff suffered damages including the artificial depression of its stock price, dilution from capital raised at manipulated prices, and the costs of contesting Nasdaq's Bid Price Rule and Stockholders' Equity Rule deficiency determinations, each as alleged above.

## IX. JURY TRIAL DEMANDED

621. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all the issues so triable.

## X. REQUESTED RELIEF

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff against Defendants:

1. For compensatory and special damages in an amount to be determined at trial, including treble damages;
2. For injunctive relief;
3. For prejudgment interest and post-judgment interest;
4. For costs incurred in this action;
5. For reasonable attorneys' fees; and
6. For such other and further relief as the Court deems just and appropriate.

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman (DE ID 3702)
Carmella L. Cinaglia (DE ID 7032)
FOX ROTHSCHILD LLP
1201 N. Market St., Suite 1200
Wilmington, DE 19801
Tel.: (302) 622-4237
sliebesman@foxrothschild.com
ccinaglia@foxrothschild.com

Jacob S. Frenkel (*admitted pro hac vice*)
Brian S. Yu (DE ID 6482)
DICKINSON WRIGHT PLLC
1825 I Street, N.W., Suite 900
Washington, D.C. 20006
Tel: (202) 457-0160
jfrenkel@dwlaw.com
byu@dwlaw.com

Dated: August 26, 2026

*Attorneys for Plaintiff*